# Hernandez v. Board of County Commissioners County of Grant, New Mexico

United States District Court, D. New Mexico. | August 31, 2005 | Not Reported in Fed. Supp. | 2005 WL 8163603

**Document Details**

| | |
|---|---|
| standard Citation: | Hernandez v. Bd. of Cnty. Commissioners Cnty. of Grant, New Mexico, No. CIV 05-0397 DJS/LFG, 2005 WL 8163603 (D.N.M. Aug. 31, 2005) |
| All Citations: | Not Reported in Fed. Supp., 2005 WL 8163603 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | New Mexico |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**

Attorneys and Law Firms (p.1)
MEMORANDUM OPINION AND ORDER (p.1)
All Citations (p.2)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 8163603
Only the Westlaw citation is currently available.
United States District Court, D. New Mexico.

Sandra HERNANDEZ, Desiree Reyes,
Leticia Rodriguez, and Liz Villalba, Plaintiffs,
v.
BOARD OF COUNTY COMMISSIONERS
COUNTY OF GRANT, NEW MEXICO,
Louis Tavizon, and Steve Reese, Defendants.

No. CIV 05-0397 DJS/LFG
|
Filed 08/31/2005

**Attorneys and Law Firms**

Mark D. Jarmie, Jarmie & Associates, Albuquerque, NM, for Plaintiffs.

Mark A. Basham, Basham & Basham PC, Santa Fe, NM, Robert W. Becker, Stephen G. French, French & Associates, PC, Jonlyn M. Martinez, William D. Slease, Slease & Martinez, P.A., Albuquerque, NM, for Defendants.

**MEMORANDUM OPINION AND ORDER**

DON J. SVET, UNITED STATES MAGISTRATE JUDGE

***1 THIS MATTER** is before the Court on Plaintiffs' Motion for Entry of Default Judgment Against Defendant Tavizon **[Doc. No. 25]**, filed August 2, 2005. Plaintiffs move the Court for entry of a default judgment against Defendant Tavizon pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure. Plaintiffs claim Defendant Tavizon "has failed to plead or otherwise properly defend as provided by the Federal Rules of Civil Procedure." Mot. for Entry of Default J. at 2. Specifically, Plaintiffs contend Defendant Tavizon has not answered the counts of the First Amended Complaint "for which he has not filed a Rule12 motion" and therefore they seek a default judgment as to these counts.

Plaintiffs frame the issue as "whether a defendant must answer certain counts contained in a complaint within 20 days after service of the complaint, even though the remaining counts of the complaint are the subject of pending Rule 12 motions...." Mem. in Support of Mot. for Entry of Default J. at 4. Plaintiffs rely on *Gerlach v. Michigan Bell Telephone Co.*, 448 F.Supp. 1168 (E.D. Mich. 1978) for their position that because Defendant Tavizon filed a Rule 12(b)(6) motion to dismiss and a 12(e) motion for a more definitive statement and those motions addressed only some of the claims contained in a Plaintiffs' First Amended Complaint, then Defendant Tavizon must file an answer as to those claims not addressed by the Rule 12 motions.

In *Gerlach*, defendants filed a motion to dismiss counts three through six of the plaintiff's complaint. Defendants' motion did not address the first two counts of plaintiff's complaint. The court held that a partial motion to dismiss did not alter the time limits of Rule 12(a)(1)(A) with respect to the claims not addressed in the defendant's motion. *Gerlach*, 448 F.Supp. at 1174. Rule 12(a)(1)(A) requires that a defendant file an answer within 20 days after a complaint has been served. The court reasoned that separate counts are independent bases for lawsuits and thus defendants were required to proceed with litigation on those counts which they did not challenge in their 12(b) motion. *Id.*

The initial effect of a motion under Rule 12(b) is to extend the time within which an actual "responsive pleading" must be filed. Thus, a motion to dismiss functions as a tolling mechanism that extends the time within which an answer must be filed. As previously noted, Rule 12(a)(1)(A) requires that a defendant file an answer within 20 days after a complaint has been served. However, Rule 12(a) does not speak to what is required in the common situation of a partial motion to dismiss under Rule 12(b). In this case, Defendant Tavizon filed a partial motion to dismiss and a motion for a more definitive statement as to Count VI of Plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) and 12(e), respectively. Rule 12(b) states in pertinent part:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, *shall be asserted in the responsive pleading* thereto if one is required, except that *the following defenses may at the option of the pleader be made by motion* ... (6) failure to state a claim upon which relief can be granted.... A motion making any of these defenses shall

be made before pleading if a further pleading is permitted.

***2** Fed.R.Civ.P. 12(b)(emphasis added). Rule 12(e) states in pertinent part: "If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party *may move* for a more definitive statement *before interposing a responsive pleading.*" Fed.R.Civ.P. 12(e)(emphasis added). In this case, Defendant Tavizon opted to file motions pursuant to Rule 12 rather than filing an Answer to Plaintiffs' First Amended Complaint.

The majority of courts that have addressed this question have held that a partial motion to dismiss, i.e., a Rule 12(b) motion addressing fewer than all of the plaintiff's claims, extends the time for answering all claims. *See Baker v. Universal Die Casting, Inc.*, 725 F.Supp. 416 (W.D. Ark. 1989)("[F]iling of any motion to dismiss based upon the defenses listed in Rule 12(b)(1), (6) results in the responsive pleadings not becoming due until ten days after notice of the court's action."); *Brocksopp Engineering, Inc. v. Back-Simpson LTD*, 136 F.R.D. 485 (E.D. Wis. 1991)("I decline to adopt the *Gerlach* court's interpretation of Rule 12(a). By my reading of the rule's language, a partial 12(b) motion enlarges the time to file an answer."); *Ricciuti v. New York City Transit Auth.*, 1991 WL 221110 (S.D.N.Y. 1991)("I decline to follow *Gerlach*. Were it necessary to serve an answer in piecemeal fashion, as *Gerlach* suggests, a procedural thicket would emerge."); *Circuit City Stores, Inc. v. Citgo Petroleum Corp.*, 1994 WL 483463 (E.D. Pa. 1994)(same); *Schwartz v. Berry College*, 1997 WL 579166 (N.D. Ga. 1997)("Significant case law and one of the most authoritative treatises on Federal Practice and Procedure supports Defendants' position that, when a defendant files a Rule 12(b)(6) motion to dismiss, addressing only some of the claims contained in the plaintiff's complaint, the defendant is not required to file an answer until the court rules on the motion to dismiss."); *Finnegan v. University of Rochester Medical Center,* 180 F.R.D. 247 (W.D.N.Y. 1998)("[T]he weight of the case authority (which is not extensive) holds that the filing of a motion that only addresses part of a complaint suspends the time to respond to the entire complaint, not just to the claims that are the subject of the motion."); *Godlewski v. Affiliated Computer Services, Inc.*, 210 F.R.D. 571 (E.D. Va. 2002)("The *Gerlach* court's resolution of the issue under the minority approach is, in this court's opinion, unnecessarily formalistic at the expense of sound policy and judicial economy."). *See also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1346 (3d ed. 2002)("[T]he weight of the limited authority on this point is to the effect that the filing of a [Rule 12(b) ] motion that only addresses part of a complaint suspends the time to respond to the entire complaint, not just to the claims that are the subject of the motion. Courts following this majority rule have noted that the minority approach would require duplicative sets of pleadings in the event that the Rule 12(b) motion is denied and cause confusion over the proper scope of discovery during the motion's pendency.").

The Court finds that the majority view is better reasoned and will not adopt the position taken by the court in *Gerlach*. Accordingly, Plaintiffs' Motion for Entry of Default Judgment Against Defendant Tavizon is denied.

***3 NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Entry of Default Judgment Against Defendant Tavizon is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8163603

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# DeWilde v. Attorney General of

United States District Court, D. Wyoming. | October 16, 2024 | Not Reported in Fed. Supp. | 2024 WL 4643681

**Document Details**

| | |
|---|---|
| standard Citation: | DeWilde v. Att'y Gen. of, No. 24-CV-84-SWS, 2024 WL 4643681 (D. Wyo. Oct. 16, 2024) |
| All Citations: | Not Reported in Fed. Supp., 2024 WL 4643681 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Wyoming |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**


Attorneys and Law Firms (p.1)
**ORDER GRANTING DEFENDANTS' 12(b)(6) MOTION TO DISMISS** (p.1)
All Citations (p.7)


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4643681
Only the Westlaw citation is currently available.
United States District Court, D. Wyoming.

Jake Stanley DEWILDE, Plaintiff,
v.
ATTORNEY GENERAL OF the United States; and Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Defendants.

Case No. 24-CV-84-SWS
|
Signed October 16, 2024

**Attorneys and Law Firms**

Jake Stanley DeWilde, Wapiti, WY, Pro Se.

Jeremy A. Gross, United States Attorney's Office, Cheyenne, WY, Jeremy S. B. Newman, Department of Justice Civil Division, Federal Programs Branch, Washington, DC, Defendants.

## ORDER GRANTING DEFENDANTS' 12(b)(6) MOTION TO DISMISS

Scott W. Skavdahl, Chief United States District Judge

***1** Plaintiff seeks to construct a machinegun and filed this lawsuit asking for a judicial declaration that 18 U.S.C. § 922(o) is facially unconstitutional. (ECF 1.) The matter is before the Court on the Defendants' Motion to Dismiss the Complaint (ECF 10) and supporting memorandum (ECF 11). Plaintiff filed an opposition to dismissal (ECF 12), and Defendants replied (ECF 13). With the Court's leave, Plaintiff also submitted notice of supplemental authority (ECF 16), to which Defendants responded (ECF 17). Having considered the parties' submissions, reviewed the record herein, and being otherwise fully advised, the Court finds and concludes Plaintiff's complaint must be dismissed for failure to state a claim on which relief can be granted.

## STANDARD OF ADJUDICATION

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal of a claim or complaint that fails "to state a claim upon which can be granted." As with all 12(b)(6) motions, the Court accepts the complaint's well-pled factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 570 (2007)). In this case, though, Defendants do not contend the complaint's factual allegations are lacking; instead, Defendants argue the complaint's legal premise is incorrect and does not entitle Plaintiff to any relief. Dismissal under Rule 12(b)(6) "is appropriate if the law simply affords no relief." *Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011). One of the purposes of Rule 12(b)(6) "is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citing *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989)).

## BACKGROUND

The Second Amendment to the U.S. Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Plaintiff Jake Stanley DeWilde filed this action for declarative and injunctive relief, claiming that 18 U.S.C. § 922(o) and its implementing federal regulation, 27 C.F.R. § 479.105(a), unconstitutionally ban the transfer or possession of machineguns in violation of the Second Amendment. [1] Throughout this Order, the term "machinegun" is used to refer to a weapon capable of automatically firing more than one round by a single function of the trigger, as generally defined by federal statute. 26 U.S.C. § 5845(b).

1 Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun" except for transfers or possession of machineguns "under the authority of" a federal or state governmental agency, or "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect [May 19, 1986]." 18 U.S.C. § 922(o). The federal regulation 27 C.F.R. § 479.105(a), provides that applications to make. transfer, or import a machinegun will not be approved where such making, transfer, or receipt of the machinegun violates the law, including § 952(o).

***2** Mr. DeWilde has a concrete desire and plan to construct an M16 machinegun, so he applied to the Bureau of Alcohol, Tobacco, Firearms, and Explosives for approval to make the M16 rifle. (ECF 1-1.) The ATF denied his application to make an M16 machinegun, concluding it would violate the Firearm Owners' Protection Act of 1986, of which 18 U.S.C. § 922(o) is included. (ECF 1-2, 1-3.) Based on at least one recent federal prosecution for unlawful machinegun possession in the District of Wyoming, Mr. DeWilde realistically fears criminal prosecution were he to go ahead and build the machinegun without approval from the ATF. (ECF 1-1.)

In this lawsuit, Mr. DeWilde relies on recent U.S. Supreme Court precedent to argue that § 922(o) is "facially unconstitutional" because it violates the Second Amendment. (ECF 1 p. 1.) Accordingly, he asks the Court to issue a declaratory judgment determining § 922(o) is "facially unconstitutional" and issue an injunction requiring the ATF to approve his application to build the M16 machinegun. (ECF 1 p. 7.) Unlike Mr. DeWilde's previous lawsuit challenging § 922(o), his standing to bring the claim in this case is not contested. [2]

2 *See* *DeWilde v. Att'y Gen. of United States*, No. 23-8054, 2024 WL 1550708, at *1 (10th Cir. Apr. 10, 2024) (affirming this Court's dismissal of Mr. DeWilde's prior suit for lack of standing). For the instant action, the Court finds Mr DeWilde has asserted an injury in fact sufficient to grant him standing to challenge the denial of his machinegun approval.

Defendants seek dismissal of Mr. DeWilde's complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted, arguing § 922(o) is constitutionally sound as a matter of law. Mr. DeWilde, naturally, disagrees with Defendants' assessment of the law.

## DISCUSSION

Mr. DeWilde expressly limited his pro se complaint to assert only a facial challenge to § 922(o)'s machinegun restriction. (*See* ECF 1.) However, the Court liberally construes Mr. DeWilde's pro se complaint [3] as asserting both a facial and an as-applied challenge to § 922(o)'s machinegun restrictions. More on the differences between these two challenges will be discussed below.

3 Because Mr. DeWilde proceeds pro se (without the assistance of counsel) in this matter, the Court liberally construes his filings, but it cannot act as his advocate. *See* *Luo v. Wang*, 71 F.4th 1289, 1291 n.1 (10th Cir. 2023).

"Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*; *see also* *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 80 (2022) (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations."). Two of the Second Amendment's limitations will control the outcome of this case and require dismissal of Mr. DeWilde's complaint for failure to state a claim on which relief can be granted.

First, as Mr. DeWilde's supplemental authority explained, one of the Second Amendment's limitations is that it applies to weapons one can "bear," i.e., carry. *See* *Heller*, 554 U.S. at 584 ("At the time of the founding, as now, to 'bear' meant to 'carry.' ") This limitation defeats Mr. DeWilde's facial attack upon § 922(o) because § 922(o) also applies to circumstances involving automatic-firing weapons that are not carriable.

Second, if Mr. DeWilde's pro se complaint could be liberally construed to allege an as-applied challenge to § 922(o), the Second Amendment protects the right to keep and carry the sorts of weapons "in common use at the time." *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). As this Court explained in Mr. DeWilde's previous lawsuit, machineguns are not in common use, and Mr. DeWilde's argument that the U.S. military's use of machineguns places them in common use does not win the day. Thus, the Second Amendment does not create in Mr. DeWilde any right to keep and bear a machinegun, which defeats any as-applied challenge to § 922(o). Moreover, even if the Second Amendment could be found to apply to Mr. DeWilde's desire to possess an M16 machinegun, the restriction on such in 922(o) is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (2022) (internal quotation omitted).

### 1. Mr. DeWilde's express facial challenge to § 922(o) fails under his own supplemental authority.

***3** Mr. DeWilde's complaint expressly asserts that § 922(o) is facially unconstitutional. "Facial challenges are disfavored for several reasons." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). Some bases for disfavoring facial challenges include the fact that they often rely on speculation, they demand the Court ignore judicial restraint, and they can overturn laws before the laws can be otherwise implemented in a constitutional manner. *Id.* The U.S. Supreme Court "has therefore made facial challenges hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). "[A] plaintiff can only succeed in a facial challenge by 'establishing that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange*, 552 U.S. at 449 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also United States v. Streett*, 434 F. Supp. 3d 1125, 1172 (D.N.M. 2020), *aff'd*, 83 F.4th 842 (10th Cir. 2023) (stating that a successful facial challenge "requires that there exists 'no [other, theoretical] set of circumstances' in which the law could be constitutionally applied") (alteration in original) (quoting *Salerno*, 481 U.S. at 745); *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.").

Here, the supplemental authority provided by Mr. DeWilde (ECF 16) demonstrates why he cannot prevail on his facial challenge to § 922(o). Mr. DeWilde supplemented his opposition to dismissal with a recent decision issued by the United States District Court for the District of Kansas in *United States v. Tamori Morgan*, No. 23-10047-JWB, 2024 WL 3936767 (D. Kan. Aug. 26, 2024). There, the trial judge dismissed certain criminal charges after determining § 922(o) was unconstitutional as applied to the circumstances in that case. Significantly for Mr. DeWilde's case, though, the District of Kansas first explained why a facial challenge to § 922(o) fails:

> The Tenth Circuit has yet to apply *Bruen* to § 922(o). Therefore the court starts its analysis at the beginning: the statutory text. Section 922(o) generally makes it unlawful to "possess a machinegun." *Id.* Section 922 incorporates the definition of machinegun from 26 U.S.C. § 5845, which defines that term as
>
>> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.
>
> § 5845(b). The court notes that this definition is extremely broad. It does not, for instance, include a projectile in the definition like the definitions for a "rifle" or "shotgun" do under 18 U.S.C. § 921 or § 5845. Nor does it require that a projectile or "shot" be expelled through the energy of an explosive or other propellant, as contemplated under the definitions of "rifle," "shotgun," "any other weapon" and "destructive" device" in § 5854(c) through (f), or the definitions of a "firearm," "shotgun," or "rifle" in § 921(a). Thus, this definition seems to encompass everything from an aircraft-mounted automatic cannon to a small hand-held taser or stun gun that can easily be placed inside a handbag and which shoots multi-shot bursts of electrical particles with a single pull of the trigger, or a fully automatic BB gun that shoots multiple rounds of metal projectiles using compressed air. The court is not, of course, faced with a situation where the government has charged someone under § 922(o) with illegal possession of a taser or a BB gun. But the example of the aircraft-mounted gun seems fatal to Defendant's facial challenge. Defendant fails to show how an example like that would constitute a "bearable arm" within the Second Amendment's protection. And to succeed on a facial challenge, Defendant must show that § 922(o) is unconstitutional in all its applications. *Rahimi*, 144 S. Ct. at 18[9]8.

***4** *Morgan*, 2024 WL 3936767, at *1–2.

"[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). "As *Heller* explained, the term [bearable arm] includes any '[w]eapo[n] of offence' or 'thing that a man wears for his defence, or takes into his hands,' that is 'carr[ied] ... for the purpose of offensive or defensive action.' " *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (second, third, and fourth alterations in original) (quoting *Heller*, 554 U.S. at 581, 584). Thus, the Second Amendment applies to wearable or carriable weapons or instruments of defense.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The District of Kansas readily identified a situation to which the Second Amendment would not apply (an aircraft-mounted cannon can automatically fire multiple rounds from a single trigger function but is not a carriable weapon), and therefore the Second Amendment would not preclude § 922(o)'s regulation of such a machinegun. Mr. DeWilde has not shown that § 922(o) is unconstitutional on its face in all its potential applications. His supplemental authority establishes that the law simply affords no relief for his facial attack upon § 922(o), and therefore the facial challenge will be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

**2. <u>Had Mr. DeWilde asserted an as-applied challenge, it too would fail.</u>**

Mr. DeWilde expressly limited his complaint to a facial challenge upon § 922(o). (*See* ECF 1.) However, if his complaint could be liberally construed to also assert an as-applied challenge, it too would be dismissed for failure to state a claim on which relief can be granted.

"[A]n as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the particular circumstances of the case." *Carel*, 668 F.3d at 1217 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007)). When challenging a law as applied, challengers "seek to vindicate their own rights based on their own circumstances." *Scherer v. U.S. Forest Service*, 653 F.3d 1241, 1245 (10th Cir. 2011).

The significant circumstances of Mr. DeWilde's particular case include the following: (1) Mr. DeWilde is not otherwise dispossessed of his firearm rights under federal law (e.g., he is not a convicted felon, he is not subject to a domestic violence restraining order, etc.[4]); (2) Mr. DeWilde seeks an M16 machinegun, an automatic rifle regularly issued to military personnel, for apparently lawful reasons, including the defense of his home and family; (3) Mr. DeWilde applied to the ATF for permission to construct an M16 automatic rifle from an existing AR-15 semiautomatic rifle; and (4) the ATF denied Mr. DeWilde's application, seemingly due to § 922(o), which provides that machineguns may only be transferred to or possessed by government agencies for official use (*see* ECF 1-2 p. 9; ECF 1-3 p. 2).

4 *See* 18 U.S.C. § 922(g).

***5** In *Bruen*, the U.S. Supreme Court created a two-step test for analyzing alleged violations of the Second Amendment:

(1) Does the Second Amendment's plain text cover the individual's alleged or desired conduct, which would presumptively protect such conduct?

(2) If so, has the Government justified the challenged regulation by showing it is consistent with the United States' historical tradition of firearm regulation?

*See Bruen*, 597 U.S. at 24.

**2.1 <u>The Second Amendment does not cover or presumptively protect Mr. DeWilde's desire to build and possess an M16 machinegun.</u>**

The first step in the *Bruen* analysis "demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. The Second Amendment's "operative clause—'the right of the people to keep and bear Arms shall not be infringed'—'guarantee[s] the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia." *Id.* at 20 (quoting *Heller*, 554 U.S. at 592).

Significant to Mr. DeWilde's claim, one of the limitations on the Second Amendment recognized by the U.S. Supreme Court is that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Heller*, 554 U.S. at 623 (discussing *United States v. Miller*, 307 U.S. 174 (1939)). More specifically, "the sorts of weapons protected were those 'in common use at the time.' " *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179); *see Bruen*, 597 U.S. at 32 (concluding the Second Amendment protects "carrying handguns publicly for self-defense" in part because "handguns are weapons 'in common use' today for self defense").

Mr. DeWilde contends, "The M16 rifle, and its variants, are the standard small-arms weapons in common use by the United States military." (ECF 1 p. 5.) Accordingly, asserts Mr. DeWilde, "The M16 is the quintessential rifle for use in the modern militia, just as the musket was the quintessential rifle for use in the militia of the colonial and revolutionary war era." (*Id.*) He essentially argues that the U.S. military's use of machineguns like the M16 places machineguns "in common use," and therefore a civilian's desire to possess a machinegun is covered by the Second Amendment.

Mr. DeWilde's reliance on the standing military's use of a weapon as justification for deeming the weapon "in common

use" is misguided and incorrect. The militia of which the Second Amendment speaks, i.e., "civilians primarily, soldiers on occasion," *Miller*, 307 U.S. at 179, is not the standing U.S. military of today, and the two cannot accurately be equated. At this Nation's founding, "[t]he sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia." *Id* The weapons used by the founders' militia were necessarily the weapons used by the common citizen, as the militia and the citizenry were largely the same. *See Heller*, 554 U.S. at 624-25 ("In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.") (alteration in original) (quoting *State v. Kessler*, 614 P.2d 94, 98 (Ore. 1980)).

***6** Times and sentiments have, of course, significantly changed. Standing armies with professional soldiers are now favored and necessary for the Nation's defense, and the modern-day standing military's weapons greatly exceed those of the average citizen. They are not the same, and the U.S. military's use of the M16 machinegun simply does not render such a weapon "in common use." The Supreme Court previously commented on the gap that has developed between society's common weaponry and the military's weaponry and how that gap interplays with the Second Amendment:

> It may be objected that if weapons that are most useful in military service —M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. at 627-28.

All this is to say that just because a weapon is used by the United States Armed Forces, even a weapon commonly employed by the Armed Forces, does not also mean it is necessarily "in common use" in the United States at large. As this is Mr. DeWilde's sole argument in favor of finding the M16 machinegun to be "in common use," he has not shown the Second Amendment extends to his desired possession of a machinegun at the first step of the *Bruen* analysis. Nor has he asserted that the M16 machinegun is "in common use" outside of military service, which is significant considering military personnel make up such a small fraction of the U.S. population.[5] And in any event, "[a]lthough the number of civilian-owned machineguns has increased to about 740,000, this amount—which is less than .2% of total firearms in the United States—remains too insignificant for machineguns to be considered in common use." *United States v. Simien*, 655 F. Supp. 3d 540, 554 (W.D. Tex. 2023); *see also United States v. Mitchell*, No. 1:24-CR-9, 2024 WL 2272275, at *4 (N.D. Ohio May 20, 2024) (agreeing with and adopting *Simien's* reasoning); *United States v. Berger*, 715 F.Supp.3d 676, 687-88 (E.D. Penn. 2024) (rejecting argument that machineguns are in "common use" and collecting caselaw from various jurisdictions rejecting similar arguments post-*Bruen*).

5 *See* Department of Defense, *Defense Department Report Shows Decline in Armed Forces Population While Percentage of Military Women Rises Slightly* (Nov. 6, 2023), available at https://www.defense.gov/News/Releases/kelease/Article/3580676/ (reporting slightly more than two million U.S. service members in 2022).

"It is no surprise ... that courts have continued to hold, post-*Bruen*, that the Second Amendment protections simply do not extend to machineguns." *United States v. Bachmann*, No. 8:23-CR-304-VMC-CPT, 2024 WL 730489, at *3 (M.D. Fla. Feb. 22, 2024) (collecting cases and quoting *United States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *3 (N.D. Ga. May 17, 2023), *report and recommendation adopted*, No. 1:22-CR-00236-SDG,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

2023 WL 3867792 (N.D. Ga. June 7, 2023)). The Second Amendment does not create in Mr. DeWilde any right to keep and bear a machinegun, which defeats any as-applied challenge to § 922(o) at the first step of the *Bruen* analysis.

**2.2 Section 922(o)'s machinegun restriction is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.**

***7** Even if the Second Amendment could be said to protect Mr. DeWilde's desire to possess an M16 machinegun, the restriction on such in § 922(o) is well supported by the historical tradition of regulating the keeping and bearing of dangerous and unusual weapons. Thus, any as-applied challenge would fail the second step of the *Bruen* analysis.

The second half of the *Bruen* test requires the Government to show the restriction "is consistent with the Nation's historical tradition of firearm regulation." *United States v. Rahimi*, 144 S. Ct. 1889, 1896 (2024) (quoting *Bruen*, 597 U.S. at 24). The U.S. Supreme Court has acknowledged there exists "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627 (collecting historical supporting sources); *see also Rahimi*, 144 S. Ct. at 1897 (noting that at the Nation's founding, "[s]ome jurisdictions banned the carrying of 'dangerous and unusual weapons' ").

The only question, then, is whether Mr. DeWilde's desired M16 machinegun constitutes a "dangerous and unusual weapon." The Court has little difficulty finding it does. "After *Heller*, the Courts of Appeals have uniformly held that machineguns are dangerous, unusual, and not in common use." *United States v. Mitchell*, No. 1:24-CR-9, 2024 WL 2272275, at *4 (N.D. Ohio May 20, 2024) (collecting cases). They are unusual because they are uncommon to society at large.

> A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market.

*United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012), *cert. denied*, 568 U.S. 1149 (2013). And their dangerousness hardly needs to be explained.

> The machine gun was first widely used during World War I, where it "demonstrated its murderously effective firepower over and over again." William Rosenau, Book Note, *The Origins of the First Modern Weapon*, TECH. REV., Jan. 1987, at 74, (reviewing John Ellis, *The Social History of the Machine Gun* (1986)). A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. *See* George C. Wilson, *Visible Violence*, 12 NAT'L J. 886, 887 (2003). Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns.

*Id.*; *see also United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 142 (3d Cir. 2016) (collecting cases and describing how machineguns are primarily weapons of war and are often favored by criminals because they can overpower other types of firearms).

In sum, § 922(o)'s machinegun restriction "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. It is "relevantly similar," *Bruen*, 597 U.S. at 29, to the regulation of "dangerous and unusual weapons" existing and enforced since the founding of the United States. Consequently, § 922(o) does not infringe upon the Second Amendment, and any as-applied challenge in this case fails at the second step of the *Bruen* test.

## CONCLUSION AND ORDER

The Second Amendment is not a second-class right, but it also is not without limits. Mr. DeWilde's facial challenge to the constitutionality of 18 U.S.C. § 922(o) falls flat as explained by his own supplemental authority, *United States v. Tamori Morgan*, No. 23-10047-JWB, 2024 WL 3936767 (D. Kan. Aug. 26, 2024). And to the extent his complaint can be liberally construed to also assert an as-applied challenge, the two-step *Bruen* test shows § 922(o) does not run afoul of the Second Amendment. Machineguns are a dangerous and unusual weapon and were not in common use then or even now. Accordingly, Mr. DeWilde has not set forth a claim on which relief can be granted.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***8 IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss the Complaint (ECF 10) is **GRANTED**. Mr. DeWilde's Complaint for Declaratory and Injunctive Relief (ECF 1) is hereby **DISMISSED WITH PREJUDICE**[6] under Federal Rule of Civil Procedure 12(b)(6). The Clerk of Court will please enter a general judgment in favor of Defendants and close this case.

6 "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). Mr. DeWilde's complaint fails because his claim for relief is fatally flawed in its legal premise, not for failure to plead sufficient facts. Therefore, amending his complaint would be futile because such amendment could not correct the flawed legal premise, and dismissal with prejudice, as an adjudication on the merits under Fed. R. Civ. P. 41(b), is appropriate.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4643681

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Smith v. Hillstone Healthcare Inc.

United States District Court, S.D. Ohio, Eastern Division. | May 4, 2018 | Not Reported in Fed. Supp. | 2018 WL 2087137

**Document Details**

| | |
|---|---|
| standard Citation: | Smith v. Hillstone Healthcare Inc., No. 2:17-CV-1075, 2018 WL 2087137 (S.D. Ohio May 4, 2018) |
| All Citations: | Not Reported in Fed. Supp., 2018 WL 2087137, 2018 Wage & Hour Cas.2d (BNA) 159,086 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Ohio |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**

Attorneys and Law Firms (p.1)
Opinion and Order (p.1)
All Citations (p.3)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2087137
United States District Court, S.D. Ohio, Eastern Division.

Doniele SMITH, on behalf of herself
and others similarly situated, Plaintiff,
v.
HILLSTONE HEALTHCARE INC. and
Cornerstone Innovations, Inc., Defendants.

Case No. 2:17-cv-1075
|
Signed 05/04/2018

**Attorneys and Law Firms**

Matthew James Porter Coffman, Coffman Legal, LLC, Columbus, OH, Peter Alan Contreras, Contreras Law, Amlin, OH, for Plaintiff.

Scott E. Salsbury, Salsbury & Salsbury, L.P.A., Hudson, OH, Laura L. Mills, Mills, Mills, Fiely & Lucas, Canton, OH, for Defendants.

Opinion and Order

JAMES L. GRAHAM, United States District Judge

***1** Plaintiff Doniele Smith brings this putative collective action for overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 207, against defendants Hillstone Healthcare Inc. and Cornerstone Innovations, Inc. Plaintiff alleges that defendants violated the FLSA by not properly calculating overtime pay rates. According to the complaint, plaintiff and other employees were given "additional remuneration for work performed during specific shifts(s) and/or day(s)." Compl., ¶ 28. The complaint alleges that overtime pay should have been based upon the sum of an employee's regular hourly pay and the additional remuneration she received, but defendants instead allegedly paid only one and one-half times the regular hourly pay.

This matter is before the court on Hillstone's motion to dismiss, Cornerstone's motion for judgment on the pleadings, and plaintiff's motion to conditionally certify a collective action under the FLSA.

## I. Background

Doniele Smith is a licensed State Tested Nursing Assistant who began employment at the Isabelle Ridgway Care Center in Columbus in November 2015. Defendants purchased the Isabelle Ridgway Care Center in May 2017 and are alleged to have become joint employers of Smith at that time. Smith alleges that Hillstone operates a number of facilities in Ohio which offer long-term care, hospice care, therapy and other healthcare services. Cornerstone allegedly provides payroll services to Hillstone.

Smith's employment with Hillstone ended in August 2017. According to Smith's declaration, which she submitted in support of her motion to conditionally certify, she worked more than 40 hours per week at least once between May 2017 and August 2017. Smith has submitted one pay statement, which shows that she worked 7 overtime hours during a one week period in June 2017. Smith states that she earned a "nondiscretionary bonus" during that same week in June. Smith Decl., ¶ 9. Her pay statement lists a "Bonus" of $150.

Smith's pay statement shows that her regular hourly rate of pay was $11.00 and that her overtime rate was $16.50. It is plaintiff's theory that defendants, in calculating her rate of overtime pay, should have first added her regular hourly wages and her bonus, divided by 40 hours worked, and then multiplied that result by one and one-half. See 29 C.F.R. § 778.209(a).

Smith asserts in her declaration, without providing further detail, that her experience as an employee was similar to that of other employees of defendants and that defendants have a company-wide policy of not factoring in additional remuneration when calculating overtime pay. Smith Decl., ¶¶ 11-12.

Plaintiff proposes a collective action that would include all current and former hourly employees who have worked at defendants' 13 Ohio facilities in the past 3 years and who have received "remuneration payments" in addition to their normal hourly wage during any workweek in which they worked over 40 hours.

## II. Standard of Review

### A. Motion to Dismiss

Hillstone has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Iqbal, 556 U.S. at 679; Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); Twombly, 550 U.S. at 555-56.

***2** Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); Papasan v. Allain, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Twombly, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

### B. Motion for Judgment on the Pleadings

Cornerstone has moved for judgment on the pleadings under Rule 12(c), which provides, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to motions for judgment on the pleadings is the same standard applicable to motions to dismiss under Rule 12(b)(6). See Hindel v. Husted, 875 F.3d 344, 346 (6th Cir. 2017). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 582 (6th Cir. 2007) (internal citation and quotation marks omitted). However, the court need not accept as true legal conclusions or unwarranted factual inferences. Id. (citing Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999) ).

## III. Discussion

The arguments made by Hillstone and Cornerstone in their separate motions are essentially the same—that the complaint's mere reference to "additional remuneration," without factual content, is insufficient to support a reasonable inference that plaintiff is entitled to more overtime pay than what she received. The distinction between the separate motions is that Cornerstone's motion for judgment on the pleadings relies on its answer, to which all of Smith's timesheets and pay statements are attached.

The pay statements attached to Cornerstone's answer show that there were four workweeks in which Smith worked overtime hours. In each instance Smith was paid a regular hourly rate of $11.00 and an overtime rate of $16.50. In two of those four workweeks, Smith also received a bonus, the first for $150 and the second for $100. These pay statements (the authenticity and accuracy of which plaintiff does not dispute) are consistent with the allegations in the complaint concerning plaintiff's regular rate of pay, receipt of additional remuneration and rate of overtime pay.

Under the FLSA, a covered employer shall not employ any employee "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The "regular rate" is defined as "all remuneration for employment," but it excludes payments for "services performed during a given period" if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3). See also Featsent v. City of Youngstown, 70 F.3d 900, 905 (6th Cir. 1995).

***3** The applicable regulations make a distinction between discretionary and nondiscretionary bonuses:

> Section 7(e) of the Act requires the inclusion in the regular rate of all

> remuneration for employment except eight specified types of payments. Among these excludable payments are discretionary bonuses....

29 C.F.R. § 778.208.

> In order for a bonus to qualify for exclusion as a discretionary bonus under section 7(e)(3)(a) the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid. The sum, if any, to be paid as a bonus is determined by the employer without prior promise or agreement. The employee has no contract right, express or implied, to any amount. If the employer promises in advance to pay a bonus, he has abandoned his discretion with regard to it.

29 C.F.R. § 778.211(b).

The complaint does not contain sufficient factual content from which the court can draw a reasonable inference that plaintiff or the purported class were paid nondiscretionary bonuses. The complaint alleges that plaintiff and other employees received "remuneration" in addition to their regular hourly wages. The only factual content provided in support of this allegation is that the remuneration was for "work performed during specific shift(s) and/or day(s)." Compl., ¶ 28. The complaint fails to provide any allegations that the fact and amount of payment for working a certain shift or day was established pursuant to a contract, agreement or promise made prior to a time quite close to the end of the period for which the additional remuneration was paid. In other words, the complaint contains no factual matter that would support an inference that the remuneration paid by defendants was nondiscretionary in nature.

The timesheets and pay statements attached to the answer do not provide any support for plaintiff. Other than reflecting that plaintiff twice received a bonus, these documents give no indication as to the circumstances by which she earned her bonuses—whether by prior agreement or not.

Plaintiff contends that it is clear that she has alleged that she and other employees received nondiscretionary bonuses. The complaint never uses that term; it appears only in Smith's declaration, attached to her motion to conditionally certify. Even if the declaration could be considered, the term "nondiscretionary bonus" is used as a label or legal conclusion by Smith and should not be accepted as true. See Twombly, 550 U.S. at 555; Papasan, 478 U.S. at 286. That is, the declaration asserts that Smith received a "nondiscretionary bonus," but it provides no factual context as to the circumstances in which she received the bonus or how the fact and amount of the bonuses were determined. See Smith Decl., ¶¶ 8-9. Also attached to the motion to certify is a Hillstone employee handbook, but it does not contain any policy regarding the payment of bonuses.

**IV. Conclusion**

For the reasons set forth above, defendant Cornerstone's motion for judgment on the pleadings (doc. 6) and defendant Hillstone's motion to dismiss (doc. 17) are GRANTED. The court will not terminate the case at this time but hereby grants plaintiff leave to file an amended complaint within 30 days of the date of this Order.

***4** Plaintiff's motion to conditionally certify a class (doc. 4) is DENIED without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2087137, 2018 Wage & Hour Cas.2d (BNA) 159,086

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Edwards v. City of Raleigh

United States District Court, E.D. North Carolina, Western Division. | September 11, 2024 | Not Reported in Fed. Supp. | 2024 WL 4156829

**Document Details**

| | |
|---|---|
| standard Citation: | Edwards v. City of Raleigh, No. 5:23-CV-683-FL, 2024 WL 4156829 (E.D.N.C. Sept. 11, 2024) |
| All Citations: | Not Reported in Fed. Supp., 2024 WL 4156829 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | North Carolina |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**

Attorneys and Law Firms (p.1)
ORDER (p.1)
All Citations (p.15)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4156829
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina, Western Division.

Leo J. EDWARDS, individually and on behalf of all others similarly situated, Plaintiff,
v.
CITY OF RALEIGH, Defendant.

NO. 5:23-CV-683-FL
|
Signed September 11, 2024

**Attorneys and Law Firms**

Amanda M. Whitt-Downs, Hannah B. Simmons, Matthew S. Marlowe, Gilda A. Hernandez, The Law Offices of Gilda A. Hernandez, PLLC, Cary, NC, for Plaintiff.

Anna M. Davis, Alice J. Tejada, City of Raleigh, City Attorney's Office, Raleigh, NC, for Defendant.

ORDER

LOUISE W. FLANAGAN, United States District Judge

***1** This matter is before the court on plaintiff's motion to conditionally certify this case as a collective action and to authorize issuance of notice (DE 17), defendant's partial motion to dismiss for failure to state a claim (DE 23), and plaintiff's motion to strike exhibits (DE 26). The motions have been briefed fully, and in this posture the issues raised are ripe for ruling. For the following reasons, plaintiff's motion for conditional certification is granted in part and held in abeyance in part, and the remaining motions are granted in part and denied in part as set forth herein.

## STATEMENT OF THE CASE

Plaintiff, a former employee of defendant's police department, commenced this action on November 29, 2023, and filed the operative first amended complaint on March 27, 2024, asserting claims for violations of the overtime pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), on behalf of himself and a collective of defendant's current and former employees. Plaintiff alleges that defendant failed to pay him and other employees the required wages, including at the overtime premium rate. Plaintiff seeks unpaid compensation, gap time compensation, wages for uncompensated work, certification of a FLSA collective action, liquidated damages, prejudgment interest, and attorneys' fees and costs. [1]

1 Plaintiff also asserts that his claims are governed by a three-year statute of limitations where defendant's acts constitute willful violations of the FLSA pursuant to 29 U.S.C. § 255.

Shortly after amending his complaint, plaintiff filed the instant motion to certify conditionally a FLSA collective defined as:

> [a]ll individual who were, are, or will be employed at [d]efendant Raleigh police stations who (1) worked in the position of [p]olice [o]fficer, or other similarly situated non-exempt positions; (2) [ ] were subjected to [d]efendant's policy of being required to perform work off the clock, such as before the start of their shift; (3) were subjected to [d]efendant's Comp Time policy and were not compensated for all hours worked up to and in excess of eighty-five and a half (85.5) hours per fourteen (14) days, and/or [ ] were paid additional pay including but not limited to bonuses and worked overtime during any pay period for which additional pay, including, but not limited to bonuses was received any time within three years prior to the commencement of this action, through the present.

(DE 18 at 9), and for court authorization of notice to issue to potential collective members. Plaintiff seeks approval of a proposed notice, method for distribution of the same, and provision of contact information of proposed opt-in plaintiffs to aid in such distribution. In support of this motion, plaintiff relies on memorandum of law, declaration of plaintiff, and the aforementioned proposed notice and opt-in forms.

In opposition to plaintiff's motion to certify, defendant relies upon 43 exhibits, including 1) defendant's previous and current Operating Procedure 300-5 Overtime policies ("Overtime Policy"); 2) minutes records showing defendant's city council's adoption of past overtime policies and the current Overtime Policy; 3) records pertaining to plaintiff's pay periods, submitted timesheets, and other materials accessible to plaintiff during his employment with defendant; 4) Departmental Operating Instructions adopted by the Raleigh Police Department ("RPD"); 5) sample documents related to police officer roll call and work schedules; 6) training materials presented to police officers; 7) records purportedly signed by plaintiff attesting to his receipt of certain forms; and 8) declarations of various officials, who are employed by defendant. Defendant argues there are no similarly situated employees with respect to plaintiff's claims that satisfies the conditional certification standard under 29 U.S.C. § 216(b).

***2** Defendant also opposes the form of proposed notice to potential class members on grounds that it is insufficiently neutral and contains other deficiencies. Defendant further asserts that any release of contact information as to putative collective members would require entry of a protective order "that will safeguard the requested information[.]" (DE 22 at 20).[2]

2 Between filing of plaintiff's motion to certify conditionally a FLSA collective and defendant's response in opposition, the court granted defendant's unopposed motion to stay discovery, including the filing of a discovery plan, until the court issues an order addressing plaintiff's motion for conditional certification. (See DE 21).

Thereafter, defendant filed the instant partial motion to dismiss under Rule 12(b)(6), relying on 1) plaintiff's timesheets and pay stubs relating to various pay periods in dispute; 2) records relating to hours worked by plaintiff; 3) records relating to plaintiff's court attendance on October 29, 2021; and 4) declarations of various officials, who are employed by defendant. Defendant's motion is directed at plaintiff's claims for overtime and gap time compensation, as well as claims pertaining to plaintiff's bonus payments, defendant's compensatory leave practices, and mandatory court and training appearances.

Following filing of its motion, defendant answered plaintiff's operative first amended complaint. Thereafter, plaintiff responded in opposition to defendant's motion and filed the instant motion to strike the exhibits relied upon by defendant in defendant's opposition to plaintiff's motion to certify and defendant's memorandum in support of defendant's partial motion to dismiss.

## STATEMENT OF FACTS

The facts alleged in plaintiff's complaint[3] may be summarized as follows. Plaintiff and the other employees consist of current and former police officers ("police officers") working for the RPD, defendant's primary law enforcement agency. (Compl. ¶¶ 1, 14). "Defendant is responsible for providing policing and law enforcement services throughout Raleigh, North Carolina." (Id. ¶ 21). Plaintiff, a resident of Sanford, North Carolina, was employed by the RPD between approximately January 13, 2020, and December 16, 2022. (Id. ¶¶ 11, 12, 27).

3 Hereinafter, all references to the complaint in the text, or "compl." in citations, are to the operative first amended complaint (DE 16), unless otherwise specified.

Plaintiff alleges that defendant compensates RPD police officers on an hourly basis, "as hourly non-exempt under the FLSA." (Id. ¶ 25). As a police academy cadet from approximately January 13, 2020, through September 25, 2020, plaintiff was paid at a rate of approximately $18.80 per hour. (Id. ¶¶ 12, 29). In September 2020, following his training as a cadet, plaintiff became a police officer and his pay rate increased to approximately $19.37 per hour. (Id. ¶ 30). Plaintiff's pay increased to approximately $19.76 per hour in January 2021. (Id. ¶ 31). "Around September 2021, [plaintiff's] pay rate increased again to approximately $20.55 [per hour]." (Id. ¶ 32). Plaintiff's pay increased to approximately $21.57 per hour in March 2022, and then increased again later in 2022 to approximately $22.00 per hour until plaintiff's termination date on December 16, 2022. (Id. ¶¶ 12, 33–34). As a police officer, plaintiff's duties included "(1) patrolling the community in an effort to be proactive in response to crime; (2) promptly responding to incidents; (3) carrying out arrests; (4) effectively communicating with the public ...; (5) navigating [d]efendant's computer systems and software programs; (6) investigating vehicular accidents; (7) crime scene management; (8) conducting vehicular stops; (9) [responding to] domestic violence [incidents]; (10) investigating crimes;

(11) drafting reports; (12) assisting with the prosecution of crimes by testifying as a witness in court; and (13) maintaining community safety." (Id. ¶ 35).

***3** Plaintiff alleges that police officers employed by defendant "are typically scheduled to work approximately eighty-four (84) hours every fourteen (14) days." (Id. ¶ 36). Police officers are also compensated and required to submit timesheets containing their worked hours every 14 days. (Id. ¶ 40). Thus, according to the complaint, defendant's 14-day work period mandated "[d]efendant to compensate [RPD officers] time and one-half for any hours worked over eighty-five and one-half (85.5)" in that 14-day work period. (Id. ¶ 3). However, plaintiff alleges that "[d]efendant only calculated overtime hours every twenty-eight (28) days, resulting in a significant undercutting of [police officers'] overtime wages." (Id. ¶ 3).

Further, plaintiff alleges that police officers were not permitted to record time worked prior to the start of their shift, even where before their shifts, "[police officers] were required to prepare and inspect ... patrol cars, prepare service equipment, log in to [d]efendant's various systems to ensure a successful patrol, and ensure body and dash cameras were properly working." (Id. ¶¶ 42–43). "If [police officers] attempted to record such time, [they] would get into trouble with [d]efendant." (Id. ¶ 43). Plaintiff alleges that "[o]n average, [police officers] were required to arrive between approximately ten (10) to twenty (20) minutes prior to the start of their shift to complete such activities." (Id. ¶ 44). Thus, plaintiff alleges that he is owed approximately an extra $67.80 per 14-day pay period, "based on [plaintiff's] starting hourly rate as a police officer of approximately $19.37, and applicable overtime premium rate of approximately $29.06." (Id. ¶ 45).

Additionally, plaintiff alleges that "police officers frequently stayed past the end of their scheduled shift in order to finish a call, turn in equipment, finish reports, book evidence, take charges out on a suspect, have warrants signed by a [magistrate] ..., and transport suspects to jail." (Id. ¶ 46). Plaintiff asserts an average of 45 minutes spent at the end of each shift, "or approximately 5.83 hours per pay period." (Id. ¶ 47). "Although this time worked past the end of a scheduled shift was recorded on [d]efendant's system, [police officers] have no way of verifying [that they] were paid for such hours through compensatory time at the appropriate overtime premium rate." (Id. ¶ 48). Further, plaintiff alleges that this "post-shift work was not counted as overtime, but instead, was allegedly banked as comp time." (Id. ¶ 49). This practice effectively "forced [police officers] to utilize [comp time] at [d]efendant's request" rather than "at their own discretion" because "when a police officer's comp time bank comes close to seventy (70) hours, the police officer is required, by [d]efendant, to take time off ... to avoid triggering [d]efendant's automatic overtime payout." (Id. ¶ 51).

Plaintiff also alleges that police officers were often required to make "court appearances ... outside of their scheduled shifts." (Id. ¶ 53). "While these hours were recorded, they were not properly compensated as overtime, but again, banked as comp time." (Id. ¶ 55). Plaintiff, for example, "was required to attend court for 8.25 hours during the [p]ay [p]eriod from October 22, 2021, through November 5, 2021, in addition to his regularly scheduled eighty-four (84) hours of work for the fourteen (14) day pay period." (Id. ¶ 56). However, "[h]is pay stubs reflect that these 8.25 hours were paid out at a rate of $20.54, which was equal to his regular hourly rate at the time, instead of the overtime premium rate, which would have been $30.81 per hour." (Id.). Thus, plaintiff alleges that he "is owed approximately $84.73 in unpaid overtime wages" from "this two-week pay period alone." (Id.). [4]

4 Plaintiff alleges another example of unpaid wages where he was required to spend twenty hours on a federal case in addition to his regularly scheduled hours. (Id. ¶ 57). However, plaintiff alleges that "[w]hen referencing his pay stubs for the same period, there is no account of the additional twenty (20) hours worked in federal court." (Id.). Thus, plaintiff asserts he is entitled to approximately $647.10 from that period. (See id.).

***4** Additionally, plaintiff alleges that "police officers were required to attend in-service training sessions ... scheduled on off-duty days." (Id. ¶¶ 58–59). As an example, plaintiff asserts that he attended a mandatory four-hour training session on March 3, 2022. (Id. ¶ 60). However, plaintiff's pay stub for that period did not include the additional four-hour training session. (Id.). Thus, plaintiff asserts that he "is owed approximately $129.42 in unpaid overtime wages" from this two-week pay period. (Id.).

"[P]olice officers [also] received additional pay or non-discretionary bonuses ... such as for receiving vaccinations." (Id. ¶ 61). "However, [d]efendant failed to take into account such nondiscretionary bonus[es] when

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

calculating police officers' regular rate of pay[.]" (Id. ¶ 62). Thus, plaintiff alleges that "[police officers] did not receive the appropriate premium overtime rate(s) because [d]efendant did not incorporate all bonus earnings, in determining the appropriate regular rate for overtime compensation when [police officers] worked in excess of eighty-five and a half (85.5) hours per fourteen (14) day period[.]" (Id. ¶ 5).

In sum, plaintiff alleges that the failure to compensate police officers for time worked during pre-shift and post-shift hours, as well as mandatory trainings and court appearances on days off, led to plaintiff, and leads to those similarly situated, not being paid for all hours worked and not being paid time-and-a-half for overtime. Plaintiff alleges that "[d]efendant maintained a policy of not properly compensating employees at the appropriate overtime premium rates for all hours worked in excess of eighty-five and one-half (85.5) in [a] fourteen (14) day work period[.]" (Id. ¶ 4). Plaintiff claims that his experience with defendant is representative of that of the putative FLSA collective class.

Additional alleged facts pertinent to the instant motions will be discussed in the analysis below.

## COURT'S DISCUSSION

A. Plaintiff's Motion to Strike (DE 26)

Plaintiff moves to strike the 43 exhibits appended to defendant's response in opposition to plaintiff's motion for conditional certification and the six exhibits appended to defendant's partial motion to dismiss. As part of his motion, plaintiff suggests the court should decline to consider the exhibits where they do "not qualify as the type of evidence that may be considered at the pleading stage, and because [d]efendant has failed to meet its burden that [they] should be subject to judicial notice[.]" (DE 27 at 16).[5] The court agrees in that part seeking to have the court decline to consider the exhibits at this juncture, and otherwise disagrees to the extent the motion seeks to strike the exhibits.

5 Page numbers in citations to documents in the record specify the page number of the document designated by the court's case management / electronic case filing (CM/ECF) system, rather than the page number, if any shown on the face of the underlying document.

A district court may, on motion of a party or on its own initiative, strike from a pleading an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike "are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001).[6]

6 Internal citations and quotation marks are omitted from all citations unless otherwise specified.

***5** By its plain terms, Rule 12(f) applies to "pleadings" such as a complaint or answer, not to exhibits included with a motion. See Fed. R. Civ. P. 12(f); Fed. R. Civ. P. 7(a) (defining pleadings). Plaintiff also has not demonstrated the exhibits are "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Accordingly, under the circumstances of this case, the court denies that part of the motion seeking to strike the exhibits. However, where plaintiff does not rely solely on Rule 12(f) in support of his motion, the court considers more particularly as follows plaintiff's request for the court to not consider the exhibits in addressing the motion to dismiss and motion to certify.

In reviewing a complaint under Rule 12(b)(6), the court may "consider documents attached to the complaint or incorporated by reference, including those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Epcon Homestead, LLC v. Town of Chapel Hill, 62 F.4th 882, 885 (4th Cir. 2023); see also Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (noting courts "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity"); Zak v. Chelsea Therapeutics Intern., Ltd., 780 F.3d 597, 606–07 (4th Cir. 2015) ("[c]onsideration of a document attached to a motion to dismiss ordinarily is permitted only when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity.") (emphasis added).

Additionally, upon a Rule 12(b)(6) motion to dismiss, courts "may properly take judicial notice of matters of public record." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Whereas, under Federal Rule of Evidence 201, adjudicative facts are "simply the facts of the particular case," Goldfarb v. Mayor and City Council of Baltimore,

791 F.3d 500, 508 n.6 (4th Cir. 2015), "courts may consider relevant facts obtained from the public record, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint." Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013).[7] Considering these standards, the court addresses the subject exhibits in turn as follows.

7 For purposes of the instant analysis, the court applies the same standard to consideration of exhibits attached to defendant's response in opposition to plaintiff's motion to certify, with further discussion of the standard for certification set forth herein.

1. Defendant's Overtime Policy and Minutes Records

Considering first defendant's Overtime Policy and its precursors, (DE 22-1, DE 22-2, DE 22-3, DE 22-4, DE 22-5, DE 22-6), and the relevant city council minutes records, (DE 22-7, DE 22-8, DE 22-9, DE 22-10, DE 22-11, DE 22-12), defendant asserts that the court can properly take judicial notice of these exhibits as legislative facts. In particular, defendant asks the court to take judicial notice of the Overtime Policy "showing that [defendant] adopted a [28] day cycle for non-exempt sworn officers where they earned overtime after working 171 hours." (DE 30 at 8). The court declines to do so. Plaintiff vigorously contests consideration of the Overtime Policy at this stage of the litigation, and the court is "mindful that judicial notice must not be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters." Goldfarb, 791 F.3d at 511; see also Clatterbuck, 708 F.3d at 558 ("The narrow exception ... does not, however, grant the district court carte blanche to label any information a legislative fact merely because it was garnered from the public record associated with the enactment of an ordinance.").

***6** Additionally, for the reasons set forth herein, consideration of the Overtime Policy and the attendant city council exhibits is not determinative of the court's analysis of defendant's partial motion to dismiss and plaintiff's motion for conditional certification. In taking judicial notice of legislative facts, courts must still construe them "in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint." Clatterbuck, 708 F.3d at 557. And "whether information is the proper subject of judicial notice depends on the use to which it is put." Id. at 558. Thus, even where the court would take judicial notice of the fact that defendant's city council adopted the Overtime Policy in 2008, for reasons discussed below, that fact would not defeat plaintiff's allegation that "[d]efendant maintained a policy of not properly compensating employees at the appropriate premium rates for all hours worked in excess of [85.5] in that [14] day work period." (Compl. ¶ 4). Indeed, defendant "does not ask the [c]ourt to determine whether it followed its policy or to take judicial notice of facts for the matter asserted." (DE 30 at 8).

For similar reasons, the court declines to take judicial notice of the Overtime Policy and related documents as adjudicative facts. "Under Federal Rule of Evidence 201, courts at any stage of a proceeding may judicially notice a fact that is not subject to reasonable dispute, provided that the fact is generally known within the court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Zak, 780 F.3d at 607. Defendant argues that the court should judicially notice these documents because declaration by defendant's Human Resources Director "provid[es] the personal knowledge and foundation required to attest that she is the custodian of [defendant's] personnel policies," and thus, the declaration "can be accurately and readily determined from sources who[se] accuracy cannot be reasonably questioned." (DE 30 at 7). However, that defendant's Human Resources Director attests to the veracity of the exhibits does not transform all of the subjected assertions into facts that are themselves subject to judicial notice. See Clatterbuck, 708 F.3d at 558. This goes beyond and is in addition to facts readily verified by reference to the underlying source, and is therefore not properly subject to judicial notice under Rule 201.

Lastly, defendant argues that the court may consider the Overtime Policy where plaintiff's complaint "questioned [defendant's] [O]vertime [P]olicy and incorporated some of its language." (DE 30 at 2). But plaintiff's complaint makes scant reference to the Overtime Policy. The complaint largely references defendant's policy of not properly compensating police officers in the abstract. (See, e.g., compl. ¶ 1 ("Defendant had a systemic company-wide policy, pattern, or practice of failing to pay employees for all hours worked ...")); (see also id. ¶ 4 ("Defendant maintained a policy of not properly compensating employees at the appropriate overtime premium rates ...")). At a maximum, the complaint makes a singular reference to defendant's Overtime Policy where plaintiff sets forth his proposed definition of the FLSA collective pursuant to § 216(b). (See id. ¶ 7 ("All individuals who were, are, or will be employed at [d]efendant Raleigh


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

police stations who ... were subject to [d]efendant's Comp Time policy and were not compensated for all hours worked up to and in excess of [85.5] hours per [14] days.")). That lone assertion is insufficient to conclude that plaintiff "explicitly incorporated [the Overtime Policy] into the complaint by reference." Goines, 822 F.3d at 166.

Defendant cites to Gasner v. Cnty. of Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995), for the proposition that "[c]ourts do not permit 'a plaintiff with a legally deficient claim to survive a motion to dismiss by simply failing to attach a dispositive document upon which it relied.' " (DE 30 at 2). But the face of the complaint does not suggest that plaintiff relied on the Overtime Policy. Indeed, the complaint only makes a singular reference to defendant's "Comp Time policy" and does not quote or cite to it. Defendant asserts that plaintiff paraphrases the Overtime Policy where the complaint alleges that "[d]efendant categorizes [p]laintiff's hours worked beyond [p]laintiff's schedule between 168 and 171 every [28] days as unscheduled hours worked." (DE 30 at 14). But that assertion, considered alongside plaintiff's one general reference to the Overtime Policy, is insufficient to conclude that plaintiff explicitly relied on the Overtime Policy in drafting his complaint. See Goines, 822 F.3d at 166 ("Although the complaint included a few quotes from and references to the Incident Report, [the plaintiff's] claims do not turn on, nor are they otherwise based on, statements contained in the Incident Report ... Under these circumstances, the Incident Report arguably is not integral to the complaint and therefore should not have been considered by the district court."); see also Sira v. Morton, 380 F.3d 57, 67 (2d. Cir. 2004) ("Limited quotation from or reference to documents that may constitute the relevant evidence in a case is not enough to incorporate these documents, wholesale, into the complaint."). Furthermore, that the complaint expressly disputes the length of the work period in the Overtime Policy further evidences that the Overtime Policy was not "explicitly relied on in the complaint." Phillips, 190 F.3d at 618. [8]

8 The court also notes plaintiff's argument that "[d]efendant runs afoul of the [c]ourt [o]rdered stay of discovery," (DE 21), granted after defendant moved to stay a scheduling order and the time to submit a discovery plan. (DE 20). Therein, defendant moved "to stay discovery until after adjudication of [p]laintiff's pending motion to conditionally certify a collective action and for a court-authorized notice to be issued" under § 216(b) of the FLSA. (Id. at 1). While the court does not address plaintiff's argument on the merits, it acknowledges that plaintiff has not had the opportunity to depose witnesses or review all of defendant's documents attached as exhibits. See Gay v. Wall, 761 F.2d 175, 178 (4th Cir. 1985) ("Because Gay was not afforded an opportunity for reasonable discovery, the district court's treatment of the motion to dismiss as a motion for summary judgment was an abuse of discretion.").

2. Defendant's Remaining Exhibits – Timesheets and Pay Stubs

***7** As to the remaining exhibits, defendant asserts that the complaint references "plaintiff's pay stubs, timesheets and court sign-in sheets, making them integral to [p]laintiff's claims." (DE 30 at 4). The court disagrees.

In its response in opposition to plaintiff's motion for conditional certification, (DE 22), defendant includes as exhibits 1) declarations by defendant's officials, (DE 22-13, DE 22-20, DE 22-32, DE 22-35, DE 22-39, DE 22-41); 2) plaintiff's timesheets for the pay periods starting on September 11, 2021, September 25, 2021, February 26, 2022, and March 12, 2022, (DE 22-14); 3) defendant's internal time calculator for some of those periods, (DE 22-15); 4) plaintiff's pay stubs for those periods, (DE 22-16, DE 22-17); 5) a screenshot purporting to show wage and compensatory time information to which plaintiff had access, (DE 22-18); 6) a FAQ sheet allegedly disseminated to police officers, (DE 22-19); 7) Departmental Operating Instructions adopted by the RPD between 2013 and 2023, (DE 22-21, DE 22-22, DE 22-23, DE 22-24, DE 22-25, DE 22-26, DE 22-27, DE 22-28, DE 22-29, DE 22-30, DE 22-31); 8) a sample redacted roll call form, (DE 22-33); 9) the RPD's work schedule from December 2019 through January 2023, (DE 22-34, DE 22-40); 10) materials used to train RPD employees on timesheet submission, compensation, and other payrolls matters, (DE 22-36, DE 22-37, DE 22-38); and 11) forms purportedly signed by plaintiff acknowledging receipt of the RPD's policy manual and attendance at RPD trainings, (DE 22-42, DE 22-43).

Further, appended to the partial motion to dismiss, (DE 24), defendant includes as exhibits 1) declarations by defendant's officials, (DE 22-1, DE 22-5); 2) plaintiff's timesheets for the pay periods beginning on October 9, 2021, October 23, 2021, January 1, 2022, and January 15, 2022, (DE 24-2); 3) plaintiff's pay stubs for those same periods, (DE 24-3); 4) a spreadsheet allegedly displaying comments that plaintiff

made between September 19, 2020 and June 22, 2022, (DE 24-4); and 5) plaintiff's court attendance record for October 29, 2021.

The court also declines to consider these exhibits at this stage in the litigation. The majority of the exhibits are not arguably "integral to the complaint." Secretary of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007). Further, plaintiff raises authenticity objections as to the exhibits. (DE 32 at 14). As to plaintiff's timesheets, pay stubs, and court sign-in records, while plaintiff mentions periods of work that coincide with the proffered exhibits, plaintiff does so as examples to bolster the extant factual allegations in his complaint. (See, e.g., compl. ¶ 56 ("Plaintiff ... for example, was required to attend court ...")); (see also id. ¶ 60 ("By way of example, [p]laintiff ... attended a mandatory ... [t]raining on March 3, 2022 ..."). Thus, these documents are not integral to the complaint nor were they "explicitly relied on in the complaint." Zak, 780 F.3d at 607. Defendant will have the opportunity to present these exhibits at a later juncture.

In sum, plaintiff's motion to strike is denied in that part where it seeks to have the court strike defendant's exhibits from the record, and granted in that part where it seeks to have the court not consider defendant's exhibits in ruling on defendant's partial motion to dismiss and plaintiff's motion for conditional certification. [9]

9 Plaintiff also posits evidentiary arguments as a basis to grant his motion to strike defendant's exhibits from the record. Some courts have concluded that motions to strike are properly directed towards "evidence submitted in support of motions or pleadings." See, e.g., Morris v. Precoat Metals, No. 2:22-cv-0053-SLB, 2013 WL 830868, at *2 (N.D. Ala. Mar. 4, 2013). "Under this view, motions to strike evidence may be granted where the evidence that is offered is inadmissible under the Federal Rules of Evidence." Id. But where the court agrees with plaintiff's arguments as to declining consideration of defendant's exhibits under the Rule 12 pleading standard, the court finds it unnecessary at this time to resolve plaintiff's evidentiary challenges. Furthermore, for similar reasons, the court does not address plaintiff's allegation that defendant's submission of exhibits is "a backdoor attempt to persuade this [c]ourt to utilize the intermediate standard under the FLSA's conditional certification step." (DE 27 at 11). Defendant does not challenge the certification standard. (See DE 30 at 13).

B. Defendant's Partial Motion to Dismiss (DE 23)

1. Standard of Review

***8** "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

2. Analysis

Plaintiff asserts claims for violations of the FLSA overtime provision, 29 U.S.C. § 207. The FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

Section 207 prohibits employment for "a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a); see also Salinas v. Com. Interiors, Inc., 848 F.3d 125, 133 (4th Cir. 2017) (quoting 29 U.S.C. § 207(a)(1)) ("[T]he FLSA establishes a federal minimum wage and requires employers to pay 'a rate not less than one and one-half times the regular rate' to employees who work more than forty hours in a single workweek.").

"Recognizing the unique nature of the work performed by police officers and firefighters, Congress provided a partial exemption to the FLSA's overtime requirements for public agency employers." Monahan v. Cnty. of Chesterfield, Va.,

95 F.3d 1263, 1267 (4th Cir. 1996). In particular, § 207(k) provides the following exemption:

> No public agency shall be deemed to have violated [§ 207(a)] with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities ... if—
>
> (1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days ...; or
>
> (2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,
>
> compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k) (hereinafter, the "§ 207(k) exemption"). By regulation, the period of 216 hours stated in § 207(k) has been replaced by "171 hours for law enforcement employees." 29 C.F.R. § 553.201; id. § 553.230. Accordingly, "a public employer need not ... compensate law enforcement employees at the overtime rate until they have worked a total of 171 hours for 28 consecutive days." Roy v. Cnty. of Lexington, South Carolina, 141 F.3d 533, 538–39 (4th Cir. 1998). "The number of hours at the regular and overtime wage rates for periods of fewer than 28 days would be calculated applying the same proportion, as explained in 29 C.F.R. § 553.230." Lamon v. City of Shawnee, Kan., 972 F.2d 1145, 1150 (10th Cir. 1992); see also Calvao v. Town of Framingham, 599 F.3d 10, 13 (1st Cir. 2010) ("[T]he partial exemption in § 207(k) set a higher threshold of hours that public safety personnel can work in a [28] day work period – or a proportional number of hours in a shorter work period of at least seven days – before these employees become entitled to overtime compensation.").

***9** Defendant's partial motion to dismiss is directed at plaintiff's FLSA claims for overtime and gap time compensation, as well as claims pertaining to plaintiff's bonus payments, defendant's compensatory leave practices, and mandatory court and training appearances. [10] The court addresses these challenged claims in turn below.

10 Plaintiff additionally asserts an FLSA violation on the basis that he worked prior to the start and after the end of his scheduled shifts. (See Compl. ¶¶ 42-48, 83-84). Defendant does not challenge these claims in its motion to dismiss and it concedes that plaintiff has stated a FLSA claim for performing uncompensated pre-shift and post-shift work. (DE 31 at 6 n.5).

a. Overtime and Gap Time Compensation

Defendant argues that plaintiff's claim to overtime and gap time compensation based on a 14-day work period fails where defendant adopted a work period of 28 days pursuant to the § 207(k) exemption. Defendant suggests that establishment of a 28-day work period eliminates defendant's purported overtime and gap time compensation obligations under plaintiff's alleged facts. See O'Brien v. Town of Agawam, 350 F.3d 279, 290 (1st Cir. 2003) ("The longer the work period, the more likely it is that days of calm will offset the inevitable emergencies, resulting in decreased overtime liability."). The court disagrees.

The United States Court of Appeals for the Fourth Circuit has not addressed the types of allegations that will trigger application of a § 207(k) exemption. However, opinions from other circuit courts of appeal are instructive. "The [c]ity bears the burden of showing that it qualifies for a section [§ 207(k)] exemption." Adair v. City of Kirkland, 185 F.3d 1055, 1060 (9th Cir. 1999). "Whether an employer meets this burden is normally a question of fact." Flores v. City of San Gabriel, 824 F.3d 890, 903–04 (9th Cir. 2016); see also Singer v. City of Waco, Tex., 324 F.3d 813, 818 (5th Cir. 2003) ("This issue (whether the City established a 14-day or a 28-day work period) is a question of fact, and was properly submitted to the jury."); Birdwell v. City of Gadsden, Ala., 970 F.2d 802, 805 (11th Cir. 1992). [11]

11 The circuit courts of appeal are divided as to the employer's burden of proof required to show that a § 207(k) work period has been established. Compare Lamon, 972 F.2d at 1154 (preponderance of the evidence), with Calvao, 599 F.3d at 15 (clear and affirmative evidence), and Birdwell, 970

F.2d at 805 (clear and affirmative evidence). In Singer, the Fifth Circuit did not specify the burden of proof on the employer, but it cited to Lamon and Spradling v. City of Tulsa, Okla., 95 F.3d 1492, 1505 (10th Cir. 1996). Nevertheless, Singer addressed the disputed length of the work period established under § 207(k), not merely whether an employer had established a § 207(k) regime in the first instance. The Fourth Circuit has not addressed this burden of proof split under § 207(k) and the court need not weigh in at the pleading stage.

"Generally, the employer must show that it established a § 207(k) work period and that the § 207(k) work period was 'regularly recurring.' " Flores, 824 F.3d at 904 (quoting 29 C.F.R. § 553.224(a)); see Lamon, 972 F.2d at 1154 ("To be adopted, the work period must have been put into effective operation by the City[.]"); see also Singer, 324 F.3d at 819 ("To be established by a city, the longer work period .. must have been put into effective operation by the city."). [12]

12 At this stage, the court need not address differences, if any, between the substantive standards articulated in Flores, Lamon, and Singer.

***10** Here, plaintiff states a FLSA claim for defendant's violation of the overtime and gap time provisions of the FLSA. Plaintiff allegedly was paid every 14 days, turned in a timesheet every 14 days, and worked on a rotating 14-day schedule. (Compl. ¶ 40). However, plaintiff alleges that defendant "only calculated overtime hours every [28] ... days, resulting in a significant undercutting of [p]laintiffs' overtime wages." (Id. ¶ 3). While defendant agrees that plaintiff was paid overtime every 28 days where defendant purportedly adopted a 28-day work period, plaintiff specifically alleges that "[d]efendant adopted a fourteen (14) day work period." (Compl. ¶ 2; id. ¶ 80). Given this discrepancy, it is reasonable to infer, drawing all factual inferences in plaintiff's favor, that plaintiff did not receive the requisite overtime or gap time pay for all hours worked in the 14-day work period.

Defendant still urges the court to find, as a matter of law, that defendant established a 28-day work period under § 207(k). Defendant correctly states that "[a]s used in section [§ 207(k)], the term work period ... cannot be less than 7 consecutive days nor more than 28 consecutive days ... [but] the work period ... need not coincide with the duty cycle or pay period[.]" 29 C.F.R. § 553.224(a). In Lamon, the plaintiffs renewed their motion for summary judgment or directed verdict arguing that the evidence presented at trial did "not show that the City established a bona fide work period under § 207(k), because ... [d]espite the institution of a 28-day work period under Administrative Code No. 2–5, the City continued to pay its law enforcement personnel every two weeks and to pay overtime for hours worked in excess of 40 per week." 972 F.2d at 1151. The Tenth Circuit concluded that 29 C.F.R. § 553.224(a) "explicitly allows pay periods to vary from work periods and makes no mention of a requirement that overtime wage rates be paid only for hours exceeding 171 in a work period." Id. at 1152. Upon the plaintiffs' motions, the Tenth Circuit held that "[t]he evidence was uncontroverted that the City adopted Administrative Code No. 2–5, setting forth the City's § 207(k) employment policy." Id.

Lamon may ultimately lend support to defendant's arguments. However, at this stage, the court cannot conclude that defendant established a 28-day work period where it must construe all well-pleaded factual allegations in plaintiff's favor. See Spradling v. City of Tulsa, Okla., 945 F.3d 1492, 1505 (10th Cir. 1996) (establishing a work period under § 207(k) "is normally a question of fact"). And plaintiff, without the benefit of the discovery process, has specifically alleged that defendant established a 14-day work period by asserting that plaintiff was paid every 14 days, submitted timesheets every 14 days, and worked on a 14-day schedule. Lamon does not command the court to resolve this disputed factual determination at the motion to dismiss stage. See 972 F.2d at 1153 ("The trial court correctly denied Plaintiffs' motion for directed verdict and renewed motion for summary judgment, as there was evidence upon which the jury could properly have found that the City had established [a] 28-day work period permissible under subsection (k).").

Even so, defendant asserts that plaintiff's allegations that plaintiff was paid and submitted timesheets every 14 days and worked a 14-day duty cycle are insufficient to state a claim for overtime where defendant is not required to align the work period and duty cycle or pay period under 29 C.F.R. § 553.224(a). The court disagrees. In Singer, the Fifth Circuit determined that "[t]he district court correctly told the jury that the City could establish a particular work period by demonstrating that it actually pays its fire fighting employees in accordance with the longer work period." 324 F.3d at 819. The court does not question that employers need not "structure pay periods to be co-extensive with the chosen work period." Lamon, 972 F.2d at 1151; but here, plaintiff alleges sufficient facts to plausibly infer that defendant had not "actually adopted a 28-day work period" which was "put

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

into effective operation” id. at 1154, or had not “established a § 207(k) work period” of 28-days and “the § 207(k) work period was regularly recurring.” Flores, 824 F.3d at 904; cf. Franklin v. City of Kettering, Ohio, 246 F.3d 531 (6th Cir. 2001) (finding defendant sufficiently demonstrated explicit adoption of a 28-day work period under § 207(k) where defendant offered testimony and other evidence showing that officers were aware of the work period). [13]

13 Notably, in its briefing, defendant does not cite to any case at the motion to dismiss stage where a court concluded that a city established a contested work period in the face of the complaint's well-pleaded assertions to the contrary.

***11** Furthermore, even if defendant could establish a policy of a 28-day work period, this would not foreclose plaintiff's claims under the present allegations. In Singer, the Fifth Circuit found that there was sufficient evidence for a jury to find that the plaintiff established a 14-day work period even though, at trial, the defendant introduced a memorandum from the city fire chief asserting that a “a 28 day-work cycle will be established.” 324 F.3d at 820. The Singer court concluded that the jury could properly find that the relevant work period was 14 days where the city's finance director testified that the pay period was 14 days, the finance director understood the work period to align with the pay period, and the city had always calculated overtime compensation on a 14-day cycle. Id. The Fifth Circuit refused to disturb the jury's determination where the plaintiff produced significant countervailing evidence despite the defendant's provision of the fire chief's memorandum. Id. at 821; see also Adair, 185 F.3d at 1061 (emphasis added) (“The [defendant] established a [§ 207(k)] exemption when it specified the work period in the [collective bargaining agreement] and when it actually followed this period in practice”). The court's judicial notice of the Overtime Policy, therefore, would not conclusively show that defendant followed the provisions of its Policy or preclude countervailing evidence that may emerge in the discovery process to support plaintiff's allegations. See Birdwell, 970 F.2d at 806 (“[T]he plaintiffs never had a chance to present evidence regarding the work period since the district court ruled that [§ 207(k)] did not apply while the plaintiffs were presenting their case. Thus, we cannot direct the district court to enter a judgment for the defendant without first giving the plaintiffs an opportunity to present evidence[.]”)

In sum, plaintiff sufficiently alleges a claim for overtime and gap time compensation based on a 14-day work period. Thus, that part of defendant's motion to dismiss seeking to dismiss this claim is denied.

Defendant also asserts that plaintiff's claim for unpaid overtime compensation must be dismissed where plaintiff misstates the threshold overtime requirement under 29 C.F.R. § 553.230(c). Defendant is correct that where defendant has adopted a 14-day work period, defendant is obligated to pay the overtime premium rate only after plaintiff works 86 hours in that period. See id. While plaintiff's complaint alleges that the overtime threshold is triggered at 85.5 hours in a 14 day-work period, plaintiff agrees in his briefing that 86 hours is the correct maximum hour standard. Defendant does not cite to any legal authority requiring the court to dismiss all of plaintiff's overtime and gap time compensation claims under the FLSA on the basis of this misstatement. Furthermore, the factual allegations in plaintiff's complaint give rise to a plausible inference that plaintiff worked more than 86 hours during certain 14-day work periods without compensation at the overtime premium rate. See Hall v. DIRECTV, LLC, 846 F.3d 757, 777 (4th Cir. 2017) (“[T]o state a plausible FLSA overtime claim, plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week.”); see also Pforr v. Food Lion, Inc., 851 F.2d 106, 108 (4th Cir. 1988) (“[P]laintiff under the FLSA need [ ] show the amount and extent of improperly compensated work as a matter of just and reasonable inference”). Thus, the court will not dismiss plaintiff's claim for overtime and gap time compensation on the basis of this misstatement in plaintiff's complaint.

b. Bonuses

Next, the parties dispute whether defendant was required to include bonuses paid to plaintiff, including a bonus for receiving a vaccination on October 8, 2021, in his regular rate of pay under the FLSA. Defendant asserts that the bonus paid to plaintiff for the October 8, 2021, vaccination was discretionary, and therefore, it did “not need to be included in [p]laintiff's regular rate of pay.” (DE 24 at 11). Defendant also argues that plaintiff's allegation as to additional pay or nondiscretionary bonuses fails the requisite pleading standard. (DE 31 at 5). The court agrees.

"[T]he regular rate at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include ... [s]ums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency[.]" 29 C.F.R. § 779.18(e)(1). Further, "[s]ums paid in recognition of services performed during a given period if ... the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly" are not required to be included in the employee's regular rate. Id. § 779.18(e)(3).

***12** Here, plaintiff alleges that he "received a bonus for receiving a vaccine in the workweek ending on approximately October 8, 2021." (Compl. ¶ 63). Plaintiff alleges that the $250 bonus was "nondiscretionary" and "[d]espite receiving such a bonus, ... [d]efendant did not appropriately augment ... [p]laintiff's regular rate of pay." (Id. ¶¶ 61, 63). Plaintiff also asserts that "police officers received additional pay or non-discretionary bonuses during their time working for [d]efendant, such as for receiving vaccinations." (Id. ¶ 61). But plaintiff is silent on other bonuses paid to plaintiff other than the October 8, 2021, bonus. And plaintiff fails to allege any facts that give rise to a reasonable inference that the October 2021 bonus or other bonuses were made by defendant "pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly," 29 C.F.R. § 779.18(e)(3), or "measured by or dependent on hours worked, production, or efficiency," id. § 779.18(e)(1). Further, plaintiff's complaint does not allege that any of his bonuses were paid "contingent upon [plaintiff] continuing in employment." Id. § 778.211. Nor does plaintiff allege, as to any of his bonuses, facts supporting the inference that defendant did not "retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus[es] were paid." Id.

In response, plaintiff asserts that "[w]hether a bonus was nondiscretionary or discretionary is a fact question that is inappropriate for resolution at the motion to dismiss stage." (DE 29 at 21). But plaintiff still fails to plead any facts supporting the inference that bonuses paid to him were nondiscretionary or required to be included in his regular rate of pay. Cf. Bradescu v. Hillstone Rest. Grp., Inc., No. SACV 13-1289-GW (RZx), 2014 WL 5312546, at *4 (C.D. Cal. Sept. 18, 2024) (finding a factual dispute where the plaintiff alleged she received a bonus each time she trained a new server).

Accordingly, plaintiff's claim alleging a FLSA violation based upon defendant's failure to include bonuses in plaintiff's regular rate of pay is dismissed. Defendant's motion in this part thus is granted.

c. Compensatory Time Off Policy

The court next turns to plaintiff's allegation that defendant required plaintiff "to take off, generally, the next shift, to avoid triggering [d]efendant's automatic overtime payout" whenever his "comp time bank [came] close to seventy (70) hours." (Compl. ¶ 51). Plaintiff alleges this practice violates the FLSA where "instead of taking comp time earned at their own discretion, police officers are forced to utilize it at [d]efendant's request[.]" (Id.). Defendant admits that it requires employees to use their compensatory time as plaintiff alleges, but asserts that plaintiff's allegations fail as a matter of law under the FLSA. (See DE 24 at 12). The court agrees with defendant.

Plaintiff abandons his claim as to defendant's compensatory time off policy by not addressing defendant's arguments in his response brief. (See generally DE 29). In addition and in the alternative, plaintiff fails to plausibly allege a FLSA violation against defendant on this basis. "If compensation is paid to an employee for accrued compensatory time off, such compensation shall be paid at the regular rate earned by the employee at the time the employee receives such payment." 29 U.S.C. § 207(o)(5)(3)(B). Section 207(o)(5) "imposes a restriction upon an employer's efforts to prohibit the use of compensatory time when employees request to do so; [however, § 207(o)(5)] says nothing about restricting an employer's efforts to require employees to use compensatory time." Christensen v. Harris Cnty., 529 U.S. 576, 585 (2000) (emphasis omitted). "[U]nder the FLSA an employer is free to require an employee to take time off work, and an employer is also free to use the money it would have paid in wages to cash out accrued compensatory time." Id.

Accordingly, plaintiff's claim based upon requiring plaintiff to take compensatory leave upon approaching 70 hours of compensatory time is dismissed. Defendant's motion in this part thus is granted.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

d. Mandatory Court Attendance and Training Sessions

Turning to plaintiff's allegation that defendant failed to compensate plaintiff for time spent in court and training sessions, defendant argues that plaintiff's claim "lacks the factual sufficiency required for a claim under Rule 12(b)(6)." (DE 24 at 13). The court disagrees.

***13** The Fourth Circuit addressed the pleading standards sufficient to state a claim under the FLSA, in the context of an overtime claim, in Hall v. DIRECTV, LLC, 846 F.3d 757 (4th Cir. 2017). In Hall, the Fourth Circuit pronounced:

> [T]o make out a plausible overtime claim, a plaintiff must provide sufficient factual allegations to support a reasonable inference that he or she worked more than forty hours in at least one workweek and that his or her employer failed to pay the requisite overtime premium for those overtime hours. Under this standard, plaintiffs seeking to overcome a motion to dismiss must do more than merely allege that they regularly worked in excess of forty hours per week without receiving overtime pay.
>
> At the same time, however, we emphasize that the standard we today adopt does not require plaintiffs to identify a particular week in which they worked uncompensated overtime hours ... Thus, to state a plausible FLSA overtime claim, plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week. A plaintiff may meet this initial standard by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility.

Id. at 776–77 (emphasis in original).

Here, plaintiff alleges that police officers were required to attend "court and training sessions on unscheduled off days." (Compl. ¶ 26). According to the complaint, plaintiff was not properly compensated for these "mandated work duties." (Id. ¶ 52). As examples, plaintiff asserts that he attended court for 8.25 hours during the pay period between October 22, 2021, and November 4, 2021, but was not compensated at the overtime premium rate despite working more than his scheduled hours for the 14-day pay period. (Id. ¶ 56). Additionally, plaintiff alleges that he spent 20 hours on a federal case during the pay period between March 26, 2022, and April 8, 2022, but plaintiff was not compensated for that work. (Id. ¶ 58). Plaintiff also alleges that he attended a mandatory four-hour training on March 3, 2022, in addition to his regularly scheduled hours. (Id. ¶ 60). However, plaintiff asserts he was not appropriately compensated for that training session either. (See id.). Specifically, plaintiff alleges that, for a particular period, defendant failed to adequately compensate him for all hours worked, including time police officers were required to attend court and training sessions. Plaintiff alleges sufficient facts to satisfy the pleading standards set forth in Hall.

In response, defendant proffers numerous exhibits, pertinent to the court appearance and training session examples, that purport to refute plaintiff's allegations that he was not adequately compensated. (See, e.g., DE 24 at 13–15). However, for reasons articulated above, the court declines to consider these exhibits at this stage. And it would be incongruous to dismiss plaintiff's detailed allegations for failure to satisfy the pleading standard where Hall expressly emphasized that plaintiffs need not "identify a particular week in which they worked uncompensated overtime hours." Hall, 846 F.3d at 777 (emphasis in original).

***14** Accordingly, defendant's motion to dismiss that part of the complaint seeking adequate compensation for mandatory court appearances and training sessions is denied.

C. Plaintiff's Motion to Certify (DE 17)

The statute governing FLSA collective actions, 29 U.S.C. § 216(b), provides, in pertinent part:

> An action to recover the liability prescribed in the [FLSA] may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). Accordingly, there are two requirements for maintenance of such an FLSA action, also known as a "collective action": 1) the plaintiffs who are joined in the action must be "similarly situated"; and 2) they must opt in by filing their consent to sue with the court. Id.; Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 173 (1989).

Although the statute does not set forth a process for certifying the members of a collective action, "[l]ower courts have borrowed class-action terminology to describe the process of joining co-plaintiffs under 29 U.S.C. § 216(b)," despite the "significant differences between certification under Federal Rule of Civil Procedure 23 and the joinder process under § 216(b)." Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 71 n. 1 (2013).

Ordinarily, district courts have followed a two-stage process for certifying members of a FLSA collective action. First, at the notice stage, early in a case, the named plaintiffs may seek "conditional certification" based upon a limited record, including approval of a notice to putative collective action members of their right to opt in. Id. at 70. A final determination on certification is made later, typically after discovery but before trial, when the court has available to it substantially more information. See, e.g., Scott v. Chipotle Mexican Grill, Inc., 954 F.3d 502, 515 (2d Cir. 2020); Rosinbaum v. Flowers Foods, Inc., 238 F. Supp. 3d 738, 743 (E.D.N.C. 2017).

The notice stage, subject of the instant certification motion, is grounded in the recognition by the United States Supreme Court, in Hoffmann-La Roche, that "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) ... by facilitating notice to potential plaintiffs." 493 U.S. at 169. "Congress has stated its policy that [FLSA] plaintiffs should have the opportunity to proceed collectively," and "[t]he broad remedial goal of the statute should be enforced to the full extent of its terms." Id. at 170, 173.

"A collective action allows [FLSA] plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources," and "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [unlawful] activity." Id. at 170. "Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." Id. (citing Fed. R. Civ. P. 83). "Court authorization of notice serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." Id.

***15** The statute does not define the terms "similarly situated" for purposes of determining collective action membership. The Supreme Court and the Fourth Circuit also have not announced a test to determine whether individuals are "similarly situated." This court previously has used a test adopted originally from a FLSA treatise, whereby "plaintiffs must raise a similar legal issue as to coverage, exemption, or nonpayment or minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions, but their situations need not be identical." De Luna-Guerrero v. N. Carolina Grower's Ass'n, Inc., 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (quoting Kearns, The Fair Labor Standards Act, § 18.IV.D.3); see, e.g., Vazquez-Aguilar v. Gasca, 477 F.Supp.3d 418, 422 (E.D.N.C. 2020) (same).

Several circuit courts of appeal recently have addressed comprehensively a standard for determining whether employees are "similarly situated" for purposes of an FLSA collective action. For example, the Second Circuit held that "to be 'similarly situated' means that named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation." Scott, 954 F.3d at 516. "That is, party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." Id. Likewise, the Ninth Circuit has held that "plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." Campbell v. City of Los Angeles, 903 F.3d 1090, 1117 (9th Cir. 2018); see also O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d 567, 584-85 (6th Cir. 2009) ("[P]laintiffs were similarly situated, because their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct.").

In this case, plaintiff has demonstrated for purposes of conditional certification that proposed opt-in plaintiffs are "similarly situated," under any of the foregoing definitions. The court first sets forth below its reasons for determining

that putative plaintiffs are similarly situated, followed by discussion of plaintiff's proposed notice.

a. Similarly Situated

Proposed opt-in plaintiffs are similarly situated to named plaintiff for several reasons. First, they all performed similar duties as police officers employed by defendant. (See Edwards Decl. (DE 18-1) ¶ 3). Second, they all worked in positions where defendant allegedly failed to adequately compensate them for similar pre-shift and post-shift work activities, as well as mandatory court attendance and training sessions. (See id. ¶¶ 4, 5, 9, 12, 16, 18, 20, 23, 26). Third, because all of these employees were allegedly subject to the same 14-day work period and other policies and practices of defendant, they raise similar core issues of fact and law material to the disposition of the FLSA claims. (See id. ¶¶ 40–43).

In response, defendant first argues that "[p]laintiff has failed to articulate even a modest showing of facts to show the [c]ity established a 14-day work period rather than a 28-day work period for any alleged similarly situated employees." (DE 22 at 7). The court disagrees, where it has previously determined that issues of fact preclude a determination that defendant established a 28-day work period as a matter of law. For one, defendant presumes a requirement different from that suggested by the authorities and case law set forth above. See, e.g., O'Brien, 575 F.3d at 584 ("Showing a 'unified policy' of violations is not required."). In any event, plaintiff identifies a common policy, scheme, or plan, in that hourly non-exempt police officers allegedly were subjected to a pay policy that resulted in "unpaid overtime wages for [any work] over [85.5] [hours] per [14] day pay period." (See Edwards Decl. ¶ 43).

***16** Next, as to plaintiff's alleged uncompensated pre-shift and post-shift work, defendant argues that certification of similarly situated employees is inappropriate where "[p]laintiff fails to provide any facts, such as the names of these officers, the districts, squads and unit assignments of these officers, the names of any involved supervisors who were aware of the activities, or any details about how he became aware of officers' fears to record their hours worked." (DE 22 at 11). Effectively defendant requests the court to impose a standard greater than required for conditional certification. See Genesis Healthcare Corp., 569 U.S. at 70; Gasca, 477 F.Supp.3d at 422-425; see, e.g., Butler v. DirectSAT USA, LLC, 876 F.Supp.2d 560, 567 (D. Md. 2012) (noting plaintiff's "evidence need not ... enable the court to determine conclusively whether a class of similarly situated plaintiffs exists"). Further, there is no requirement as to the number of declarations or affidavits supporting a motion for conditional certification. See, e.g., Johnson v. PHP of NC, Inc., No. 5:23-cv-00462-M, 2024 WL 2290590, at *5 (E.D.N.C. May 21, 2024) ("In accordance with the purpose underlying the FLSA's collective action procedure, the initial inquiry into whether putative members are similarly situated proceeds under a fairly lenient standard and requires only minimal evidence."); Romero v. Mountaire Farms, Inc., 796 F.Supp.2d 700, 705 (E.D.N.C. 2011) ("The standard for conditional certification is fairly lenient and requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."); Williams v. Long, 585 F.Supp.2d 679, 684 (D. Md. 2008) ("This would include factual evidence by affidavits or other means, but mere allegations in the complaint would not suffice.").

Defendant also cites to cases where courts denied plaintiffs' motions for conditional certification for failing to "show a 'reasonable basis' to claim there are other similarly situated employees." (DE 11) (quoting Yerger v. Liberty Mut. Grp., Inc., No. 5:11-cv-238-D, 2012 WL 4423499, at *4 (E.D.N.C. Sept. 24, 2012)). Those cases are distinguishable. In Yerger, the court concluded that the plaintiff failed to demonstrate she was similarly situated to any other field auditor after finding that the plaintiff possessed "atypical lack of discretion and independent judgment." Id. In Giron v. Square A Constr. Inc., the court denied conditional certification where the plaintiff, a commercial truck driver, did not proffer any evidence that other "drivers, mechanics, warehouse workers, repairmen, bricklayers, framers, and concrete masons" were subject to similar "job requirements or pay provisions." No. 3:20-cv-00626-DSC, 2021 WL 2481882, at *1, *2 (M.D.N.C. June 17, 2021). And in Ceras-Campo v. WF P'ship, while the court noted that the plaintiff had failed to provide declarations from any of the putative opt-in plaintiffs, the court recognized that this deficiency was "not entirely dispositive" and still concluded that there were "other problems with [the] [p]laintiff's declaration itself." No. 5-10-cv-215-BO, 2011 WL 588417, at *3 (E.D.N.C. Feb. 9, 2011).

Here, plaintiff's declaration demonstrates that he and other police offers were required to complete a variety of tasks prior to the start of their scheduled shifts. (See, e.g., Edwards Decl. ¶ 16). Plaintiffs avers that he and other police officers "were frequently required to stay past the end of [their]

scheduled shift to continue finishing tasks[.]" (Id. ¶ 18). Plaintiff further declares that he and other police offers were on average "required to attend at least one [court] proceeding per month ... depending on [their] workload and the number of subpoenas [they] received." (Id. ¶ 26). And plaintiff establishes that "[f]rom personally speaking with, observing, and working alongside other officers, [he] know[s] that other officers for [d]efendant were subject to the same or similar policies and practices regarding job duties and scheduling of hours worked." (Id. ¶ 40); See McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 470 (E.D.N.C. 2010) ("[C]ourts have routinely recognized that where an employer has a common practice of failing to pay employees for all hours worked, factual distinctions of the type claimed by [defendant] provide no basis to deny initial certification of a collective action under the FLSA."). Thus, plaintiff's declaration makes a factual showing sufficient to satisfy the evidentiary standard at this initial certification stage.

***17** In sum, plaintiff meets the collective action standard here by virtue of common legal issues arising from defendant's alleged failure to pay overtime as due, in the context of a limited universe of non-exempt police officers sharing the same RPD setting and working pursuant to the same alleged practices and policies. If, following the completion of discovery, defendant determines that some opt-in plaintiffs operated pursuant to materially different procedures or factual circumstances, it may seek to sever the same individuals from the class through a motion for decertification. However, under the circumstances of this case, it would not promote efficiencies for either the court or litigants to require any putative collective action members to proceed in a separate action. Therefore, the court in its discretion grants plaintiff's motion for conditional certification.

b. Notice

As part of the instant motion, plaintiff seeks to have the court approve the "proposed FLSA notice of this action and the consent form." (DE 17 at 1). In addition, plaintiffs seek an order for production of names and other contact information for all putative class members and approval of a method for distribution of the notice. (Id.). While the court grants that part of plaintiff's motion for conditional certification, further proceedings are required to determine the appropriate notice to issue. Where the court dismisses some of plaintiff's FLSA claims based on inappropriately compensated bonuses and defendant's compensatory time off policy, the court directs plaintiff to supplement the motion with a revised request for court-authorized notice to be issued to collective action members. Further, the parties are directed to file motion(s) for protective order where defendant asserts that release of any contact information as to putative opt-in plaintiffs is protected under North Carolina law. (See DE 22 at 20).

Therefore, plaintiff's motion to certify is granted in that part seeking conditional certification and held in abeyance in that part seeking court authorization of notice.

## CONCLUSION

Based on the foregoing:

1. Plaintiff's motion to strike (DE 26) is GRANTED IN PART and DENIED IN PART;

2. Defendant's partial motion to dismiss (DE 23) also is GRANTED IN PART and DENIED IN PART. Plaintiff's claims based upon bonuses received and defendant's compensatory time off policy are DISMISSED under Rule 12(b)(6);

3. As to the remaining claims, plaintiff's motion to certify and to authorize issuance of notice (DE 17) is GRANTED IN PART pertaining to certification and HELD IN ABEYANCE IN PART pertaining to notice;

4. Plaintiff is DIRECTED to file, within 14 days of the date of this order, a supplement to his motion including a revised request for court-authorized notice to be issued to collective action members, in light of the court's determinations herein. Plaintiff's supplement shall specify if defendant consents to the form of notice; if not, defendant is DIRECTED to file, within 14 days thereof, a response; and

5. The parties are DIRECTED to file motion(s) for protective order as set forth herein, within 14 days of the date of this order.

SO ORDERED, this the 11th day of September, 2024.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4156829

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Guy v. Lampert

United States District Court, D. Wyoming. | December 26, 2017 | Not Reported in Fed. Supp. | 2017 WL 8784492

**Document Details**

| | |
|---|---|
| standard Citation: | Guy v. Lampert, No. 17-CV-013-J, 2017 WL 8784492 (D. Wyo. Dec. 26, 2017) |
| All Citations: | Not Reported in Fed. Supp., 2017 WL 8784492 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Wyoming |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**

Attorneys and Law Firms (p.1)
**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT** (p.1)
All Citations (p.28)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 8784492
Only the Westlaw citation is currently available.
United States District Court, D. Wyoming.

Jon Michael GUY Plaintiff,
v.
Robert LAMPERT, Wyoming Department of Corrections (WDOC) Director; Jeffie Wiggins, Central Services Division Administrator; Donald Hargett, (former) Wyoming Medium Correctional Institution (WMCI) Warden; Ruby Ziegler, Wyoming Honor Farm (WHF) Warden; Robert Hultz, Wyoming State Penitentiary (WSP) Deputy Warden; Eric Staiger, WMCI American Corrections Association (ACA) Coordinator; Carrie Caruthers, Wyoming Honor Farm (WHF) Security Captain; Timothy Rysell, WDOC Security Threat Group (STG) Investigative Captain; Seth Norris, WMCI Captain; Shawn Hobson, WSP Security Captain; Michael McManis, WMCI Lieutenant; Dennis Phillips, WMCI Lieutenant; Dave Hendricks, WMCI Lieutenant; Brian Church, WMCI Sergeant; Jeremy Lira, WMCI Sergeant; Brendon Walker, WMCI Sergeant; Lance Kennedy, WMCI Grievance Manager; WMCI; Jennifer Emigh, WMCI Officer; Kevin Stender, WMCI Officer; De Maramed, WMCI Officer; Zachary Mehrens, WMCI Officer; Daniel Cook, WMCI Officer; Scott Leever, WMCI Case Team Leader (CTL); Drew Murphy, WMCI Laundry Supervisor; Michelle Brooks, WMCI Office Support Specialist; John Doe, Unknown WDOC Employee, individually and in their official capacity, Defendants.

Case No. 17–CV–013–J
|
Signed 12/21/2017
|
Filed 12/26/2017

**Attorneys and Law Firms**

JonMichael Guy, Torrington, WY, pro se.

Charles Michael Steve Aron, Aron & Hennig, Laramie, WY, for Plaintiff.

Justin Ashkhan Daraie, John H. Ridge, Wyoming Attorney General's Office, Cheyenne, WY, for Defendants.

## ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT

ALAN B. JOHNSON, UNITED STATES DISTRICT JUDGE

***1** This matter is before the Court upon an amended *pro se* prisoner civil rights complaint pursuant to 42 U.S.C. § 1983, by Plaintiff, Jon Michael Guy, who has been granted *in forma pauperis* status. [Doc. 46; Doc. 4]. Defendants have filed a Motion to Dismiss First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). [1]

1 Defendant John Doe has been previously dismissed without prejudice. [Doc. 10].

The Court, having carefully considered each pleading, having reviewed the complete file herein, and being otherwise fully advised, FINDS the Motion to Dismiss First Amended Complaint should be GRANTED.

### TABLE OF CONTENTS

**BACKGROUND ...** ——

**APPLICABLE LEGAL PRINCIPLES ...** ——
**42 U.S.C. § 1983 ...** ——

**Retaliation ...** ——

**Qualified Immunity ...** ——

**DISCUSSION ...** ——
**Official Capacity ...** ——

**Individual Capacity ...** ——

**Retaliation ...** ——

**Equal Protection ...** ——

**Plaintiff's Activities ...** ——

**(i) *Staff Promotions* ...** ——

**(ii) *Negativity Campaign* ...** ——

**(iii) *Conduct Violation Reports* ...** ——

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(iv) *Security Threat Group Validation* ... ——**

**(v) *Grievance Procedure Process* ... ——**

**(vi) *Alleged Retaliation Involving Public Records* ... ——**

**(vii) *Denial of Transfer* ... ——**

**(viii) *Cumulative Harassment* ... ——**

**(ix) *Retaliation through the Commissary* ... ——**

**(x) *General Allegations* ... ——**

**Prison Litigation Reform Act [PLRA] ... ——**

**Federal Rules Civil Procedure 12(b)(6) ... ——**

**“Staff Promotions” ... ——**

**“Negativity Campaign” ... ——**

**“Conduct Violation Reports (CVR)” ... ——**

**“Security Threat Group Validation” ... ——**

**“Grievance Procedure Process” ... ——**

**“Alleged Retaliation Involving Public Records” ... ——**

**“Denial of Transfer Request” ... ——**

**“Allegations of Cumulative Harassment” ... ——**

**“Retaliation through the Commissary” ... ——**

**“General Allegations” ... ——**

**Qualified Immunity ... ——**

**“Retaliation” ... ——**

**“Discrimination” ... ——**

**Qualified Immunity by Defendant ... ——**

**Tort Liability ... ——**

**CONCLUSION ... ——**

**ORDER ... ——**

## BACKGROUND

The original complaint filed by Plaintiff encompassed ninety-four (94) pages, and named twenty-five (25) defendants. It alleged systemic retaliation, discrimination, and conspiracy, based on his various experiences since being transferred to Wyoming Medium Correctional Institution (WMCI). There were three claims for relief based on alleged retaliation, discrimination, and conspiracy by all Defendants in both their individual and official capacities. [Doc. 1]. Defendants, in response, filed a motion to dismiss and supporting memorandum. [Doc. 43; Doc. 44]. Plaintiff, rather than respond directly to the motion to dismiss, timely filed a 155–page amended complaint. [Doc. 46]. Defendants thereafter filed a second motion to dismiss. [Doc. 51]. Plaintiff, rather than respond to the second motion to dismiss, sought permission to file a second amended complaint [Doc. 54], which this Court denied. [Doc. 58]. The denial order allowed Plaintiff to file a response to Defendants’ second motion to dismiss.[Doc. 58, p. 1]. He thereafter filed a memorandum in opposition to the motion to dismiss first amended complaint. [Doc. 65]. The opposition stated “[to] the extent any claims or defendants that are included in the amended complaint are not mentioned herein, those claims and defendants are relinquished.” [Doc. 65, p. 62]. It specifically relinquished the conspiracy claim. [Doc. 65, p. 2 ¶ A(2) ].

***2** The limitation period in which a § 1983 complaint must be filed in order to be timely is determined by the applicable state limitation statute for recovery of damages for personal injury which represents legislative and public policy controlling the right to litigate. *Chase Securities Corporation v. Donaldson*, 325 U.S. 304, 313–314 (1945); *Navajo Tribe of Indians v. State of N.M.*, 809 F.2d 1455, 1470 (10th Cir. 1987); *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S. Ct. 1938, 1947 (1985); *Gee v. Pacheco*, 627 F.3d 1178, 1189–1190 (10th Cir. 2010); *Weldon v. Ramstad–Hvass*, 512 Fed. Appx. 783, 791 (10th Cir. 2013). The appropriate limitation period in Wyoming is four years.

> (a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action accrues:
>
> (iv) Within four (4) years, an action for:
>
> (C) An injury to the rights of the plaintiff, not arising on contract and not herein enumerated...

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Wyo. Stat. § 1–3–105(a)(iv)(C).

Federal law, however, governs when the claim accrues.

> Although state law determines the applicable statute of limitations period, federal law governs the particular point in time at which a claim accrues. We have previously explained that "[s]ection 1983 claims accrue, for the purposes of the statute of limitations, 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' "

*Kripp v. Luton*, 466 F.3d 1171, 1175 (10th Cir. 2006)(footnotes omitted). *See also, Weldon v. Ramstad–Hvass*, 512 Fed. Appx. at 791.

Plaintiff initiated this § 1983 action through his first complaint on January 19, 2017. He asserts in both his initial and amended complaint the alleged violations which support his § 1983 action occurred after his transfer to WMCI on or June 20, 2013. His initial complaint, having been filed within four years of the June 20, 2013, was timely.

## APPLICABLE LEGAL PRINCIPLES

42 U.S.C. § 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010). A "person acting under color of state law" must have committed the complained-of acts in the course of the performance of their duties, and have misused power they possessed by virtue of state law. *United States v. Classic*, 313 U.S. 299, 325–326 (1941).

The Supreme Court has taken a flexible approach to what is state action. A private party may be considered a state actor if: (1) there is a close nexus between the government and the challenged conduct; (2) the state has insinuated itself into a position of interdependence with a private party; (3) a private party is a willing participant with the state or its agents; and (4) the state delegates to the private party a traditional government function. *Read v. Klein*, 1 Fed. Appx. 866, 870–871 (10th Cir. 2001). If these factors are not met, the complained-of conduct is "private conduct," and "no matter how discriminatory or wrongful, may not be redressed by a § 1983 claim." *Read v. Klein*, 1 Fed. Appx. at 870–871.

A plaintiff suing under section 1983 may recover only money damages from defendants sued in their individual capacity, and only injunctive relief from defendants sued in their official capacities. *Brown v. Montoya*, 662 F.3d at 1161, citing *Hafer v. Melo*, 502 U.S. 21, 30, 27 (1991).

> ***3** A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability. [footnote omitted] Personal liability "under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).

*Brown v. Montoya*, 662 F.3d at 1163.

"Personal involvement is an essential allegation in a § 1983 action." *Mitchell v. Maynard*, 80 F.3d 1433, 1444 (10th Cir. 1996).

> It is axiomatic that, to prevail on a damages claim for a constitutional violation pursuant to § 1983, the plaintiff must show that the defendant, acting under color of state law, "personally participated in the alleged violation." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Conclusory allegations are not sufficient to state a constitutional violation. *Id.*

*Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007).

"[I]t is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 or *Bivens* claim. *Tonkovich*, 159 F.3d at 532 (emphases added)." *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013).

> Section 1983 does not authorize liability under a theory of respondeat superior. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, to establish supervisory liability, a plaintiff must show that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199.

*Brown v. Montoya*, 662 F.3d at 1164.

A district court, in addition, is obliged to dismiss a civil rights complaint filed by a prisoner *in forma pauperis* if at any time it determines the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A.

A complaint which lacks an arguable basis either in law or in fact is to be considered frivolous. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Motion to Dismiss

Motions to dismiss for failure to state a claim under Rule 12(b)(6) require the Court to determine whether a plaintiff has pled sufficient facts to state a plausible claim.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and internal citations omitted). *See also*, *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280(10th Cir. 2013), and *Garling v. United States Environmental Protection Agency*, 849 F.3d 1289 (10th Cir. 2017).

***4** Two principles underlie this standard. First, only factual allegations are given weight in the analysis. Simple naked assertions devoid of factual enhancement are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. at 678–679. Second, only plausible claims survive. *Ashcroft v. Iqbal*, 556 U.S. at 679.

> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief.

*Ashcroft v. Iqbal*, 556 U.S. at 679 (quotation marks and internal citations omitted). *See also, Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247–1248 (10th Cir. 2008), and *Silver v. Glass*, 459 Fed. Appx. 691, 694–696 (10th Cir. 2012).

The United States Supreme Court has been particularly critical of complaints which are vague on specifics, and leave defendants little idea where to begin when seeking to respond to conclusory allegations. *Robbins v. Oklahoma*, 519 F.3d at 1248 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007) ).

Plaintiff is *pro se*, thus his amended complaint should be construed liberally. *Jordan v. Sosa, ADX*, 654 F.3d 1012, 1018, fn. 8 (10th Cir. 2011); *Haines v. Kerner*, 404 U.S. 519–520–521 (1972); *Garza v. Davis*, 596 F.3d 1198, 1201 n. 2 (10th Cir. 2010). It is not, however, the "proper function of the district court to assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

Dismissal of a *pro se* complaint under Rule 12(b)(6) should ordinarily be without prejudice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Dismissal with prejudice, however, is proper "where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001)(quoting *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803, 806 (10th Cir. 1999) ).

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

These same consideration standards apply as well in cases subject to qualified immunity defenses wherein "plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Robbins v. Oklahoma*, 519 F.3d at 1249.

Retaliation

Prison officials may not retaliate against an inmate for exercising his constitutional rights, even when the action taken in retaliation would otherwise be permissible. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); 636 Fed. Appx. 753, 755 (10th Cir. 2016). Plaintiff, however, in order to establish liability for retaliation, must provide proof of three elements:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

***5** *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (citations omitted). *See also, Dawson v. Audet*, 636 Fed. Appx. 753, 755 (10th Cir. 2016)(quoting *Shero v. City of Grove, Okla.*, 510 F.3d at 1203). And to satisfy the third element, Plaintiff must establish "but for the retaliatory motive, the incidents to which he refers ... would not have taken place." *Peterson v. Shanks*, 149 F.3d at 1144. *See also, Dawson v. Audet*, 636 Fed. Appx. at 755 (quoting *Peterson v. Shanks*, 149 F.3d at 1144).

Plaintiff has unquestionably "engaged in constitutionally protected activity" as filing grievances and lawsuits are constitutionally protected. [Doc. 46, pp. 7–16 ¶¶ 37–93; Doc. 46, p. 8 ¶ 43; p. 9 ¶ 45; p. 10 ¶ 49; p. 11 ¶ 52; p. 11 ¶ 55;p. 12 ¶¶ 59, 61; p. 13 ¶¶ 65, 72]. *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2009); *Dawson v. Audet*, 636 Fed. Appx. at 755. He has, therefore, provided proof of the first element. Simple recitation of these activities does not, however, fulfill all three elements.

> While [plaintiff] undeniably engaged in protected activity-he has pursued a plethora of prison grievances and lawsuits over the years-that alone does not establish the requisite causal connection for his retaliation claim. If it did, litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness. "Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity."

*Strope v. Cummings*, 381 Fed. Appx. 878, 883 (10th Cir. 2010). Plaintiff, however, in order to prevail on a claim of retaliation, must provide proof of the second and third elements, in particular the "but for" element. He must "allege specific facts showing that 'but for the retaliatory motive, the incidents to which he refers ... would not have taken place.' " *Banks v. Katzenmeyer*, 645 Fed. Appx. 770, 772 (10th Cir. 2016)(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). *See, also, Dawson v. Audet*, 636 Fed. Appx. at 758.

Qualified Immunity

Qualified immunity shields public officials from civil damage liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The United States Supreme Court reaffirmed this immunity standard in 2012 and 2013.

> Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. See *Ashcroft v. al–Kidd*, 563 U.S. ——, —— (2011) (slip op., at 3). In *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), we held that courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question whether the purported right exists at all. *Id.*, at 227. This approach comports with our usual reluctance to decide constitutional questions unnecessarily. *Id.*, at 241; see also *Camreta v. Greene*, 563 U.S. ——, —— (2011) (slip op., at 9–10); *al–Kidd*, 563 U.S., at —— (slip op., at 3).
>
> ***6** To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have

> understood] that what he is doing violates that right.' " *Id.*, at—(slip op., at 9) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." 563 U.S., at ——(slip op., at 9). This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can " 'reasonably ... anticipate when their conduct may give rise to liability for damages.' "*Anderson, supra*, at 639 (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ).

*Reichle v. Howards*, —— U.S. ——, ——, 132 S.Ct. 2088, 2092 (2012).

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "*Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al–Kidd*, 563 U.S. ——, ——, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ). "We do not require a case directly on point" before concluding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd*, 563 U.S., at ——, 131 S.Ct., at 2083.

*Stanton v. Sims*, —— U.S. ——, ——, 134 S.Ct. 3, 4, 5 (2013). *See also, Beattie v. Smith*, 543 Fed. Appx. 850, 856 (10th Cir. 2013).

> Government defendants sued under § 1983 in their individual capacities have qualified immunity: "government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (quotation omitted).

*Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

The Tenth Circuit has succinctly outlined the need for, and relevant contours of, qualified immunity.

> Damages actions against public officials under § 1983 and *Bivens* impose "substantial social costs." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). They threaten potentially significant personal liability for actions that arise out of the performance of official duties, and they can subject officials to burdensome and distracting litigation. This could lead to undesirable *ex ante* effects: reticence of officials in carrying out important public functions and, perhaps worse, a general disaffection with public service, rooted in the calculation that its costs simply outweigh its benefits. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

> To avoid these and other evils, the Supreme Court has recognized that public officials enjoy qualified immunity in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties. *See Anderson*, 483 U.S. at 638, 107 S.Ct. 3034. "Qualified immunity is an immunity from suit rather than a mere defense to liability." *Lewis*, 604 F.3d at 1225 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (internal quotation marks omitted). And because it is "the norm" in private actions against public officials, officials enjoy a presumption of immunity when the defense of qualified immunity is raised. *Id.* (quoting *Harlow*, 457 U.S. at 807, 102 S.Ct. 2727) (internal quotation marks omitted); *see Kerns v. Bader. 663 F.3d 1173, 1180 (10th Cir.2011)* ("Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs."). A plaintiff seeking to overcome that presumption must make a two-part showing: first, that a public official violated the plaintiff's constitutional (or, in the case of a § 1983 action, more generally, federally protected) rights; and second, that these rights were clearly established at the time of the alleged violation. *See Lewis*, 604 F.3d at 1225; *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir.2009). This standard, by design, "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al–Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011).

***7** *Pahls v. Thomas*, 718 F.3d 1210, 1226, 1227 (10th Cir. 2013).

> "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, ––– U.S. ––––, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *al–Kidd*, 563 U.S. at 741, 131 S.Ct. 2074). Indeed, **"the dispositive question is 'whether the violative nature of** *particular* **conduct is clearly established,' "** *id.* (quoting *al–Kidd*, 563 U.S. at 742, 131 S.Ct. 2074) (emphasis added), and "[t]he inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition,' " *id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) ).

*Pauly v. White*, 814 F.3d 1060, 1075 (10th Cir. 2016)(emphasis added).

Plaintiff, therefore, in order to overcome the qualified immunity presumption, must prove each Defendant violated one of his constitutional rights, and such right was clearly established under the law to such an extent they would have understood their conduct was impermissible. "Failure on either qualified immunity element is fatal to the plaintiff's case." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011). *See, also, Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011) (setting out this standard for assessing whether a right is clearly established), and *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (permitting either of the two qualified-immunity elements to be addressed first).

## DISCUSSION

***Official Capacity***

Each of the Defendants, Robert Lampert, Jeffie Wiggins, Donald Hargett, Ruby Ziegler, Robert Hultz, Eric Staiger, Carrie Caruthers, Timothy Rysell, Seth Norris, Shawn Hobson, Michael McManis, Dennis Phillips, Dave Hendricks, Brian Church, Jeremy Lira, Brendon Walker, Lance Kennedy, Jennifer Emigh, Kevin Stender, De Maramed, Zachary Mehrens, Daniel Cook, Scott Leever, Drew Murphy, and Michelle Brooks are officials of the State of Wyoming in various capacities through their employment by WMCI, and the Wyoming Department of Corrections, which are agencies of the State of Wyoming. *Wyo. Stat. § 7–13–401; Wyo. Stat. § 9–2–2012; Wyo. Stat. § 25–1–104*. [Doc. 46, pp. 3, 4, 5, 6 ¶¶ 8–32]. Any claim against a government official in their "official" capacity is, in actuality, a claim against the official's office, and thus the state, as the official is simply an agent of the government entity for which they work. *Brown v. Montoya*, 662 F.3d at 1163 (citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71(1989). *See also, Johnson v. Board of Commissioners for the County of Fremont*, 85 F.3d 489, 493 (10th Cir. 1996) and *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978).

A state, and its agencies, have immunity from suit under the Eleventh Amendment, and thus can not be sued in federal court by a private individual with three exceptions: "(1) the state consents to suit; (2) Congress expressly abrogates the states' immunity; or (3) the citizen sues a state official pursuant to *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)." *Opala v. Watt*, 454 F.3d 1154, 1157 (10th Cir. 2006) *cert denied*, 549 U.S. 1078 (2006). *See also, Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). There is no indication in the record before the Court the State of Wyoming has consented to suit under 42 U.S.C. § 1983 in federal court, and Plaintiff's claims against Defendants do not fall within one of the narrow exceptions to immunity enumerated in the Wyoming Governmental Claims Act (WGCA). Wyo. Stat. Ann. §§ 1–39–105 through 112.[2] The WGCA grants absolute immunity to the State of Wyoming as well as all local government entities and their officials and employees unless such immunity has been waived by the Act. *Wyo. Stat. Ann. § 1–39–104(a)*. The Act establishes a "closed-ended" waiver under which immunity is the rule, and liability is the exception. Immunity is applicable unless expressly waived by the Act. *Rice v. Collins Communications, Inc.*, 236 P.3d 1009, 1016 (Wyo. 2010); *Garman v. Campbell County School Dist. No. 1*, 630 F.3d 977, 980 (10th Cir. 2010); *Routh v. State of Wyoming ex rel. Wyoming Worker's Compensation Division*, 952 P.2d 1108, *reh. denied* (Wyo. 1998); *Harbel v. Wintermute*, 883 P.2d 359, 363 (Wyo. 1994); *Worden v. Village Homes*, 821 P.2d 1291, 1295 (Wyo. 1991). A court "must strictly construe the statutory exceptions to immunity against potential claimants and, conversely, liberally construe the grant of immunity in favor of the governmental entity." *Harbel v. Wintermute*, 883 P.2d at 364. The State of Wyoming has not consented to be sue in federal court under § 1983, and thus has not waived its Eleventh Amendment immunity.

2 The exceptions to governmental immunity are summarized as follows:
1. negligent operation of motor vehicle, aircraft or watercraft. (Wyo. Stat. Ann. § 1–39–105);

2. negligent operation or maintenance of building, recreation area or park. (Wyo. Stat. Ann. § 1–39–106);
3. negligent operation of airports. (Wyo. Stat. Ann. § 1–39–107);
4. negligent operation of public utility. (Wyo. Stat. Ann. § 1–39–108);
5. negligent operation of public medical facilities. (Wyo. Stat. Ann. § 1–39–119);
6. negligence of public health care providers. (Wyo. Stat. Ann. § 1–39–110); and
7. tortious conduct of peace officers. (Wyo. Stat. Ann. § 1–39–112).
*Wyo. Stat. Ann.* §§ 1–39–105 through 112.

***8** The United States Supreme Court has also held a "State is not a 'person' against whom a § 1983 claim for money damages might be asserted." *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 671 (2002), *citing Will v. Michigan Dept. of State Police*, 491 U. S. 58, 66 (1989). Congress has thus not expressly abrogated a state's immunity under § 1983.

The third exception to Eleventh Amendment immunity derives from the United States Supreme Court decision in *Ex Parte Young* which requires fulfillment of four criteria in order for immunity to be waived:

> First, we determine whether the action is against state officials or the state itself. Second, we look at whether the alleged conduct of the state officials constitutes a violation of federal law. Third, we assess whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages impacting the state treasury. Finally, we analyze whether the suit rises to the level of implicating 'special sovereignty interests.'
>
> *Robinson v. Kansas*, 295 F.3d 1183, 1191 (10th Cir. 2002) (internal citations and quotations omitted).

*Opala v. Watt*, 454 F.3d at 1158.

Plaintiff has failed to present any factual pleading or argument which addresses any of the noted four criteria, thus there is no basis to find an exception to immunity pursuant to *Ex Parte Young.* Plaintiff's claims against Defendants in their "official" capacity are thus barred by Eleventh Amendment immunity, and therefore subject to dismissal without prejudice. *Pettigrew v. Okla. ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1212 (10th Cir. 2013)("[I]mplicit in enactment of the Eleventh Amendment is that state sovereign immunity ordinarily bars federal-court jurisdiction over private suits against a state by citizens of the state."); *Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cnty., Okla. v. Guthrie*, 654 F.3d 1058, 1069 n. 9 (10th Cir. 2011) ("[A] dismissal on sovereign immunity grounds ... must be without prejudice."); *Shue v. Lampert*, 580 Fed. Appx. 642, 644 (10th Cir. 2014).

***Individual Capacity***

Scattered throughout the amended complaint by Plaintiff are factual allegations aimed at different groups of Defendants, as well as allegations relating to the many different activities he has been permitted to engage in while incarcerated. Plaintiff then aggregates all the allegations to support his three asserted federal law causes of action, retaliation, discrimination, and conspiracy, against all twenty-five Defendants. Plaintiff has relinquished the conspiracy claim, [Doc. 65, p. 2 ¶ A(2) ], thus the following discussion will address his retaliation and discrimination causes of actions as well as the underlying allegations.

Retaliation

Plaintiff asserts Defendants violated his First Amendment right to be free from retaliation based on the following aggregated instances of alleged misconduct:

(a) discriminating against Plaintiff for filing grievances;

(b) discriminating against Plaintiff for pursuing legal actions against the Wyoming Department of Corrections ("WDOC") and its officials;

(c) discriminating against Plaintiff for requesting public records;

(d) discriminating against Plaintiff for writing an op-ed which was published in a newspaper;

***9** (e) discriminating against Plaintiff for filing complaints about the WDOC with the ACLU, the state senate, and other entities;

(f) discriminating against Plaintiff for assisting other inmates with administrative and legal matters;

(g) subjecting Plaintiff to false and frivolous staff reports;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(h) subjecting Plaintiff to false and frivolous conduct violation reports ("CVRs");

(i) subjecting Plaintiff to a false and frivolous security threat group ("STG") validation;

(j) subjecting Plaintiff to ongoing harassment and disrespect;

(k) denying and/or rejecting Plaintiff's grievances;

(l) frustrating all administrative processes in which Plaintiff is engaged;

(m) depriving Plaintiff of the protections and safeguards provided to other inmates; and

(n) employing lower standards and ad hoc agendas in determining the reliability and veracity of information used to validate Plaintiff as a STG affiliate and processing Plaintiff's CVRs.

Plaintiff combines all of these assertions to support a single claim of retaliation. [Doc. 46, pp. 147, 148 ¶¶ 336–338]

Equal Protection

Plaintiff asserts Defendants violated the Equal Protection Clause of the Fourteenth Amendment by discriminating against him for conducting the same activities listed in relation to his retaliation claim. He once again aggregates the factual assertions to support his discrimination claim. [Doc. 46, pp. 149, 150 ¶¶ 341–344].

Plaintiff's Activities

The activities Plaintiff has been allowed to pursue, and continues to pursue, while in prison, include filing more than 200 grievances and grievance appeals, filing nine lawsuits and two appeals, writing an op-ed for a newspaper, writing several dozen (if not hundreds) of letters and complaints to state and federal officials, communicating with ACLU attorneys, working with and providing assistance to other inmates on legal issues, and making numerous public records requests. [Doc. 46, pp. 7–16 ¶¶ 37–93].

Plaintiff, by his own admission, has been able to freely engage in these actions. [Doc. 46, p. 8 ¶ 43; p. 9 ¶ 45; p. 10 ¶ 49; p. 11 ¶ 52; p. 11 ¶ 55; p. 12 ¶¶ 59, 61; p. 13 ¶¶ 65, 72]. His amended complaint nevertheless alleges retaliation and discrimination. He argues the following ten categories of adverse actions would not have taken place if he had not engaged in the described activities.

(i) *Staff Promotions*

Plaintiff lists nine staff promotions which took place between 2014 and 2016. [Doc. 46, pp. 17, 18, 19 ¶¶ 94–102]. He obviously does not have access to WDOC personnel files, and admits when he filed his amended complaint he was not sure who was ultimately responsible for the promotions. [Doc. 46, ¶ 94, n. 7]. He nevertheless asserts the promotions only took place "to reward those who had treated Plaintiff poorly." [Doc. 46, p. 19 ¶ 96].

(ii) *Negativity Campaign*

Plaintiff sets forth a number of conclusory statements alleging adverse actions by Defendants which lack specificity and, in many instances, are incomprehensible. He asserts, for example, (a) the WDOC staff began casting Plaintiff as a pariah and targeting him for retaliation by deriding and excoriating him; (b) Defendants Lampert, Hargett, Ziegler, and Hobson began a campaign of vitriol, calumny, and contempt towards Plaintiff; (c) this campaign quickly transmuted from calumnious invective and vitriol to widespread opprobrium throughout the WDOC/WMCI; (d) this campaign progressed into widespread inimical and retaliatory treatment; (e) all Defendants participated in this campaign and engaged in retaliation against Plaintiff; (f) the campaign has had the effect of encouraging WDOC/WMCI staff to harass Plaintiff, arbitrarily discriminate against Plaintiff, and pursue false and/or frivolous CVRs and STG validation against Plaintiff; (g) as a result of Plaintiff's self-declared high profile, defendants have engaged in a continuing, ongoing and tacit de facto policy/scheme of retaliation and acquiescence/condoning of retaliation and harassment; (h) the defendants' treatment and open loathing of Plaintiff has fostered an adverse atmosphere that is charged with hostility and indifference inimical to Plaintiff; (i) ill treatment of Plaintiff is pervasive throughout the WDOC/WMCI; and (j) several defendants would have been more receptive to Plaintiff's grievances and concerns if he had not been engaged in the many and extensive activities previously discussed. [Doc. 46, pp. 19–27 ¶¶ 103–140].

(iii) *Conduct Violation Reports*

***10** Plaintiff asserts certain Defendants filed seven conduct violation reports (CVR) against him, and concludes these CVRs where issued for purely retaliatory reasons.[Doc. 46,

pp. 28, 29, 30 ¶ 142; pp. 30, 31 ¶ 151; pp. 31, 32 ¶ 153; pp. 34, 35 ¶ 160]. He further asserts the named Defendants "knew the proper policies and procedures surrounding the issuance of a CVR and ... deliberately chose to ignore them in an effort to retaliate against Plaintiff." [Doc. 46, p. 35 ¶ 161]. He also admits, however, "[a]ll CVRs mentioned herein were either dismissed prior to a disciplinary hearing being conducted, dismissed at the disciplinary hearing, overturned on appeal, or overturned on rehearing." [Doc. 46, p. 34 ¶ 159].

(iv) *Security Threat Group Validation*

Plaintiff asserts many Defendants wrongly identified him as part of a security threat group (STG). [Doc. 46, pp. 37–87 ¶¶ 164–291]. His assertions contain numerous conclusory allegations, which are repeatedly stated against various named Defendants. Examples of the conclusory and repetitive nature of those allegations include the following:

• Various Defendants "knew prior to Plaintiff's validation that Plaintiff is not and has never been an 'affiliate' 'associate' or 'member' to a STG[.]" [Doc. 46, pp. 48,49 ¶ 165(ttt) ].

• Various Defendants' "tacit acquiescence of and deliberate indifference to Plaintiff's validation is substantially motivated by Plaintiff's engagement in the constitutionally protected activities[.]" [Doc. 46, pp. 50, 51 ¶ 165(uuu) ].

• Various Defendants have "the duty and authority to overturn Plaintiff's wrongful validation, failed to consider or investigate Plaintiff's claims that he was not in any way associated with an STG, tacitly acquiesced [to] the desultory investigation that was conducted, and w[ere] deliberately indifferent to Plaintiff's claims of non-affiliation." [Doc. 46, pp. 55, 56 ¶ 165(tttt) ].

• Various Defendants "maintained a scheme of allowing staff to use unreliable, erroneous and false information when reviewing information and validating Plaintiff as a STG 'affiliate[.]' " [Doc. 46, pp. 59, 60 ¶ 165(wwww) ].

Plaintiff, notwithstanding his allegations, admits an investigation took place to determine if he was part of such a group. [*See, e.g.*, Doc. 46, pp. 37, 38 ¶ 165(c); p. 42 165(ff) ]. He also admits an appeal took place as a result of his being named as part of a security threat group. [*See, e.g.*, Doc. 46, p. 51 ¶ 165(vvv); p. 53 ¶ 165(jjjjj) ]. Plaintiff, after the appeal process, could still be removed from the STG validation by signing a Renunciation Statement, which he apparently declined to do. [Doc. 46, p. 65 ¶ 165(kkkkk) (Policy 3.301 permits a defendant to be removed from an STG validation by renunciation) ].

(v) *Grievance Procedure Process*

Plaintiff alleges certain Defendants abused the grievance procedure processes. [Doc. 46, pp. 87–111 ¶¶ 220–253]. The main thrust of his allegations centers on an argument certain Defendants denied some of his grievances, a result which is not particularly surprising given the fact, by his own admission, he has filed over 200 of them. [Doc. 46, p. 9 ¶ 45]. He also admits, however, he was fully permitted to process these appeals through the designated prison appeal process, [Doc. 46, p. 9 ¶ 45], and occasionally prevailed. [Doc. 46, p. 93 ¶ 222(j) ].

The allegations with regard to the grievances of which Plaintiff complains include: he was not given copies of certain grievances; he was not given an envelope for a grievance; extensions where periodically granted to prison staff members, extending the time they had to respond to the grievances; and, prison staff denied certain grievances. [Doc. 46, pp. 94–98 ¶ 222(k) ]. He thus summarily concludes, based on rejection of some of his grievances, various Defendants "provided erroneous, vacuous, perfunctory, derisive, and prevaricating responses, rejections and denials of Plaintiff's grievances, irrespective of the merits thereof[,]" [Doc. 46, pp. 100, 101 ¶ 230].

(vi) *Alleged Retaliation Involving Public Records*

***11** Plaintiff alleges he was denied records he requested under the Wyoming Public Records Act, or such records were redacted. [Doc. 46, pp. 11–122 ¶¶ 254–269]. He further asserts he was denied records, in part, because he did not have funds to pay an "unlawful" fee for the records, [Doc. 46, p. 111 ¶ 255 (Defendants are "unlawfully charg[ing] fees"); p. 116 ¶ 256(dd) (Plaintiff would have to pay $15.00 for time to prepare and construct a record) ], and his requests included confidential personnel records. [Doc. 46, p. 114 ¶¶ 256(u), 256(v) ].

Plaintiff also indirectly acknowledges, however, by his reference to *Guy v. Lampert*, 362 P.3d 331 (Wyo. 2015) [Doc. 46, pp. 117, 118 ¶ 256(mm) ], the Wyoming Public Records Act sets out the sole remedy for denial of public records, *i.e.*, seek a hearing in state district court for an order directing the custodian of the record to show cause why the requesting individual should not be entitled to inspect the record. *See* W.S. § 16–4–203(f). Plaintiff, in *Guy v. Lampert*,


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

sued employees of the Wyoming Department of Corrections for allegedly denying him access to public records. The Wyoming Supreme Court upheld the dismissal of his lawsuit based on his failure to follow the remedy set forth in the Public Records Act. *Guy v. Lampert*, 362 P.3d at 338–339. It is also relevant to note Plaintiff failed as well in a second lawsuit concerning a record request denial by WMCI and Wyoming Department of Corrections. *Guy v. Lampert*, 376 P.3d 499 (Wyo. 2016).

Plaintiff, notwithstanding the fact he is, or at least should be after two failed litigation attempts, fully aware of the proper procedure for addressing public records act claims, still insists on raising the very same allegations he has previously asserted, arguing the various listed Defendants "had the power to abide by the WPRA when responding to or dealing with Plaintiff's public records requests and deliberately chose not to." [Doc. 46, p. 122 ¶ 269].

(vii) *Denial of Transfer*

Plaintiff complains his prison transfer request was denied, allegedly for retaliatory purposes. [Doc. 46, pp. 122–192 ¶¶ 270–297]. He requested a transfer from WMCI to the Wyoming State Penitentiary in Rawlins, Wyoming, because he "no longer felt comfortable at WMCI[.]" [Doc. 46, p. 123 ¶ 271(a); p. 124 ¶ 271(i) ].

(viii) *Cumulative Harassment*

Plaintiff lists a litany of minor complaints [Doc. 46, pp. 129–139 ¶¶ 298–306], which he does admit "when considered alone, may (or may not) rise to the level of a constitutional retaliation." [Doc. 46, p. 129 ¶ 298].The list includes the following: (a) he receives unhelpful, false, rude, condescending and/or irrelevant responses" to communications; (b) he is subject to urinalysis testing; (c) he was denied a side dish of food he requested; (d) he was once denied the receipt of a certain pair of shoes and a music cd; (e) he was found guilty of a conduct violation; (f) he was scoffed at; (g) he was told to mind his own business; (h) he was subject to pat-searches; and (i) he was not hired as an ice-cream delivery man or a janitor or a librarian. Plaintiff lists other similarly innocuous acts, and then concludes these things happened to him solely because Defendants engaged in a "scheme of continual and ongoing harassment." [Doc. 46, p. 137 ¶ 301].

(ix) *Retaliation through the Commissary*

Plaintiff asserts Defendants Lampert, Hargett, and other unknown staff members retaliated against Plaintiff by: (a) "deplet[ing] its number of available commissary items significantly," [Doc. 46, p. 139 ¶ 309]; (b) "intentionally selling commissary items of lower quality," [Doc. 46, p. 139 ¶ 310]; and, (c) "downsizing of the commissaries throughout the WDOC's five facilities to include the number of items sold as well as the quality of items sold," [Doc. 46, p. 140 ¶ 312]. Plaintiff summarily concludes the "motivation to bid out inferior or generic products and to downsize the commissaries is to retaliate against Plaintiff..." [Doc. 46, p. 140 ¶ 315].

(x) *General Allegations*

***12** Plaintiff sets out a number of additional allegations which generally repeat the allegations previously set forth in the amended complaint. [Doc. 46, pp. 141–147 ¶¶ 323–335].

The amended complaint by Plaintiff, in addition to arguably being subject to dismissal pursuant to the Prison Litigation Reform [PLRA] Act as frivolous at best, and possibly even malicious, clearly fails to state a plausible retaliation or equal protection claim for relief.

*Prison Litigation Reform Act [PLRA]*

Congress enacted the PLRA in the wake of a sharp rise in prisoner litigation in the federal courts. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). The PLRA contains a variety of provisions designed to bring this litigation under control, including 28 U.S.C. § 1915(e)(2)(B):

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that—
>
> (B) the action or appeal—
>
> (i) is frivolous or malicious;
>
> (ii) fails to state a claim on which relief may be granted; or
>
> (iii) seeks monetary relief against a defendant who is immune from such relief.

and 28 U.S.C. § 1915(A)(a):

> On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—

(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or

(2) seeks monetary relief from a defendant who is immune from such relief.

A number of the allegations by Plaintiff in support of his claims of retaliation and violation of equal protection are, at a minimum, frivolous, bordering on malicious, and thus would justify dismissal of both claims as violations of the PLRA if for no other reason. Consider the following examples.

A sizeable portion of the amended complaint by Plaintiff is dedicated to allegations relating to public records, and Defendants' alleged failures to provide him with such records. [Doc. 46, pp. 111–122 ¶¶ 254–269]. Such an assertion, based on the fact Plaintiff has already litigated public records act claims twice in state court, is plainly frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

Plaintiff, in the first case, was informed by the Wyoming Supreme Court the only remedy available to him for a public records dispute is set forth in W.S. § 16–4–203. He must apply "for an order directing the custodian of the record to show cause why he should not permit the inspection of the record." *Guy v. Lampert*, 362 P.3d at 337–338 (quoting W.S. § 16–4–203(f)). And Plaintiff, in this matter, cannot plead ignorance of the Court's direction, as he cites this decision in his amended complaint. [Doc. 46, pp. 117, 118 ¶ 256(mm) ].

Plaintiff, in the second case, "invoked the district court's jurisdiction under Wyo. Stat. Ann. § 16–4–203(f) to evaluate the State defendants' response to his Public Records Act request." *JonMichael Guy v. Lampert, et al.*, 376 P.3d 499, 502 (Wyo. 2016). He also asserted "federal constitutional claims" under the First and Fourteenth Amendments, as he has done in this matter, and asked the court "to grant him declaratory and injunctive relief and compensatory damages on those claims." *JonMichael Guy v. Lampert, et al.*, 376 P.3d at 502. The state district court found the "defendants had not denied Guy access to any public records as they had provided him all the records he requested on January 6, 2014." *JonMichael Guy v. Lampert, et al.*, 376 P.3d at 502. The district court, more importantly, regarding Plaintiff's constitutional claims and requests for declaratory relief, injunctive relief, and compensatory damages, also concluded "that the limited judicial review authorized by the [Public Records] Act does not extend to such claims and forms of relief." *JonMichael Guy v. Lampert, et al.*, 376 P.3d at 502. The Wyoming Supreme Court upheld the rulings of the state district court. *JonMichael Guy v. Lampert, et al.*, 376 P.3d at 505.

***13** Plaintiff, now for the third time in this matter, seeks to litigate the public records issues through what he clearly knows, based on his prior state court litigation, is an incorrect procedure. He nevertheless asserts a public records act claim under the guise of First and Fourteenth Amendment constitutional claims. The Tenth Circuit, in similar circumstances, has held cases such as these must be dismissed.

> Under 28 U.S.C. § 1915, when a litigant is proceeding in forma pauperis, the district court <u>must dismiss</u> any action or appeal that is frivolous or malicious. "[R]epetitious litigation of virtually identical causes of action may be dismissed under § 1915 as frivolous or malicious."

*Wylie v. Ritter*, 292 Fed. Appx. 744, 745 (10th Cir. 2008) internal citations omitted; emphasis added).

> The Tenth Circuit has further stated:
>
> When a pro se litigant files complaints that are repetitive, duplicative of other filings, without merit, or frivolous, he abuses the district court process. *See Werner v. Utah*, 32 F.3d 1446, 1447, 1449 (10th Cir. 1994). "[R]epetitious litigation of virtually identical causes of action may be dismissed under [28 U.S.C.] § 1915 as frivolous or malicious." *McWilliams–v. Colorado*, 121 F.3d 573, 574 (10th Cir. 1997) (internal quotation marks omitted) (first alteration in original). "The unnecessary burden placed upon the judicial process in adjudicating these frivolous and malicious lawsuits is obvious." *Van Sickle v. Holloway*, 791 F.2d 1431, 1437 (10th Cir. 1986). <u>"[T]here is no constitutional right of access to the courts to prosecute an action that is frivolous or malicious.... No one, rich or poor, is entitled to abuse the judicial process."</u> *Tripati v. Beaman*, 878 F.2d 351, 353 (10th Cir.1989) (per curiam).

*Childs v. Miller*, 713 F.3d 1262, 1265 (10th Cir. 2013)(emphasis added).

Plaintiff requested a transfer to the Wyoming State Penitentiary in Rawlins because he "no longer felt comfortable at WMCI[.]" [Doc. 46, p. 123 ¶ 271(a); p. 124 ¶ 271(i) ]. His request was denied which he asserts was "strictly for purposes of retaliation and harassment." [Doc. 46, p. 122 ¶

270]. A prisoner, however, does not have a protected interest requiring incarceration in a particular institution.

> Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

* * *

> Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.

*Meachum v. Fano*, 427 U.S. 215, 225, 228 (1976). *See also, Milligan v. Archuleta*, 659 F.3d 1294, 1296 (10th Cir. 2011)("prisoner has no constitutional right to remain in a particular institution."); *United States v. Klein*, 589 Fed. Appx. 909, 911 (10th Cir. 2014)(same).

And perhaps the most frivolous allegation by Plaintiff argues Defendants Lampert, Hargett, and other unknown staff members retaliated against him by: (a) "deplet[ing] its number of available commissary items significantly," [Doc. 46, p. 139 ¶ 309]; (b) "intentionally selling commissary items of lower quality," [Doc. 46, p. 139 ¶ 310]; and, (c) "downsizing of the commissaries throughout the WDOC's five facilities to include the number of items sold as well as the quality of items sold," [Doc. 46, p. 140 ¶ 312]. Plaintiff summarily concludes the "motivation to bid out inferior or generic products and to downsize the commissaries is to retaliate against Plaintiff..." [Doc. 46, p. 140 ¶ 315].

*Federal Rules Civil Procedure 12(b)(6)*

***14** Plaintiff, even considering the fact he is acting *pro se*, and thus his amended complaint should be construed liberally, has failed to state a plausible claim for either retaliation or equal protection sufficient to avoid a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 678–679; *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013); *Garling v. United States Environmental Protection Agency*, 849 F.3d 1289 (10th Cir. 2017); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247–1248 (10th Cir. 2008); *Silver v. Glass*, 459 Fed. Appx. 691, 694–696 (10th Cir. 2012); *Jordan v. Sosa, ADX*, 654 F.3d 1012, 1018, fn. 8 (10th Cir. 2011); *Haines v. Kerner*, 404 U.S. 519–520–521 (1972); *Garza v. Davis*, 596 F.3d 1198, 1201 n. 2 (10th Cir. 2010). "Conclusory allegations are not sufficient to state a constitutional violation." *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007). A plaintiff must prove an affirmative link between the facts he asserts, and the constitutional violation alleged. It is not sufficient to simply list out a host of facts, and then conclude the defendants must have been engaged in violation of a constitutional rights. *Stidham v. Peace Officers Standards and Training*, 265 F.3d 1144, 1156–1157 (10th Cir. 2001); *Jenner v. Zavaras*, 339 Fed. Appx. 879, 881 (10th Cir. 2009).

The amended complaint filed by Plaintiff fails to satisfy this pleading standard. It certainly does catalogue many events which have allegedly occurred at WMCI over the course of Plaintiff's years in prison. What is obviously missing, however, are the links between the asserted facts, and the remaining causes of action. What is missing is the middle term in logical parlance between the first premises (the asserted facts) and the conclusions (the remaining causes of action, retaliation and equal protection). Plaintiff has described events he alleges have occurred, yet he fails to make any real factual connection between those events, and his claims of retaliation and discrimination. This conclusion is evidenced by the fact, after describing the ten categories of actions previously summarized, he resorts to multiple conclusory statements, very often in long lists, about their legality. The following details his specific failures.

"Staff Promotions"

Plaintiff lists nine staff promotions which took place between 2014 and 2016. [Doc. 46, pp. 17, 18, 19 ¶¶ 94–102]. He obviously does not have access to WDOC personnel files and fully admits he is unsure who is ultimately responsible for the promotions. [Doc. 46, p. 17 ¶ 94 n. 7]. He nonetheless summarily concludes the promotions only took place because these staff members had treated Plaintiff poorly and "if Defendant Lampert and/or Hargett did not have it out for Plaintiff, other staff would've been promoted other than the ones who did receive promotions." [Doc. 46, p. 19 ¶ 96; p. 19 ¶101].

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

What is missing from these allegations and conclusions are the middle terms, *i.e.*, the facts showing the staff members were only promoted as a means of retaliating against Plaintiff; facts showing the promotions are even an adverse action; and facts establishing the promotions were made for the purposes of discriminating against Plaintiff. The stating of mere conclusions, without more, does not raise his claims beyond the level of possibility. *Ashcroft v. Iqbal*, 556 U.S. at 678 (to assert a section 1983 claim, plaintiffs must show more than a sheer possibility a defendant has acted unlawfully).

And Plaintiff has further failed to provide proof of the second and third elements required for a valid retaliation claim, in particular the "but for" element. He has failed to "allege specific facts showing that 'but for the retaliatory motive, the incidents to which he refers ... would not have taken place.' " *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772 (citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758.

"Negativity Campaign"

***15** Plaintiff, in support of this claim, simple provides a list multiple conclusory allegations:

(i) "Staff cast Plaintiff as a pariah and targeted him for retaliation by deriding and excoriating him: over the phone; at staff meetings; during break-room conversations; at social events; possibly emails; and the like." [Doc. 46, p. 20 ¶ 104].

(ii) "On another front, at staff meetings, over the phone, during breakroom conversations, at social events, and possibly via emails, [various listed] Defendant[s] ... assiduously and surreptitiously launched, participated in, and tacitly encouraged a campaign of vitriol, calumny, and contempt towards Plaintiff throughout the WDOC, in an effort to cast Plaintiff as a pariah and target-ing for retaliation[.]" [Doc. 46, p. 21 ¶ 108].

(iii) "As its natural progression and spreading like a high school rumor does through the microcosm of the WDOC, this clandestine campaign quickly transmuted from calumnious invective and vitriol to widespread opprobrium throughout the WDOC/WMCI." [Doc. 46, p. 22 ¶ 112].

(iv) "It is common knowledge throughout the entire WDOC inmate populace that prison staff takes grievances and lawsuits personally and subsequently target those inmates who pursue such actions." [Doc. 46, p. 23 ¶ 122].

(v) "As a result of this adverse climate, ill treatment of Plaintiff is pervasive throughout the WDOC and is tacitly encouraged and condoned by [various listed] Defendant[s]." [Doc. 46, p. 25 ¶ 135].

These are just a sample of the many unsubstantiated, conclusory allegations asserted by Plaintiff, all of which clearly lack any specificity as to *who* did *what* to *whom*, and fail to "identify *specific* actions taken by *particular* defendants." They therefore fail to assert a plausible claim for either retaliation or discrimination. *Mitchell v. Maynard*, 80 F.3d at 1444; *Pahls v. Thomas*, 718 F.3d at 1226; *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d at 1193; *Ashcroft v. Iqbal*, 556 U.S. at 678 (to assert a section 1983 claim, plaintiffs must show more than a sheer possibility that a defendant has acted unlawfully).

"Conduct Violation Reports (CVR)"

Plaintiff admits the process for reviewing CVRs was correctly adhered to, and resulted in dismissal of certain CVRs. "All CVRs mentioned herein were dismissed prior to a disciplinary hearing, dismissed at a disciplinary hearing, overturned on appeal, or overturned on rehearing." [Doc. 46, p. 34 ¶ 159]. He nonetheless summarily concludes the dismissed CVRs were originally issued by Defendants for retaliatory motives, and with the intent to harass to him. [Doc. 46, pp. 28, 29, 30 ¶ 142; pp. 30, 31 ¶ 151; pp. 31, 32 ¶ 153; pp. 34, 35 ¶ 160]. What is missing, once again, are any factual links between the issuance of the CVRs and the claims of retaliation and discrimination, in particular the "but for" element required for a valid retaliation claim. Plaintiff's claims do not rise to a plausible level. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758; *Ashcroft v. Iqbal*, 556 U.S. at 678.

"Security Threat Group Validation"

***16** Plaintiff admits a security threat group investigation took place to determine if he was part of such a group, [Doc. 46, pp. 41, 42 ¶¶ 165ff-jj], and "Reports and 'evidence' related to Plaintiff's validation were submitted to Defendant Rysell by Defendants Norris, Church, and Phillips[.]" [Doc. 46, p. 43 ¶ 165qq]. He further acknowledges an appeal took place as a result of his being named as part of a security threat group. [Doc. 46, p. 51 ¶ 165vvv ("On February 9, 2016, Plaintiff attended an 'appeal interview' ..."]. Plaintiff, having lost his appeal, concedes he could still have had the STG validation removed by signing a Renunciation Statement, but

declined to do so. [Doc. 46, p. 65 ¶ 165kkkkk ("Under current Policy #3.301, if someone who is a genuine gang member exhausts an appeal interview and does not succeed in having the validation overturned, that someone has an additional avenue of recourse for which to remove the validation; i.e., debriefing/renunciation[.]"].

Plaintiff, notwithstanding the foregoing acknowledgments and admissions, summarily asserts "[b]ecause all people involved in this joint endeavor came to the same erroneous conclusion, they must have had a meeting of minds of which fabricating false STG evidence against Plaintiff and/or falsely validating Plaintiff was the subject." [Doc. 46, p. 67 ¶ 171]. This leads to further summary conclusions including:

(i) Various listed defendants, "while motivated strictly to harass and retaliate, did participate in a conspiracy to falsely validate Plaintiff[.]" [Doc. 46, p. 68 ¶ 173].

(ii) Various listed defendants "did knowingly substantially deviate from written policy and normal procedures in an effort to falsely validate Plaintiff[.]" [Doc. 46, p. 69 ¶ 177].

(iii) Various listed defendants relied on "wholly irrelevant and baseless evidence" during the validation process. [Doc. 46, p. 70 ¶ 184].

(iv) Various listed defendants ignored "exculpatory evidence that impeached the reliability of the evidence used to validate Plaintiff[.]" [Doc. 46, p. 72 ¶ 189].

Plaintiff then sets out the following allegation, without providing any facts to support an assertion prison staff members falsely validated other inmates solely to cover up the allegedly false validation of Plaintiff.

> In a smoke-screen attempt to make Plaintiff's validation appear legitimate and part of an ostensible administrative effort to stifle STG activity and identify STG members, after Plaintiff's validation, Defendants Lampert, Hargett, Norris, Phillips, Church, and Rysell (and possibly others) conspired to and did validate a number of other WMCI inmates using a paucity of false, insubstantial, tenuous, and fabricated evidence in very close temporal proximity to Plaintiff's validation.

[Doc. 46, p. 81 ¶ 207].

Once again, what Plaintiff has failed to provide, are any factual links between the STG validation, and his claims of retaliation and discrimination. His conclusory allegations addressing retaliation and discrimination are not "facts." He has, as well, also failed once again to provide any factual material to fulfill the "but for" element required for a valid retaliation claim.

Plaintiff's claims do not rise to a plausible level. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758; *Ashcroft v. Iqbal*, 556 U.S. at 678.

"Grievance Procedure Process"

Plaintiff complains Defendants denied some of his grievances. [Doc. 46, pp. 94–98 ¶222 (various defendants, among other things, "perfunctorily den[ied] Plaintiff's meritorious grievances[,]" "refus[ed] to accept meritorious grievances[,]" and "respond[ed] to Plaintiff's grievances with ad hoc reasoning and decision-making[.]") ]. He then summarily concludes, as a result of the rejection of these grievances:

(i) "Other than to retaliate against Plaintiff, there was no legitimate reason for [various listed] Defendant[s] ... to deny Plaintiff's meritorious grievances[.]" [Doc. 46, p. 100 ¶ 227].

***17** (ii) "When rejecting or denying Plaintiff's grievances, [various listed] Defendant[s] ... knew the meritorious grievances he was reviewing held merit and made conscious decisions to ignore the merits, and deliberately rendered the grievance procedure a futile avenue for which Plaintiff may seek recourse." [Doc. 46, pp. 102, 103 ¶ 235].

(iii) "While motivated strictly to harass and retaliate, [various listed] Defendant[s] ... did arbitrarily reject and deny Plaintiff's meritorious grievances for illegitimate and/or retaliatory reasons[.]" [Doc. 46, pp. 104,105 ¶ 239; pp. 107,108 ¶ 248].

Conclusory allegations asserting retaliation and discrimination, without factual support, and without fulfilling the retaliation "but for" requirement, are wholly insufficient to justify finding a "plausible claim." *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758; *Ashcroft v. Iqbal*, 556 U.S. at 678.

"Alleged Retaliation Involving Public Records"

Plaintiff alleges he was denied records requested under the Wyoming Public Records Act, or such records were redacted. [Doc. 46, ¶¶ 256–57]. He then summarily concludes various listed defendants "knew his responses, denials, and redactions to/of Plaintiff's public records requests were unlawful and knowingly and deliberately chose to violate the law[.]" [Doc. 46, p. 118 ¶259]. Such an allegation not only ignores the fact the Wyoming Supreme Court has **twice** informed him of the sole and proper remedy for public records issues, *Guy v. Lampert*, 362 P.3d at 337–338, *JonMichael Guy v. Lampert, et al.*, 376 P.3d at 502, it is supported by nothing more than summary conclusions without factual bases, and therefore fails to rise to a level of plausibility. *Ashcroft v. Iqbal*, 556 U.S. at 678.

"Denial of Transfer Request"

Plaintiff requested a prison transfer because "he no longer felt comfortable at WMCI[.]" [Doc. 46, p. 123 ¶ 271(a); p. 124 ¶ 271(i) ]. He acknowledges Defendant Hargett gave him reasons why he would not be transferred, including the fact Plaintiff's safety was not at risk. [Doc. 46, p. 125 ¶ 271(u) ]. Plaintiff still summarily asserts his transfer request was denied for retaliatory purposes. [Doc. 46, p. 128 ¶¶ 290, 296].

Plaintiff does not have a protected interest requiring incarceration in a particular institution, *Meachum v. Fano*, 427 U.S. at 225, 228; *Milligan v. Archuleta*, 659 F.3d at 1296; *United States v. Klein*, 589 Fed. Appx. at 911, and he has, as with his prior retaliation allegations, failed to fulfill the retaliation "but for" requirement. His summary assertions are, as well, wholly insufficient to justify finding a "plausible claim." *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758; *Ashcroft v. Iqbal*, 556 U.S. at 678.

"Allegations of Cumulative Harassment"

Plaintiff, in support of this allegation, sets out a litany of minor complaints which he admits, "when considered alone, may (or may not) rise to the level of a constitutional retaliation[.]" [Doc. 46, p.129 ¶ 298]. These include:

(i) "Any time Plaintiff sends a communication ... he receives completely unhelpful, false, rude, condescending and/or irrelevant responses that are rife with prevarication, deception, and misinformation." [Doc. 46, pp.129, 130 ¶ 300a].

***18** (ii) "Plaintiff was denied "choice foods[.]" [Doc. 46, p. 130 ¶ 300c].

(iii) He was denied "a pair of shoes[.]" [Doc. 46, p. 130 ¶ 300d].

(iv) He was "scoff[ed] at," told to "mind your own business and quit looking into the officer's station," subjected to a rough pat search, mad-dogged, and accused of lying. [Doc. 46, pp. 131,132 ¶ 300i].

(v) He was denied permission to purchase a CD. [Doc. 46, p.133 ¶ 300k].

(vi) He was denied work as an ice cream delivery man, janitor, and prison librarian. [Doc. 46, pp. 133, 134 ¶ 300n].

Plaintiff concludes these things happened to him solely because Defendants were engaging in a "continual and ongoing scheme of harassment/retaliation." [Doc. 46, p. 138 ¶ 303]. What is missing once again, however, as previously discussed, are the factual links between the allegations and the claim of retaliation. Plaintiff does not provide any facts showing retaliatory actions, nor has he fulfilled the retaliation "but for" requirement. His summary assertions are thus wholly insufficient to justify finding a "plausible claim." *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758; *Ashcroft v. Iqbal*, 556 U.S. at 678.

"Retaliation through the Commissary"

Plaintiff summarily asserts Defendants Lampert, Hargett, and other unknown staff members significantly reduced the number of available commissary items, intentionally began selling commissary items of much poorer quality, and downsized the commissaries throughout the WDOCs five facilities, solely to retaliate against him. [Doc. 46, pp. 139,

140 ¶¶ 307–312; p. 140 ¶ 315]. This allegation, which in effect argues the entire WDOC commissary system, which includes at least five facilities, was somehow utilized to retaliate against a single person, Plaintiff, may well be, as noted previously, the most frivolous one he has asserted. And he once again has utterly failed to provide any factual material showing retaliatory motive or actions which would amount to adverse actions, nor has he fulfilled the "but for" retaliation requirement. His summary assertions are thus wholly insufficient to justify finding a "plausible claim." *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772(citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998); *Dawson v. Audet*, 636 Fed. Appx. at 758; *Ashcroft v. Iqbal*, 556 U.S. at 678.

"General Allegations"

Plaintiff sets out a number of additional allegations which generally repeat the allegations which have been previously discussed, and fail to state a plausible claim. [Doc. 46, pp. 141–147 ¶¶ 323–335].

The remaining claims, retaliation and discrimination, asserted by Plaintiff are based solely on generalized and summary conclusions of unlawful activity as illustrated. What is missing is the link between the alleged actions by Defendants, and the causes of action Plaintiff asserts, *i.e.*, the middle terms. The amended complaint does not permit the Court to infer more than the mere possibility of misconduct.

*Qualified Immunity*

Defendants, in response to Plaintiff's § 1983 allegations, have asserted a qualified immunity defense. [Doc. 52, pp. 36–57]. A plaintiff, when such a defense is raised, has the burden to establish there has been a violation, by a defendant, of a clearly established constitutional right. *Pauly v. White*, 814 F.3d at 1075.

***19** The purported support for each of Plaintiff's remaining claims, retaliation and discrimination, are the aggregated facts from the ten categories of actions previously discussed. The nature and content of those factual allegations, when viewed through the lense of qualified immunity, do not support either a retaliation or discrimination claim.

"Retaliation"

Plaintiff, in order to establish liability for retaliation, must provide proof of three elements:(a) engagement in constitutionally protected activity; (2) "chilling" effect on a person of ordinary firmness; and (3) adverse action substantially motivated as a response to the exercise of constitutionally protected conduct. *Shero v. City of Grove, Okla.*, 510 F.3d at 1203 (10th Cir. 2007); *Dawson v. Audet*, 636 Fed. Appx. at 755. And to satisfy the third element, he must establish "but for the retaliatory motive, the incidents to which he refers ... would not have taken place." *Peterson v. Shanks*, 149 F.3d at 1144. *See also, Dawson v. Audet*, 636 Fed. Appx. at 755 (quoting *Peterson v. Shanks*, 149 F.3d at 1144).

Plaintiff has unquestionably "engaged in constitutionally protected activity" as the filing of grievances and lawsuits is constitutionally protected. [Doc. 46, pp. 7–16 ¶¶ 37–93; Doc. 46, p. 8 ¶ 43; p. 9 ¶ 45; p. 10 ¶ 49; p. 11 ¶ 52; p. 11 ¶ 55; p. 12 ¶¶ 59, 61; p. 13 ¶¶ 65, 72]. *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2009); *Dawson v. Audet*, 636 Fed. Appx. at 755. He has, therefore, provided proof of the first element. Simple recitation of these activities does not, however, fulfill all three elements. *Strope v. Cummings*, 381 Fed. Appx. at 883. Plaintiff must still provide, in order to prevail on a claim of retaliation, proof of the second and third elements, in particular the "but for" element. He must "allege specific facts showing that 'but for the retaliatory motive, the incidents to which he refers ... would not have taken place.' " *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

Plaintiff has asserted only general allegations of retaliation. He has not shown that "but for" an alleged retaliatory motive, any of the ten categories of incidents previously outlined would not have taken place. He also has not set forth existing precedent which places the constitutional questions involving the ten categories of alleged facts beyond debate as is required to overcome the presumption of qualified immunity.

The deficiencies in Plaintiff's amended complaint become even more obvious and apparent when considering the aggregate facts he has alleged in support of each claim.

# Staff Promotions

Plaintiff lists nine staff promotions which took place between 2014 and 2016, and summarily concludes the promotions took place only because the promoted staff members treated Plaintiff poorly. He has failed, however, to set forth any specific facts establishing "but for" a retaliatory motive, the promotions would not have taken place. [Doc. 46, pp. 17, 18, 19 ¶¶ 94–102; p. 19 ¶ 96]. *Harbin–Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) ("[C]onclusory allegations of retaliatory

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

motive unsupported by material facts will not be sufficient to state ... a claim under § 1983." (internal quotations omitted) ); *Hill v. Lappin*, 630 F.3d 468, 477 (6th Cir. 2010)(quoting *Harbin–Bey v. Rutter*, He has further failed to cite any case which would support the proposition staff promotions in a prison rise to the level of a civil rights violation. *Pahls v. Thomas*, 718 F.3d at 1226, 1227 (plaintiff bears the burden of showing an official violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct). Nor has Plaintiff cited any authority to establish staff promotions would chill a person of ordinary firmness from continuing to engage in any constitutional activity.

# Negativity Campaign

***20** Plaintiff, in support of this assertion, simply lists multiple generalized and conclusory allegations, without any factual specificity. He has neglected to explain, for example, how Defendants Lampert, Hargett, Ziegler, and Hobson began a campaign of vitriol, calumny, and contempt towards Plaintiff; how this campaign quickly transmuted from calumnious invective and vitriol to widespread opprobrium throughout the WDOC/WMCI; or, how this campaign has progressed into widespread inimical treatment. He has, once again, failed to cite any authority to establish these alleged actions would chill a person of ordinary firmness from continuing to engage in any constitutional activity. And the alleged statements, considering the same to be correctly stated, do not rise to the level of a constitutional violation as they in no manner or form create "terror of instant and unexpected death." *Northington v. Jackson*, 973 F.2d. 1518, 1524 (10th Cir. 1992). *See, also, Alverez v. Gonzales*, 155 Fed. Appx. 393, 396 (10th Cir. 2005)("Mere verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.' ")(quoting *Northington v. Jackson*, 973 F.2d. at 1524, and *Von Hallcy v. Clements*, 519 Fed. Appx. 521, 523 (10th Cir. 2013). Plaintiff, in addition to the fact he neglects to provide any details as to what was supposedly said about him, never claims he has been in terror of instant and unexpected death. The list of consequences of Defendants' allegedly unlawful actions in paragraph 335 of the amended complaint (and its 28 sub-paragraphs) fails to even once mention any "terror of instant and unexpected death." [Doc. 46, pp. 145, 146, 147 ¶ 335].

# Conduct Violation Reports

Plaintiff recites seven CVRs he was issued, each of which sets forth a rule which he supposedly violated. [Doc. 46, pp. 28, 29, 30 ¶ 142; pp. 30, 31 ¶ 151; pp. 31, 32 ¶ 153; pp. 34, 35 ¶ 160]. He argues he did not violate the rules stated in the CVRs, based on the fact, after the process for reviewing CVRs was correctly engaged in and followed, each was either dismissed or overturned. [Doc. 46, p. 34 ¶ 159]. He then concludes, without citing any factual support, the CVRs must have been issued out of a "retaliatory motive." [Doc. 46, pp. 28, 29, 30 ¶ 142; pp. 30, 31 ¶ 151; pp. 31, 32 ¶ 153; pp. 34, 35 ¶ 160].

Plaintiff's allegations do not support a retaliation claim. First, he admits the administrative process was followed, resulting in the dismissal of the CVRs. [Doc. 46, p. 34 ¶ 159]. The issuance of a conduct violation report, which is later dismissed, does not result in a violation of the First Amendment.

> In sum, plaintiff's allegations that he was charged with an offense, initially found guilty, and the guilty finding was overturned on administrative appeal evince no federal constitutional violation. His civil rights complaint based upon this utterly ordinary and harmless incident that has already been remedied is frivolous.

*Beauclair v. High*, 2015 WL 93636, *6 (D. Kan. Jan. 7, 2015).

Second, Plaintiff's subjective belief the CVRs were issued for retaliatory purposes is insufficient to rise to the level of a constitutional violation. "A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient." *Beauclair v. High*, 2015 WL 93636 *6 (quoting *Nielander v. Board of County Com'rs of County of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009). *See, also, Banks v. Katzenmeyer*, 645 Fed. Appx. at 773 n. 2. Third, Plaintiff has not set forth any specific facts establishing the CVRs would not have been issued "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

Finally, the recitation by Plaintiff of the numerous protected activities which he has pursued, [Doc. 46, p. 8 ¶ 43; p. 9 ¶ 45; p. 10 ¶ 49; p. 11 ¶ 52; p. 11 ¶ 55; p. 12 ¶¶ 59, 61; p. 13 ¶¶

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

65, 72], is a tacit, if not direct, admission the issuance of the CVRs did not have any "chilling effect" on his engagement in constitutionally protected activity.

# Security Threat Group Validation

Plaintiff acknowledges a security-threat-group investigation took place to determine if he was part of such a group. An appeal followed, at the conclusion of which he was given the opportunity to be removed from the STG validation by signing a Renunciation Statement. He declined. [Doc. 46, pp. 37, 38 ¶ 165(c); p. 42 165(ff); p. 51 ¶ 165(vvv); p. 53 ¶ 165(jjjjj); p. 65 ¶ 165(kkkkk) ]. Plaintiff then summarily concludes "[b]ecause all people involved in this joint endeavor came to the same erroneous conclusion, they must have had a meeting of minds of which fabricating false STG evidence against Plaintiff and/or falsely validating Plaintiff was the subject." [Doc. 46, p. 67 ¶ 171]. This allegation arguably has been made to support the conspiracy claim which Plaintiff has relinquished.[3] [Doc. 65, p. 2 ¶ A(2) ].

3 "Allegations of conspiracy may, indeed, form the basis of a § 1983 claim. *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.1994). However, a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants. *Id.* "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Id.* (quotation omitted)." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

***21** Even presuming, for discussion purposes, the intent was to state a retaliation claim based on the STG validation, such claim should be dismissed. First, Plaintiff cites no precedent for the proposition a security threat group determination which is upheld on appeal, and from which a prisoner refuses to take action to be removed, can result in a violation of the First Amendment. Second, his subjective belief the security threat group determination was issued for retaliatory purposes is insufficient to rise to the level of a constitutional violation. *Beauclair v. High*, 2015 WL 93636 *6 (quoting *Nielander v. Board of County Com'rs of County of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009). *See, also, Banks v. Katzenmeyer*, 645 Fed. Appx. at 773 n. 2. Third, Plaintiff has not set forth any specific facts establishing the determination would not have been issued "but for" his engagement in protected activities. Fourth, Plaintiff has not set forth any specific facts establishing the CVRs would not have been issued "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758. And finally, by Plaintiff's own admission, the issuance of the determination has not had any "chilling effect" on his engagement in any constitutionally protected activity. [Doc. 46, p. 8 ¶ 43; p. 9 ¶ 45; p. 10 ¶ 49; p. 11 ¶ 52; p. 11 ¶ 55; p. 12 ¶¶ 59, 61; p. 13 ¶¶ 65, 72].

# Grievance Procedure Process

Plaintiff acknowledges he has filed over 200 grievances, [Doc. 46, p. 9 ¶ 45], and then asserts specific complaints about a few of them, namely, he was not given copies of certain grievances; he was not given an envelope for a grievance; extensions were periodically granted to prison staff members, extending the time they had to respond to the grievances; and prison staff denied certain grievances. [Doc. 46, pp. 94–98 ¶ 222(k) ]. He summarily argues these actions took place as retaliation by certain Defendants. [Doc. 46, pp. 104, 105 ¶ 239].

Plaintiff has not provided a single case supporting the proposition failure to provide copies of grievances and attachments rises to the level of a First Amendment retaliation violation. He has further failed to provide any case support for his apparent assertion it is a constitutional violation to: (i) provide extensions of time to respond to prisoner grievances; (ii) deny grievances; or (iii) fail to provide envelopes. It is his burden to come forward with the supporting precedent to place the constitutional questions beyond debate, and he has clearly failed to do so.

There are additional reasons this allegation by Plaintiff lacks credence. First, his subjective belief the alleged grievance process violations occurred for retaliatory purposes is insufficient to rise to the level of a constitutional violation. *Beauclair v. High*, 2015 WL 93636 *6 (quoting *Nielander v. Board of County Com'rs of County of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009). *See, also, Banks v. Katzenmeyer*, 645 Fed. Appx. at 773 n. 2. Second, he has failed to set forth any specific facts establishing the alleged violations would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758. Third, by his own admission, the alleged grievance process violations certainly did not have any "chilling effect" on his engagement in any constitutionally protected activity, including the grievance process itself, and he hasn't shown it would have had such an effect on a person of ordinary firmness. [Doc. 46, p. 8 ¶ 43; p. 9 ¶ 45; p. 10 ¶ 49; p. 11 ¶ 52; p. 11 ¶ 55; p. 12 ¶¶ 59, 61; p. 13 ¶¶ 65, 72]. And finally,

> [w]hile [plaintiff] undeniably engaged in protected **activity-he has pursued a plethora of prison grievances and lawsuits over the years-that alone does not establish the requisite causal connection for his retaliation claim.** If it did, litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness. "Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity."

***22** *Strope v. Cummings*, 381 Fed. Appx. 878, 883 (10th Cir. 2010)(emphasis added).

# Retaliation Involving Public Records

Plaintiff alleges he was denied records requested under the Wyoming Public Records Act ("WPRA"), and certain records were redacted. [Doc. 46, pp. 11–122 ¶¶ 254–269]. He has however, once again, failed to point to any authority which supports his claim a failure to provide documents under the WPRA rises to the level of a First Amendment violation for retaliation. And there is a good reason for this failure of which twice he had been made aware, to wit, the WPRA provides the sole remedy for denial of public records in W.S. § 16–4–203(f): "Any person denied the right to inspect any record covered by this act may apply to the district court of the district wherein the record is found for an order directing the custodian of the record to show cause why he should not permit the inspection of the record." *JonMichael Guy v. Lampert, et al.*, 376 P.3d at 502; *Guy v. Lampert*, 362 P.3d at 338–339. *See, also, Manier v. Colorado State Board of Parole*, 2014 WL 7177402, *3 (D. Col. 2014) (unpublished) (dismissing public records act claim from federal court because the Colorado Open Records Act contains a provision almost exactly the same as W.S. § 16–4–203(f) ).

# Denial of Transfer Request

Plaintiff wanted a transfer to a different prison because "he was no longer comfortable" in his current prison assignment. [Doc. 46, p. 123 ¶ 271(a); p. 124 ¶ 271(i) ]. He does recognize, however, the stated reason for denial of his transfer request was the fact his safety was not at risk. [Doc. 46, p. 125 ¶ 271(u) ]. He then nevertheless summarily concludes his transfer request was denied for retaliatory purposes. [Doc. 46, pp. 122–192 ¶¶ 270–297].

There are a number of reasons Plaintiff's allegation denial of his transfer request was retaliatory fails to state a plausible claim.

First, prison officials are given great deference when making decisions about how to manage the prisons under their control.

> Courts must give great deference to the decisions of prison officials concerning the management of correctional facilities. In *Turner*, the Supreme Court established a rational relationship test for assessing the constitutionality of prison regulations and practices. The Court held that when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (internal quotation marks and citation omitted).

Second, Plaintiff does not have a protected interest requiring incarceration in a particular institution. *Meachum v. Fano*, 427 U.S. at 225, 228; *Milligan v. Archuleta*, 659 F.3d at1296; *United States v. Klein*, 589 Fed. Appx. at 911.

Third, it is Plaintiff's burden to come forward with the supporting precedent to place the constitutional question beyond debate, and he has failed to do so. *Stanton v. Sims*, 134 S. Ct. at 4, 5; *Pauly v. White*, 814 F.3d at 1075.

***23** And finally, Plaintiff has failed to provide any specific facts establishing denial of his transfer request would have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

# Cumulative Harassment

Plaintiff admits his litany of minor complaints, when considered alone, may not rise to the level of a constitutional retaliation. [Doc. 46, pp. 129–139 ¶¶ 298–306; Doc. 46, p. 129 ¶ 298]. He has, in addition, failed to provide any authority

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to support a conclusion any of his "minor" complaints could rise to the level of a First Amendment violation for retaliation, and has, once again, neglected to supply any specific facts to establish the alleged violations would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

# Retaliation through the Commissary

Plaintiff asserts Defendants Lampert, Hargett, and other unknown staff members significantly reduced the number of available commissary items, intentionally began selling commissary items of much poorer quality, and, downsized the commissaries throughout the WDOCs five facilities. [Doc. 46, p. 139 ¶ 309; Doc. 46, p. 139 ¶ 310; Doc. 46, p. 140 ¶ 312]. He summarily concludes the "motivation to bid out inferior or generic products and to downsize the commissaries is to retaliate against Plaintiff..." [Doc. 46, p. 140 ¶ 315].

Plaintiff has, once again, failed to provide any authority to support his apparent assertion managing the consumer goods distributed in prison commissary stores rises to the level of a First Amendment violation for retaliation. And, as has been routinely noted, he has failed to provide any specific facts establishing the alleged violations would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

# General Allegations

This list of additional allegations basically repeats the entirety of the allegations previously set forth previously in the amended complaint, and thus have been resolved by the previous discussion.

"Discrimination"

Plaintiff does not allege as part of his Equal Protection claim he is a member of an identifiable and protected group. His claim is rather specifically a "class-of-one" discrimination claim. [Doc. 46, p. 16 ¶ 93].

Equal-protection jurisprudence, is generally speaking, "concerned with governmental action that disproportionately burdens certain classes of citizens." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215, 1216 (10th Cir. 2011).

> But this is not always so; the equal-protection inquiry does not always relate to groups. Indeed, in *Village of Willowbrook v. Olech*, the Supreme Court carved out a "class of one" equal-protection claim; it held that a plaintiff may state such a claim by alleging that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam).
>
> "We have approached class-of-one claims with caution, wary of 'turning even quotidian exercises of government discretion into constitutional causes.' " *Kan. Penn Gaming*, 656 F.3d at 1216 (quoting *Jicarilla Apache Nation v. Rio Arriba Cty.*, 440 F.3d 1202, 1209 (10th Cir. 2006)).
>
> ***24** "It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the [allegedly] favored class." [quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004)].

*A.M. v. Holmes*, 830 F.3d 1123, 1166, 1167 (10th Cir. 2016).

"[A]t the heart of any equal protection claim must be an allegation of being treated differently than those similarly situated." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); *Taylor v. Roswell Independent School Dist.*, 713 F.3d 25, 54 (10th Cir. 2013); *Duncan v. Quinn*, 622 Fed. Appx. 735, 737 (10th Cir. 2015). And a plaintiff must "identify specific actions taken by particular defendants that could form the basis of an equal protection claim." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d at 532.

The Tenth Circuit has established a standard for class of one claims.

> The paradigmatic 'class of one' case, [ ] sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen....
>
> To prevail on this theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently. A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," and "wholly unrelated to any legitimate state activity[ ]". This

> standard is objective—if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations.

*Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (internal quotation marks and citations omitted). The Tenth Circuit has stated, with regard to the first element of the test, *i.e.*, others must be similarly situated in all material respects:

> [W]e have recognized a "substantial burden" that plaintiffs demonstrate others "similarly situated in all material respects" were treated differently and that there is no objectively reasonable basis for the defendant's action. *Jicarilla Apache Nation*, 440 F.3d at 1212 ("The requirement that a plaintiff show that similarly situated persons were treated differently is especially important in class-of-one cases." (quotation omitted) ); *see also Jennings*, 383 F.3d at 1214 ("It is [ ] imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class").
>
> This understanding is consistent with the practice of other circuits. *See, e.g., Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143 (2d Cir.2010) ("[P]laintiff [must] show that no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." (quotation omitted) ); *Cordi–Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("This requirement demands more than lip service. It is meant to be a very significant burden." (quotation omitted) ); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (requiring a class-of-one plaintiff to demonstrate that the comparable properties were "*prima facie* identical in all relevant respects").

***25** *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d at 1217–18. Indeed, the Tenth Circuit has further stated, when establishing others are similarly situated in all material respects, class-of-one plaintiffs must provide "a comprehensive ... canvassing of all possible relevant factors." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004). "It is ... imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." *Jennings v. City of Stillwater*, 383 F.3d at 1214.

Plaintiff asserts he is "similarly situated in every material respect to all incarcerated inmates." [Doc. 46, p. 7 ¶ 39]. He then proceeds to fill over eight pages with fifty-two paragraphs in an effort to establish his difference from all other prisoners. [Doc. 46, pp. 8–16 ¶¶ 43–93]. Indeed, as compared to other inmates who "maintained a low profile," [Doc. 46, p. 24 ¶ 128], Plaintiff refers to himself as "an extremely high-profile inmate."

> As a result of Plaintiff's robust legal endeavors, public criticism of the WDOC, pursuing the commissary issue, contacting myriad public officials and legal organizations, his unrelenting disposition in pursuing various public records, his profuse grievances, and the WDOC's adverse reaction/s to the same, he became *an extremely high-profile inmate* throughout the WDOC, and especially at WMCI."

[Doc. 46, p. 23 ¶ 120 (emphasis added) ]. He even boasts everyone in the prison system knows about him.

> A result of Plaintiff's high-profile status is that all (or nearly all) of the WDOC/WMCI staff knows who he is[.] ... Plaintiff commonly and unfailingly meets WDOC staff who he has never seen before but who can identify Plaintiff on sight, **evincing that Plaintiff is extremely high-profile and that his ostensible notoriety precedes him.**

[Doc. 46, pp. 23, 24 ¶¶ 123, 125 (emphasis added) ].

Plaintiff, by his own statements pointing to his "high-profile status" and "notoriety," significantly undercuts any conclusion he is "similarly situated in every material respect" to other inmates. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d at 1216. And he has completely failed to "identify specific actions taken by particular defendants that could form

the basis of an equal protection claim." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d at 532.

*Qualified Immunity by Defendant*

Each of Plaintiff's claims, as the preceding discussion clearly indicates, fail to overcome the presumption of qualified immunity. The conclusion is the same when the asserted claims are evaluated as alleged against each individual defendant. The particular defendants are grouped together under specific factual categories.

"Public Records"

Defendant Staiger is an ACA Coordinator. [Doc. 46, p. 4 ¶ 13]. The factual allegations against him involve denying Plaintiff access to public records. [Doc. 46, p. 112 ¶ 256(d); p. 118 ¶ 259(e); p. 120 ¶ 265(e); p. 121 ¶ 268(e); p. 122 ¶ 269(e) ]. Mr. Staiger is entitled to qualified immunity on these claims since the WPRA provides the sole remedy for denial of public records in W.S. § 16–4–203(f).

"Validation as a STG Member"

Defendant Caruthers is a Security Captain. [Doc. 46, p. 4 ¶ 14]. The key factual allegations against her are related to her role in investigating Plaintiff's status as a member of a security threat group. Plaintiff complains about a conversation Captain Caruthers had with another prisoner concerning him. [Doc. 46, p. 37 ¶ 165(c) ]. He also complains about a conversation she had with him about his transfer request. [Doc. 46, p. 123 ¶ 271]. The remaining allegations, which are many, are simply generalized conclusions (without actual facts) asserting Captain Caruthers was engaged in unlawful conspiratorial and retaliatory behavior.

***26** Captain Caruthers is entitled to qualified immunity. Plaintiff has failed to plead even a single, specific fact to establish any of her actions were done in a retaliatory manner, or she was personally involved in any alleged retaliation towards him. *Khalik v. United Airlines*, 671 F.3d at 1191. *See, also, Reece v. AES Corp.*, 638 Fed. Appx. at 777.

Defendant Phillips is a Security Lieutenant. [Doc. 46, p. 5 ¶ 19]. The factual allegations against him simply assert he received instructions regarding Plaintiff's STG validation, [Doc. 46, p. 41 ¶ 165(z)(ii) ]; he was in the same location with Plaintiff when pictures were taken of Plaintiff's tattoos, [Doc. 46, p. 42 ¶ 165(hh) ]; he did not inform Plaintiff he was under investigation for a STG validation, [Doc. 46, p. 42 ¶ 165(ii); p. 43 ¶ 165(ll) ]; and, he was part of an entire list of Defendants who allegedly failed to adequately investigate his STG affiliation and allegedly submitted information which he claims is false. [Doc. 46, p. 44 ¶¶ 165(tt); p. 48 ¶ 165(sss)(v) ]. The remaining allegations naming Defendant Phillips are simply generalized conclusions (without actual facts) he engaged in unlawful conspiratorial and retaliatory behavior. Plaintiff has once again failed to plead even a single, specific fact to establish any of the actions attributed to Defendant Philips were done in a retaliatory manner, or he was personally involved in any alleged retaliation. *Khalik v. United Airlines*, 671 F.3d at 1191. *See, also, Reece v. AES Corp.*, 638 Fed. Appx. at 777.

Defendant Church is a Security Sergeant. [Doc. 46, p. 5 ¶ 21]. The factual allegations against him assert he received instructions regarding Plaintiff's STG validation, [Doc. 46, p. 40 ¶ 165(o); p. 41 ¶165(z)(i) ]; he took pictures of Plaintiff's tattoos, [Doc. 46, p. 42 ¶¶ 165(hh), 165(jj) ]; he did not inform Plaintiff he was under investigation for a STG validation, [Doc. 46, p. 46 ¶ 165(kkk) ]; he casually asked Plaintiff questions, [Doc. 46, p. 43 ¶ 165(mm) ]; and, he, and an entire list of other defendants, failed to adequately investigate Plaintiff's STG affiliation. [Doc. 46, p. 44 ¶¶ 165(ss); p. 48 ¶ 165(sss)(vi) ].

Plaintiff has again failed to plead even a single, specific fact to establish any of the actions attributed to Defendant Church were done in a retaliatory manner, or he was personally involved in any alleged retaliation. *Khalik v. United Airlines*, 671 F.3d at 1191. *See, also, Reece v. AES Corp.*, 638 Fed. Appx. at 777.

Defendant Emigh is a Security Officer. [Doc. 46, p. 5 ¶ 25]. The only allegation against her asserts on or about June 23, 2016, she "attempted to suborn false information from an inmate (Mr. Niau) who was under extreme duress in an ad hoc attempt to gather information that pointed to Plaintiff being a drug dealer and STG member[.]" [Doc. 46, p. 74 ¶ 192]. Plaintiff then summarily concludes she did so for the following reasons: (i) "Defendant Emigh had a meeting of minds of which suborning and fabricating false STG evidence against Plaintiff was the subject[.]" [Doc. 46, p. 74 ¶ 192(e) ]; (ii) She and her co-conspirators' agenda to falsely validate Plaintiff as a STG member was assiduously done by design, and in a deliberate and concerted effort to retaliate..." [Doc. 46, p. 75 ¶ 192(f) ]; and (iii) "Defendant Emigh's primary motivation ... was purely retaliatory[.]" [Doc. 46, p.75 ¶ 196]. Plaintiff has again failed to plead even a single, specific fact

to establish any of the actions attributed to Defendant Emigh were done in a retaliatory manner, or she was personally involved in any alleged retaliation. *Khalik v. United Airlines*, 671 F.3d at 1191. *See, also, Reece v. AES Corp.*, 638 Fed. Appx. at 777.

***27** Defendant Hendricks is a Security Lieutenant. [Doc. 46, p. 5 ¶ 20]. The only factual allegations against him assert he "began screaming orders and accusing Plaintiff of lying." [Doc. 46, p. ¶ 300(i)(vi) ]. Lieutenant Hendricks is entitled to qualified immunity since mere verbal threats or harassment do not rise to the level of a constitutional violation unless they create terror of instant and unexpected death, which plaintiff has not asserted. *Northington v. Jackson*, 973 F.2d. at 1524, and *Von Hallcy v. Clements*, 519 Fed. Appx. at 523.

"Issuance of CVRs"

Defendant Lira is a Security Sergeant. [Doc. 46, p. 5 ¶ 22]. He issued a CVR to Plaintiff for failing to follow rules. [Doc. 46, p. 128 ¶ 142(c) ]. Plaintiff then summarily concludes the CVR was issued due to a retaliatory motive, [Doc. 46, p. 30 ¶ 151], based on his engagement in constitutionally protected activity. [Doc. 46, p. 32 ¶ 153(c) ].

Plaintiff also asserts Sergeant Lira "muscled-up" to him, perform[ed] an unnecessarily and extremely overzealous and rough pat search of Plaintiff," and began "mad-dogging" him. [Doc. 46, p. 132 ¶ 300(i)(iii)–(v) ].

Plaintiff has failed, as has been routinely noted, to provide any specific facts establishing the alleged violations, issuance of the CVRs, would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758. And finally, verbal threats or harassment do not rise to the level of a constitutional violation unless they create terror of instant and unexpected death, which plaintiff has not asserted. *Northington v. Jackson*, 973 F.2d. at 1524, and *Von Hallcy v. Clements*, 519 Fed. Appx. at 523.

Defendant Walker is a Security Sergeant. [Doc. 46, p. 5 ¶ 23]. He issued a CVR to Plaintiff for committing an act of fraud. He also supposedly, but accidently, gave Plaintiff's personal information to another inmate. [Doc. 46, p. 28 ¶ 142(b) ]. Plaintiff then summarily concludes the CVR was issued due to a retaliatory motive, [Doc. 46, p. 30 ¶ 151(b) ], based on Plaintiff's engagement in constitutionally protected activity. [Doc. 46, p.¶ 153(b) ].

Plaintiff has failed, as has been routinely noted, to provide any specific facts establishing the alleged violation, issuance of the CVR, would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758. And finally, verbal threats or harassment do not rise to the level of a constitutional violation unless they create terror of instant and unexpected death, which plaintiff has not asserted. *Northington v. Jackson*, 973 F.2d. at 1524, and *Von Hallcy v. Clements*, 519 Fed. Appx. at 523.

Defendant Stender is a Security Officer. [Doc. 46, p. 6 ¶ 26]. The sole and only allegation against him asserts he "fabricated false information in a staff report in a conspiratory [sic] attempt to get Plaintiff convicted of a CVR." [Doc. 46, p. 131 ¶ 300(h) ]. He allegedly did so for retaliatory purposes. [Doc. 46, p. 131 ¶ 300(h) ]. Plaintiff has failed, once again, to provide any specific facts establishing the alleged violation, issuance of the CVR, would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

Defendant Mehrens is a Security Officer. [Doc. 46, p. 6 ¶ 28]. He issued a CVR to Plaintiff for failing to perform work as instructed. Plaintiff summarily concludes the CVR was issued due to a retaliatory motive, [Doc. 46, p. 29 ¶ 142(f) ], based on his engagement in constitutionally protected activity. [Doc. 46, p. 32 ¶ 153(f) ]. Plaintiff has failed, once again, to provide any specific facts establishing the alleged violation, issuance of the CVR, would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

***28** Defendant Cook is a security officer. [Doc. 46, p. 6 ¶ 29]. He issued a CVR to Plaintiff for failing to comply with a written or verbal order.[Doc. 46, p. 29 ¶ 142(g) ]. Plaintiff summarily concludes the CVR was issued due to a retaliatory motive, [Doc. 46, p. 29 ¶ 142(g) ], based on Plaintiff's engagement in constitutionally protected activity. [Doc. 46, p. 32 ¶ 153(g) ]. Plaintiff has failed, once again, to provide any specific facts establishing the alleged violation, issuance of the CVR, would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

Defendant Leever is a Case Team Leader. [Doc. 46, p. 6 ¶ 30]. The only allegation against him asserts, while acting as a disciplinary hearing officer, he convicted Plaintiff of a CVR. [Doc. 46, pp. 132, 133 ¶ 300(j) ]. Plaintiff thus summarily concludes "Defendant Leever violated so many separate provisions of the established Policies when processing Plaintiff's CVR that it is utterly implausible that he did not engage in a meeting of the minds prior to convicting Plaintiff." [Doc. 46, p. 133 ¶ 300(j)(i) ]. This allegation arguably has been made to support the conspiracy claim which Plaintiff has relinquished. [Doc. 65, p. 2 ¶ A(2) ].

Defendant Brooks is an office support specialist. [Doc. 46, p. 6 ¶ 32]. She issued a CVR to Plaintiff for subjecting her to abusive and obscene language. [Doc. 46, p. 29 ¶ 142(e) ]. Plaintiff then summarily concludes the CVR was issued due to a retaliatory motive, [Doc. 46, p. 29 ¶ 142(e) ], based on his engagement in constitutionally protected activity. [Doc. 46, p. 32 ¶ 153(e) ]. Plaintiff has failed, once again, to provide any specific facts establishing the alleged violation, issuance of the CVR, would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

"Grievances"

Defendant Kennedy is a grievance manager. [Doc. 46, p. 5 ¶ 24]. Plaintiff asserts he obstructed the grievance process. [Doc. 46, p. 93 ¶ 222(h) ]. Plaintiff, however, as previously discussed, has filed over 200 grievances, and asserts specific complaints about a very small number of such grievances. The remainder of his allegations are simply generalized assertions without any specificity. He then summarily concludes Defendant Kennedy did the actions alleged for retaliatory purposes. [Doc. 46, p. 93 ¶ 222(h) ]. Plaintiff has failed, once again, to provide any specific facts establishing the alleged actions by Defendant Kennedy would not have occurred "but for" his engagement in protected activities. *Banks v. Katzenmeyer*, 645 Fed. Appx. at 772; *Dawson v. Audet*, 636 Fed. Appx. at 758.

Defendant Maramed is a security officer. [Doc. 46, p. 6 ¶ 27]. Plaintiff asserts, as he did with regard to Defendant Kennedy, Defendant Maramed he obstructed the grievance processes.[Doc. 46, p. 92 ¶ 222(g) ]. Such an allegation fails for the same reasons the same allegation was insufficient as regards Defendant Kennedy.

"General Allegations"

Defendant Murphy is a laundry supervisor. [Doc. 46, p. 6 ¶ 31]. The only and singular factual allegation against him claims he "provided false information in a staff report with the intent to cast Plaintiff in a negative light." [Doc. 46, p. 135 ¶ 300(r) ]. Plaintiff has again failed to plead even a single, specific fact to establish any of the actions attributed to Defendant Murphy were done in a retaliatory manner, or he was personally involved in any alleged retaliation. *Khalik v. United Airlines*, 671 F.3d at 1191. *See, also, Reece v. AES Corp.*, 638 Fed. Appx. at 777.

***29** Plaintiff's allegations against Robert Lampert, Director of WDOC; Jeffie Wiggins, Central Services Division Administrator; Donald Hargett, former Warden; Ruby Zeigler, Warden; Robert Hultz, Deputy Warden; Timothy Rysell, STG Investigative Captain; Seth Norris, Security Captain; Shawn Hobson, Security Captain, and Michael McManis, Security Lieutenant, [Doc. 46, pp. 3,4 ¶¶ 8–12, 15–18], are ubiquitous throughout the complaint. Defendants, in many instances, are lumped together with other Defendants in collective allegations which simply assert the exact same generalized and summary conclusions against all Defendants, without specific facts alleging who did what to whom.

Conclusory allegations are not sufficient to state a constitutional violation. *Jenkins v. Wood*, 81 F.3d at 994, 995; *Hyatt v. Board of Regents of Oklahoma Colleges*, 659 Fed. Appx. at 525.

The allegations in Plaintiff's complaint directed at these Defendants are fatally flawed as they fail to identify any specific "personal involvement" by any of them in any alleged constitutional violation, "and 'a formulaic recitation of the elements of a cause of action' will not suffice. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955." *Khalik v. United Airlines*, 671 F.3d at 1191; *Reece v. AES Corp.*, 638 Fed. Appx. at 777 (10th Cir. 2016). Dismissal on this basis alone of each of these Defendants in their individual capacity pursuant to Fed. R. Civ. P 12(b)(6) is appropriate. *Pahls v. Thomas*, 718 F.3d at1226; *Mitchell v. Maynard*, 80 F.3d at 1444; *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d at 1193.

*Tort Liability*

The sole statutory basis cited by Plaintiff in support of his complaint is 42 U.S.C. § 1983. It seems prudent, however, to point out why any state law claim also can not be a basis for liability on behalf of Defendants.

The Wyoming Governmental Claims Act (WGCA), Wyo. Stat. Ann. §§ 1–39–105 through 112,[4] governs all asserted state claims or causes of action against a Wyoming governmental entity and its employees. The Act grants absolute immunity to the State of Wyoming as well as all local government entities and their officials and employees unless such immunity has been waived by the Act. *Wyo. Stat. Ann. § 1–39–104(a)*. The Act establishes a “closed-ended” waiver under which immunity is the rule, and liability is the exception. Immunity is applicable unless expressly waived by the Act. *Rice v. Collins Communications, Inc.*, 236 P.3d 1009, 1016 (Wyo. 2010); *Garman v. Campbell County School Dist. No. 1*, 630 F.3d 977, 980 (10th Cir. 2010); *Routh v. State of Wyoming ex rel. Wyoming Worker's Compensation Division*, 952 P.2d 1108, *reh. denied* (Wyo. 1998); *Harbel v. Wintermute*, 883 P.2d 359, 363 (Wyo. 1994); *Worden v. Village Homes*, 821 P.2d 1291, 1295 (Wyo. 1991). A court “must strictly construe the statutory exceptions to immunity against potential claimants and, conversely, liberally construe the grant of immunity in favor of the governmental entity.” *Harbel v. Wintermute*, 883 P.2d at 364.

4 The exceptions to governmental immunity are summarized as follows:
1. negligent operation of motor vehicle, aircraft or watercraft. (Wyo. Stat. Ann. § 1–39–105);
2. negligent operation or maintenance of building, recreation area or park. (Wyo. Stat. Ann. § 1–39–106);
3. negligent operation of airports. (Wyo. Stat. Ann. § 1–39–107);
4. negligent operation of public utility. (Wyo. Stat. Ann. § 1–39–108);
5. negligent operation of public medical facilities. (Wyo. Stat. Ann. § 1–39–119);
6. negligence of public health care providers. (Wyo. Stat. Ann. § 1–39–110); and
7. tortious conduct of peace officers. (Wyo. Stat. Ann. § 1–39–112).
*Wyo. Stat. Ann. §§ 1–39–105* through–112.

***30** Any allegation by Plaintiff of a state law tort claim against Defendants does not fall within any enumerated exceptions to the immunity established by the Act.

> A tort claim not specifically authorized under the Act is barred. *Id.* (citing *Worden v. Village Homes*, 821 P.2d 1291, 1295 (Wyo. 1991)). The enumerated exceptions to sovereign immunity permit actions premised on negligent operation of certain governmental vehicles, § 1–39–105; negligent operation or maintenance of certain governmental facilities, § 1–39–106; negligent operation of airports, § 1–39–107; negligent operation of public utilities and services, § 1–39–108; negligent operation of public hospitals, § 1–39–109; negligent performance of health care providers employed by governmental entities, § 1–39–110; and tortious acts of peace officers, § 1–39–112.

*Hoff v. City of Casper–Natrona County Health Dept.*, 33 P.3d 99, 105 (Wyo. 2001).

And while it might appear the Defendants who are employed as correctional officers would be included in the exception of “tortious conduct of peace officers” as set out in Wyo. Stat. Ann. § 1–39–112, they, in fact, do not fall into the definition of “peace officers.” A “peace officer” is defined in Wyo. Stat. Ann. § 7–2–101(a)(iv), and correctional officers are specifically absent from the list.[5]

5 Wyo. Stat. Ann. § 7–2–101(a)(iv) lists those who qualify as peace officers as follows:
(iv) “Peace officer” means:
(A) Any duly authorized sheriff, under sheriff or deputy sheriff who has qualified pursuant to W.S. 9–1–701 through 9–1–707;
(B) Any duly authorized member of a municipal police force, a college or university campus police force or the Wyoming highway patrol who as qualified pursuant to W.S. 9–1–701 through 9–1–707;
(C) Game and fish law enforcement personnel qualified pursuant to W.S. 9–1–701 through 9–1–707; and:
(D) ... Agents of the division of criminal investigation appointed pursuant to W.S. 9–1–613 who have qualified pursuant to W.S. 9–1–701 through 9–1–707;

(E) Investigators and brand inspectors of the Wyoming livestock board who have qualified pursuant to 9–1–701 through 9–1–707:

(F) .... Any duly authorized arson investigator employed by the state fire marshal who has qualified pursuant to W.S. 9–1–701 through 9–1–707;

(G) Any superintendent, assistant superintendent or full-time park ranger of any state park, state recreation area, state archeological site or historic site who has qualified pursuant to W.S. 9–1–701 through 9–1–707, when acting within the boundaries of the state park, state recreation area, state archeological site or historic site, or when responding to a request to assist other peace officers performing their official duties;

(H) Any duly authorized detention officer in the performance of his duties and how as qualified pursuant to W.S. 9–1–701 through 9–1–707;

(J) Investigators employed by the Wyoming state board of outfitters and professional guides and qualified pursuant to W.S. 9–1–701 through 9–1–707, when enforcing W.S. 23–2–401 and 23–2–406 through 23–2–418 and board rules and regulations promulgated under W.S. 23–2–410(a)(ii);

(K) Any peace officer certified by another state who has been appointed as a special deputy sheriff of a Wyoming county pursuant to W.S. 18–3–602(c);

(M) Certified law enforcement officers of an adjoining state while responding to a request for assistance from a peace officer in this state pursuant to the "Law Enforcement Interstate Mutual Aid Act" or other lawful request; and

(N) The director and full-time staff instructors of the Wyoming law enforcement academy when duly appointed and acting pursuant to W.S. 9–1–633(b)[.] (There is no subsection (L).

***31** The inclusion of detention officers in the definition of peace officers may also appear to waive immunity for correctional officers, however, an in depth reading of the relevant statutes clearly indicates "correctional officers" are not "detention officers." The two types of officers are specifically distinguished by Wyoming statutes which define "detention officer" as "a person who is **employed by a county or municipality** on a full time basis to care for, supervise and control persons detained **in a jail or holding facility**[.]" Wyo. Stat. Ann. § 9–1–701(a)(iii)(2015)(emphasis added). A "correctional officer," in contrast, is a person **who is employed by the Wyoming department of corrections** on a full-time basis to care for, supervise and maintain custody of person confined in **Wyoming department of corrections institutions**[.]" Wyo. Stat. Ann. § 9–1–701(a)(xv)(2015)(emphasis added). "Detention officers" are specifically included as peace officers by Wyo. Stat. Ann. § 7–2–101(a)(iv)(H) which refers to detention officers as "[a]ny duly authorized detention officer in the performance of his duties who has qualified pursuant to W.S. 9–1–701 through 9–1–707." The reference language in § 7–2–101(a)(iv)(H) does not include Wyo. Stat. Ann. § 9–1–710 which sets out the separate and distinct qualifications for correctional officers. *Natrona Cnty. v. Blake*, 81 P.3d 948, 966 (Wyo. 2003)(dissenting opinion recognizing correctional officers are not peace officers, and therefore, would have immunity under the WGCA whereas defendant county sheriff did not).

Finally, Plaintiff has not complied with the procedural requirements of the Wyoming Governmental Claims Act as his amended complaint fails to include any allegation he has filed a governmental claim in compliance with the signature and certification requirements of the Wyoming Constitution. *Wyo. Stat. § 1–39–113(d)*.

> Among other things, the Wyoming Constitution and the WGCA require the filing of a notice of claim with the appropriate governmental entity, signed by the person asserting the claim, within a specified time period. Not only must these requirements be met, but a claimant must specifically plead compliance with these requirements. Failure to do so is fatal. Suits brought in Wyoming courts are routinely dismissed for want of jurisdiction if a claimant either fails to meet all conditions precedent or fails to plead compliance.

*Garman v. Campbell County School Dist. No. 1*, 630 F.3d at 980.

Any state law claims which Plaintiff may be attempting to assert against Defendants are barred by the Wyoming Governmental Claims Act.

## CONCLUSION

Plaintiff has failed to state a plausible claim for § 1983 relief against Defendants in both their individual and official capacity. It is, as well, "obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001)(quoting *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803, 806 (10th Cir. 1999)). Plaintiff has, in fact, already filed an amended complaint.

The Court, for the reasons discussed herein, FINDS Plaintiff has failed to state a claim upon which relief can be granted, thus the Motion to Dismiss by Defendants should be granted.

## ORDER

**IT IS THEREFORE HEREBY ORDERED:**

(a) the **Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)** by Defendants **is GRANTED with prejudice for failure to state a claim as to all claims EXCEPT the official capacity claims which are dismissed without prejudice**; and

(b) all pending motions, if any, are **DENIED as MOOT.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 8784492

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Benge v. Office Depot, LLC

United States District Court, E.D. California. | August 13, 2024 | Not Reported in Fed. Supp. | 2024 WL 3794038

**Document Details**

| | |
|---|---|
| standard Citation: | Benge v. Off. Depot, LLC, No. 2:24-CV-00749-DJC-DB, 2024 WL 3794038 (E.D. Cal. Aug. 13, 2024) |
| All Citations: | Not Reported in Fed. Supp., 2024 WL 3794038 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | California |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**

Attorneys and Law Firms (p.1)
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND (p.1)
All Citations (p.5)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3794038
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Christopher BENGE, individually, and on behalf of other members of the general public similarly situated, Plaintiff,
v.
OFFICE DEPOT, LLC, a Delaware limited liability company; Office Depot, Inc., a Delaware corporation; The ODP Corporation, a Delaware corporation; and Does 1 through 100, inclusive, Defendants.

No. 2:24-cv-00749-DJC-DB
|
Signed August 12, 2024
|
Filed August 13, 2024

**Attorneys and Law Firms**

Arby Aiwazian, Arman Marukyan, Elizabeth Parker-Fawley, Desiree Ruiz Alfaro, Lawyers For Justice, PC, Glendale, CA, for Plaintiff.

Hannah Victoria Schnell, Samuel Saman Sadeghi, Barbara J. Miller, Morgan, Lewis & Bockius LLP, Costa Mesa, CA, for Defendants Office Depot, LLC, The ODP Corporation.

ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

Daniel J. Calabretta, UNITED STATES DISTRICT JUDGE

***1** Plaintiff Christopher Benge brings his Class Action Complaint against Defendants Office Depot, LLC, Office Depot, Inc., and The ODP Corporation, along with 100 Doe Defendants, alleging that Defendants violated various California Labor Code provisions and California's Unfair Competition Law as a result. Defendants again seek dismissal, arguing that Plaintiff has failed to state a claim. For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss (ECF No. 17), but Plaintiff is GRANTED leave to amend one more time.

## BACKGROUND

### I. Factual Background

Plaintiff is a California resident who worked for Defendants. (*See* Second Am. Class Action Compl. for Damages (ECF No. 16) ¶¶ 5, 20 ("Second Amended Complaint" or "SAC").) Plaintiff was an hourly-paid, non-exempt Sales Advisor. (*See id.* ¶ 20.) Defendants are retailers who are in the business of operating and providing products and services through their retail stores and online platforms to sell office related supplies and services. (*See id.* ¶ 22.) Plaintiff generally alleges that Defendants violated California's Labor Code and some Wage Orders of the Industrial Welfare Commission by: (1) failing to pay overtime (*see id.* ¶¶ 51–59); (2) failing to provide meal breaks (*see id.* ¶¶ 60–73); (3) failing to provide rest breaks (*see id.* ¶¶ 74–85); (4) failing to pay the minimum wage (*see id.* ¶¶ 74–90); (5) failing to pay all unpaid wages upon discharge (*see id.* ¶¶ 91–98); and (6) failing to provide accurate wage statements (*see id.* ¶¶ 99–105). Finally, Plaintiff alleges that Defendants violated California's UCL because of the predicate Labor Code violations. (*See id.* ¶ 109.)

### II. Procedural Background

Plaintiff first filed his Class Action Complaint in Placer County Superior Court. (*See* ECF No. 1.) Defendants then removed the case to federal court. (*See id.*)

Following removal, Defendants filed their first motion to dismiss. (*See* ECF No. 8.) The parties briefed the motion to dismiss, but the Court subsequently vacated the hearing set for the motion and denied Defendants' motion without prejudice for failing to comply with this Court's Standing Order in Civil Cases, which requires the parties to meet-and-confer before noticing any motion for argument. (*See* ECF No. 11.) After issuing this minute order, Plaintiff filed his First Amended Complaint (ECF No. 12), which was replaced by the operative Second Amended Complaint (Second Am. Compl. (ECF No. 16) ("SAC")) following a joint stipulation (*see* ECF Nos. 13–14).

After agreeing to allow Plaintiff to amend his complaint, Defendants brought the instant Motion. (*See* ECF No. 17; *also* Mem. of P. and A. in Supp. of Defs.' Mot. to Dismiss Pl.'s SAC (ECF No. 17-1) ("Motion" or "Mot.").) Plaintiff timely filed his Opposition, and Defendants filed their Reply. (*See* Pl.'s Opp'n to Defs.' Mot. (ECF No. 19) ("Opposition" or "Opp'n"); Defs.' Reply in Supp. of Defs.' Mot. (ECF No. 20) ("Reply").) The Court heard oral argument on the matter where Attorney Desiree Alfaro appeared for Plaintiff, and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Attorney Samuel Saman Sadeghi appeared for Defendants. The matter is now fully briefed.

## DISCUSSION

### III. Legal Standard

***2** A party may move to dismiss for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). The motion may be granted if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)). If the complaint's allegations do not "plausibly give rise to an entitlement to relief[,]" the motion must be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("*Iqbal*").

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*"). But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *See id.* This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679.

### IV. Analysis

#### A. The Meal Break, Rest Break, Minimum Wage, and OvertimeWage Claims Fail to Adequately Plead a Labor Code Violation

##### 1. Legal Standard

In a seminal case dealing with minimum and overtime wage claims under the Fair Labor Standard Act ("FLSA"), codified in relevant part at 29 U.S.C. §§ 206(a)(1) and 207(a)(1), the Ninth Circuit "review[ed] [the plaintiff's] complaint to determine whether the allegations plausibly state[d] a claim that [the defendant] failed to pay minimum wages and overtime wages, keeping in mind that detailed facts are not required." *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) (citing *Twombly*, 550 U.S. at 555), *as amended* (Jan. 26, 2015). For a claim alleging a failure to pay overtime under the FLSA, the Ninth Circuit held that "to survive a motion to dismiss, a plaintiff ... must allege that she worked more than forty hours in a given workweek without being compensated for the overtime hours worked during that workweek." *Id.* at 644–45 (collecting cases). While recognizing that plausibility is still a context-specific inquiry, the Ninth Circuit explained that a "plaintiff may establish a plausible claim by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility." *Id.* at 645 (citing *Pruell v. Caritas Christi*, 678 F.3d 10, 14 (1st Cir. 2012)). The Ninth Circuit further explained that "at a minimum, a plaintiff asserting a violation of the FLSA overtime provisions must allege that she worked more than forty hours in a given workweek without being compensated for the hours worked in excess of forty during that week." *Id.* (collecting cases). However, the Ninth Circuit "decline[d] to make the approximation of overtime hours the *sine qua non* of plausibility for claims brought under the FLSA[ ]" because "most (if not all) of the detailed information concerning a plaintiff-employee's compensation and schedule is in the control of the defendants." *Id.* (citing *Pruell*, 678 F.3d at 15).

***3** In a recent unpublished memorandum opinion from the Ninth Circuit, it affirmed a district court's dismissal of claims for unpaid overtime, unpaid minimum wages, and rest break violations under the California Labor Code in light of *Landers*. *See Boyack v. Regis Corp.*, 812 F. App'x 428, 430 (9th Cir. 2020) (mem.) (non-precedential). The Ninth Circuit agreed that the complaint failed to state a claim under *Landers* for overtime and minimum wage claims, rest break violation claims, and claims related to failing to pay wages upon discharge. *See id.* at 430–31. Subsequently, California district courts, including in the Eastern District, have taken the Ninth Circuit's cues and dismissed claims under *Landers* for violations of California's Labor Code related to meal and rest break claims, *see, e.g., Perez v. DNC Parks & Resorts at Sequoia*, No. 1:19-CV-00484-DAD-SAB, 2020 WL 4344911, at *6 (E.D. Cal. July 29, 2020) (citing *Landers*, 771 F.3d at 646; *Boyack*, 812 F. App'x at 431), and overtime and minimum wage claims, *see, e.g., Turner v. LTF Club*

*Mgmt. Co., LLC*, No. 2:20-cv-00046-KJM-JDP, 2022 WL 1018498, at *5–6 (E.D. Cal. Apr. 5, 2022).

**2. Analysis**

Defendants argue that Plaintiff's first four causes of action are deficient in light of *Landers*. (*See* Mot. at 7–14.) The Court agrees.

**a. The Unpaid Overtime and Minimum Wage Claims**

As for the first and fourth causes of action, which bring a claim for unpaid overtime and unpaid minimum wages, respectively, Plaintiff argues that he states a Labor Code violation, noting that the Second Amended Complaint "alleges an example of a pay period where Plaintiff was not compensated overtime wages for all hours worked." (Opp'n at 5 (citing SAC ¶ 57).) The fourth cause of action does not include a similar allegation. (*See* SAC ¶¶ 86–90.)

Nevertheless, the single additional allegation that includes a specific time period is not enough to state a claim under the first cause of action because *Landers* "require[s] plaintiffs to draw on their memory and personal experience to develop factual allegations with sufficient specificity that they plausibly suggest that [the] defendant failed to comply with its statutory obligations under the FLSA." *Landers*, 771 F.3d at 643 (discussing *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013), which was relying on *Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013)). As in *Turner*, Plaintiff fails to "provide any meaningful detail to give a sense of when the alleged violations happened or how often they happened ...." *Turner*, 2022 WL 1018498, at *6. Instead, Plaintiff only alleges in his single representative allegation that he "was not compensated at an overtime rate for all time worked in excess of eight (8) hours per day, including work performed off-the-clock." (SAC ¶ 57.)

As a result, the Court GRANTS Defendants' Motion to Dismiss the first and fourth causes of action. (*See* Mot. at 7–10, 12–14.) Accordingly, the Court DISMISSES WITHOUT PREJUDICE Plaintiff's first and fourth causes of action.

**b. The Meal and Rest Break Claims**

Similarly, Plaintiff argues that the second and third causes of action, which bring meal and rest break claims, respectively, state Labor Code violations because Plaintiff alleges that there were daily violations and provides representative allegations for two weeks. (*See* Opp'n at 6 (citing SAC ¶¶ 31, 33, 67, 79).) However, as before, Plaintiff fails to "allege facts specifically identifying an instance where they were deprived of a meal or rest break." *Perez*, 2022 WL 411422, at *4 (citing *Landers* and *Boyack*).

For the second cause of action's meal break claim, Plaintiff vaguely alleges that "meal periods were either missed, shortened, taken late, and/or were interrupted." (SAC ¶ 67.) Similarly, for the third cause of action, Plaintiff only alleges that, for one week, he "worked more than six hours and did not receive two full uninterrupted paid, off-duty rest periods." (SAC ¶ 79.) Plaintiff alleges that this was because he had to "perform work duties including but not limited to, providing customer service such as answering questions and assisting customers and responding to business-related questions and instructions from supervisors." (*Id.*; *see also id.* ¶ 79 (same).) However, Plaintiff fails to state the approximate frequency of missed rest breaks because of customer service concerns and why these work duty tasks necessarily interfered with taking timely meal breaks in support of his allegation that there were violations on a "daily basis." (SAC ¶¶ 31, 33, 79.) *Compare with Perez*, 2022 WL 411422, at *5 (collecting cases). Again, the representative allegations in the Second Amended Complaint appear to be weeks selected at random. (*See* SAC ¶¶ 67, 79.) Such allegations do not "raise a claim of entitlement to relief," so " 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " *Twombly*, 550 U.S. at 558 (citations omitted).

***4** Therefore, the Court GRANTS Defendants' Motion to Dismiss the second and third causes of action. (*See* Mot. at 10–12.) The Court thus DISMISSES WITHOUT PREJUDICE Plaintiff's second and third causes of action.

**B. The Fifth and Sixth Causes of Action Also Fail to State a Claim Because They Depend on the First Four Causes of Action**

Plaintiff's only argument for the fifth cause of action was that "Plaintiff's SAC adequately alleges that Defendants failed to pay Plaintiff and the other class members for all hours worked at the applicable minimum, base, or overtime rate and for all meal and rest periods owed." (Opp'n at 7.) However, the fifth cause of action for violations of California Labor Code

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

sections 201, 202, and 203 depend on Plaintiff's allegation that he "was not paid at the time of separation all wages earned and unpaid throughout his employment, including but not limited to, minimum wages and overtime wages for time worked off-the-clock and meal and rest period premium payments for short, late, interrupted, and/or missed meal and rest periods." (SAC ¶ 95.) Because the Court concluded that Plaintiff failed to allege a plausible Labor Code violation, the fifth cause of action fails too. *See Turner*, 2022 WL 1018498, at *6.

Similarly, Plaintiff's sixth cause of action depends on the wage statements being inaccurate because Defendants "provided wage statements that did not reflect the time worked off-the-clock or all meal and rest period premiums earned." (SAC ¶ 101.) But the Court concluded that Plaintiff did not allege a Labor Code violation, so Plaintiff cannot allege an inaccurate wage statement claim. *See Perez*, 2022 WL 411422, at *8.

As a result, the Court GRANTS Defendants' Motion to Dismiss the fifth and sixth causes of action. (*See* Mot. at 14–16.) Accordingly, the Court DISMISSES WITHOUT PREJUDICE the fifth and sixth causes of action.

### C. The Seventh Cause of Action Fails to State a Claim Under the UCL

Plaintiff's seventh cause of action under the UCL "is predicated on Defendants' violations of multiple state laws, including Labor Code sections 203, 226, and 1174[.]" (Opp'n at 9.) Because the Court concluded that Plaintiff did not plausibly allege a predicate violation, the UCL claim necessarily fails. *See Turner*, 2022 WL 1018498, at *7.

Defendants also requested dismissal without leave to amend with respect to certain theories Plaintiff brings under the UCL. (*See* Mot. at 16–17; Reply at 10–11.) The Court agrees because "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999).

As a result, the section 203 claim must be dismissed without leave to amend under the UCL because it "would not 'restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.' " *Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389, 1401 (2010) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003)). "Section 203 is not designed to compensate employees for work performed[ ]" but is instead "intended to encourage employers to pay final wages on time, and to punish employers who fail to do so." *Id.* So too with penalties and damages under California Labor Code section 226, which are not restitutionary in nature. *See, e.g., Meraz-Valencia v. Westlake Royal Roofing, LLC*, No. 2:22-CV-00491-DAD-AC, 2023 WL 2541852, at *7 (E.D. Cal. Mar. 16, 2023) (collecting cases); *Gomez v. J. Jacobo Farm Labor Contractor, Inc.*, 334 F.R.D. 234, 267 (E.D. Cal. 2019) (same). And California courts have similarly dismissed UCL claims predicated on violations of California Labor Code section 1174(d), which only provides for civil penalties. *See, e.g., Byrd v. Masonite Corp.*, 215 F. Supp. 3d 859, 864–65 (C.D. Cal. 2016) (collecting cases). *Accord Dockery v. Citizens Telecom Servs. Co., LLC*, No. 2:21-CV-00416-TLN-CKD, 2023 WL 2752482, at *5 (E.D. Cal. Mar. 31, 2023).

### D. Plaintiff Is Granted Leave to Amend One Last Time

#### 1. Legal Standard

***5** Requests for leave to amend should be granted with "extreme liberality." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (quoting *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) (citation omitted)). When considering whether to grant leave to amend, a district court should consider several factors including undue delay, the movant's bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility. *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Of the *Foman* factors, prejudice to the opposing party carries the most weight. *Id.* (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)). Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend. *Eminence Capital, LLC*, 316 F.3d at 1052 (citing *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997)).

However, when the district court has already afforded a plaintiff an opportunity to amend the complaint, it has "wide discretion in granting or refusing leave to amend after the first amendment, and only upon gross abuse will [its] rulings be disturbed." *Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) (first quoting *Heay v. Phillips*, 201 F.2d 220, 222 (9th Cir. 1952) (alteration included); and then quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990)). "The district court's discretion to deny leave to amend is

particularly broad where plaintiff has previously amended the complaint." *Allen*, 911 F.2d at 373 (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)). In particular, a district court has been affirmed for denying leave to amend after only two opportunities to amend as " 'only upon gross abuse will [its] rulings be disturbed.' " *Rich*, 823 F.3d at 1209; *see also id.* ("Rich has already been afforded two opportunities to amend and is unable to show that the district court's order constitutes 'gross abuse.' " (quoting *Heay*, 201 F.2d at 222)).

### 2. Analysis

Here, except for Plaintiff's theory of restitution and recovery under the UCL based on California Labor Code sections 203, 226, and 1174(d), the Court cannot conclude that Plaintiff's causes of action "could not possibly be cured by the allegation of other facts." *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012). However, the Court warns Plaintiff that further amendment will not be granted without good cause after this Third Amended Complaint in light of the repeated failure to cure the previous deficiencies. *See Foman*, 371 U.S. at 182.

In particular, the parties have met-and-conferred regarding Plaintiff's allegations on at least two occasions and through two separate motions to dismiss. Yet, the allegations have not substantially changed. The only substantive changes are:

- Allegations including where Plaintiff worked for Defendants and how much he was paid (*compare* ECF No. 1-1 ¶ 20 *with* FAC ¶ 20; SAC ¶ 20);

- Allegations that Defendants inaccurately reported Plaintiff's hours worked "as approximately 45–73 hours per pay period[ ]" (*compare* ECF No. 1-1 ¶¶ 22–24; FAC ¶¶ 22–24 *with* SAC ¶¶ 22–26);

- Allegations that some of these violations "occurred on a daily basis[ ]" or "every time Plaintiff was entitled to receive a wage statement, from April 2022 to April 2023[ ]" (*compare* ECF No. 1-1 ¶¶ 31–33, 35,; FAC ¶¶ 30, 32, 34, 37 *with* SAC ¶¶ 31, 33, 35, 38); and

- Removing two causes of action from the Second Amended Complaint that were in the original Complaint and the First Amended Complaint.

***6** Thus, despite multiple attempts to bring attention to the deficient allegations, Plaintiff has nevertheless declined to substantively change his allegations.

### CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' Motion to Dismiss (ECF No. 17). Plaintiff is GRANTED leave to amend, except with respect to Plaintiff's theory of restitution and recovery under the UCL based on California Labor Code sections 203, 226, and 1174(d). Plaintiff has 21 days from the docketing of this Order to file his Third Amended Class Action Complaint for Damages. Defendants will have 21 days after the docketing of the Third Amended Complaint for Damages to file their next responsive pleading.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2024 WL 3794038

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Davis v. Unified School Dist. No. 500

United States District Court, D. Kansas. | August 15, 2013 | Not Reported in F.Supp.2d | 2013 WL 4401855

**Document Details**

| | |
|---|---|
| standard Citation: | Davis v. Unified Sch. Dist. No. 500, No. 12-2013-EFM, 2013 WL 4401855 (D. Kan. Aug. 15, 2013) |
| All Citations: | Not Reported in F.Supp.2d, 2013 WL 4401855 |

**Search Details**

| | |
|---|---|
| Jurisdiction: | Kansas |

**Delivery Details**

| | |
|---|---|
| Date: | March 3, 2026 at 9:04 PM |
| Delivered By: | Tyler Hartney |
| Client ID: | 106277.000003 |

**Outline**

Attorneys and Law Firms (p.1)
**MEMORANDUM AND ORDER** (p.1)
All Citations (p.6)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4401855
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

Charles DAVIS, Plaintiff,
v.
UNIFIED SCHOOL DISTRICT NO. 500 and Stephen Vaughn, Defendants.

No. 12–2013–EFM.
|
Aug. 15, 2013.

**Attorneys and Law Firms**

Alan V. Johnson, Derek L. Brown, Sloan, Eisenbarth, Glassman, McEntire & Jarboe, LLC, Topeka, KS, for Plaintiff.

Deryl W. Wynn, Teresa A. Mata, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendants.

**MEMORANDUM AND ORDER**

ERIC F. MELGREN, District Judge.

***1** Plaintiff Charles Davis filed suit against his current employer, Defendant Unified School District No. 500, and his supervisor, Defendant Stephen Vaughn, alleging retaliation in violation of Title VII of the Civil Rights Act [1] and 42 U.S.C. § 1981, as well as failure to timely pay overtime compensation in violation of the Fair Labor Standards Act. [2] Defendants move for summary judgment on all claims. Because no reasonable jury could find for Davis on any of his claims based upon the stark evidence presented, the Court grants Defendants' motion for summary judgment.

1 42 U.S.C. § 2000e *et seq.*

2 29 U.S.C. § 201 *et seq.*

**I. Factual Background** [3]

3 In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, related in the light most favorable to the nonmovant, Davis.

Plaintiff Charles Davis began his employment as a custodian with Defendant Unified School District No. 500 ("USD 500") in 1991. From 1993 to 2001, Davis was employed as a head custodian at Bethel Elementary School. During that time, he received several poor performance reviews from the school principal, which Davis believed were due solely to his resemblance to the principal's ex-husband. From 2001 to 2007, Davis worked as the head custodian at Wyandotte High School under the supervision of principal Walter Thompson and Joseph Herbin, Coordinator of Buildings and Grounds. Davis also accused Principal Thompson of retaliatory conduct, although he could not articulate a reason for the alleged animosity.

On July 25, 2007, an assistant principal at Wyandotte High School found Davis lying naked on his stomach on the school roof, and when asked what he was doing, Davis said that he was taking a break and getting some sun. Davis agreed with the assistant principal's written account of the encounter, although Davis contended that he was wearing underwear. In response to this incident on the roof, Principal Thompson recommended to the school district's Director of Human Resources, Defendant Stephen Vaughn, that Davis be terminated from employment. Vaughn investigated the incident and concurred with the termination recommendation. The School Board also concurred.

Davis exercised his right to a termination appeal before a hearing committee of two School Board members. The hearing committee recommended discipline less than termination in part because the committee believed Davis was acting under the influence of prescription drugs. The hearing committee submitted a written report with their recommendation. That report, written in 2007, stated: "Mr. Davis' supervisors describe the quality of Mr. Davis' work as average and/or marginal. Regarding his job performance, Mr. Davis contends that he has done the work requested but acknowledges that his work record is not without blemish." [4] The report went on to say that Davis's behavior and failure to notify his supervisor that he was impaired "raise[d] doubts about Mr. Davis' fitness to manage others," [5] but also stated that the hearing committee was "confident that Mr. Davis has the character and ability to rebound from this circumstance and [we] encourage him to do so." [6] Based on the report from the hearing committee, Davis was suspended without pay for thirty days and demoted from the head

custodian position to a custodian position. Head custodians and custodians have different duties and responsibilities, and receive correspondingly different compensation.

4 Report of Hr'g Comm., Doc. 23–1, at 34–35.

5 *Id.* at 39.

6 *Id.* at 40.

***2** On April 9, 2008, Davis filed an administrative charge with the EEOC, alleging that his demotion from head custodian was an act of racial discrimination. Vaughn investigated the complaint with assistance from USD 500's Human Resources Department and outside counsel, and submitted written responses to the EEOC charge. The EEOC issued a notice of dismissal and right to sue on Davis's complaints on August 25, 2008, but Davis did not pursue a civil lawsuit.

Since returning from his suspension without pay in August 2007, Davis has been employed as a custodian with USD 500. Davis began applying for numerous positions within USD 500, including head custodian positions, in November 2008. Each building within USD 500 has a head custodian. When a vacancy for head custodian arises, the Buildings and Grounds department, led by Herbin, prepares a request for the Human Resources Department to fill the position. The Human Resources Department then posts the head custodian job vacancy internally for two weeks, during which any current custodian can apply for the position online. According to Vaughn, "[USD 500's] practice is not to hire from the outside for Head Custodian," but to promote current custodians.[7] The Human Resources Department receives all of the internal job applications, reviews them, and forwards qualified applicants for the hiring manager's consideration. For head custodian positions, the hiring managers are Herbin and the school principal at the building with the vacancy. The principal, sometimes with Herbin's assistance, conducts interviews and selects the candidate to fill the head custodian vacancy. The Human Resources Department receives notification of the selection and extends the offer to the successful candidate. The School Board must approve of the selection, and does routinely approve the hires for head custodian vacancy. The Human Resources Department and Vaughn individually do not make promotion decisions within the Maintenance and Custodial Department. Vaughn has the authority to disapprove of a candidate selected for a position, but he has never disapproved a transfer or promotion recommendation submitted by Herbin.

7 Vaughn Dep., Doc. 23–2, at 10, 54.

Between November 24, 2008, and November 30, 2012, Davis applied for fourteen positions with USD 500. Many of these positions were head custodian vacancies. Herbin testified that for each head custodian vacancy, the building administrator or school principal made the hiring decision. Davis contends that Herbin was party to those decisions because USD 500's interrogatories indicated that the School Board's final decision to hire the successful candidates was made upon the recommendations of the building administrator or principal, Herbin, and the superintendent. Davis also takes issue with the fact that he did not receive notice that he had been "referred for consideration" for two of the head custodian positions that he applied for.

In November 2010, Davis filed a second EEOC charge alleging that USD 500 had retaliated against him by denying him overtime pay and a promotion to head custodian. The EEOC dismissed the charge. Davis filed a third EEOC charge in October 2011, in which Davis again alleged unlawful denial of a promotion due to retaliation, race, color, and age. The Human Resources Department provided information for USD 500's response to Davis's third charge, which was dismissed by the EEOC. After receiving his third right to sue letter, Davis initiated this lawsuit on January 6, 2012.

***3** Davis asserts two claims against USD 500 and one against Vaughn. One of Davis's claims against USD 500 alleges that the district failed to timely pay overtime compensation in violation of the FLSA. USD 500 compensates employees for hours worked in a week above 40 hours at a rate of one and one-half times the employees' regular wages. Custodians must receive approval for overtime from Herbin or the building administrator or principal at their work location. All USD 500 employees are required to report overtime work on a time sheet. If that time sheet is turned in no later than two days after the end of a pay period, the overtime compensation will be included in the next regularly scheduled paycheck. If, however, the time sheet is turned in more than two days after the conclusion of the pay period, the employee's overtime will not be processed and paid until the following pay period. Overtime compensation should be paid 15 to 30 days after submission of the time sheet.

In January 2010, Davis sent a complaint to the Human Resources Department, alleging harassment and retaliation and stating that Davis had not been paid overtime compensation due to him. Vaughn investigated the complaint

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and sent Davis a letter that acknowledge the contents of Davis's complaint and informed Davis that no pay records had been discarded and no overtime compensation was owed. Although discovery dealt with overtime payments made in January 2010, Davis now claims that he was not compensated for overtime that he submitted on January 9, 2012, until February 15, 2012, and that overtime submitted on October 12, 2012, was not compensated until November 30, 2012.

Davis's second claim against USD 500 alleges that the district unlawfully retaliated against Davis for opposing racial discrimination by failing to promote Davis to head custodian, in violation of Title VII and 42 U.S.C. § 1981. Finally, Davis alleges that Vaughn retaliated against Davis in violation of § 1981. Both USD 500 and Vaughn move for summary judgment on all claims. Because no reasonable jury could find for Davis on any of his claims, USD 500 and Vaughn are entitled to judgment as a matter of law.

## II. Legal Standard

### A. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[8] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[9] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[10] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[11] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[12] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[13]

8 Fed.R.Civ.P. 56(c).

9 *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1219 (10th Cir.2006).

10 *Thom v. Bristol–Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir.2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)).

11 *Garrison v. Gambro, Inc.,* 428 F.3d 933, 935 (10th Cir.2005).

12 *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197 (10th Cir.2000) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)).

13 *Life Wise Master Funding,* 374 F.3d at 927.

### B. Title VII of the Civil Rights Act of 1964

***4** Title VII of the Civil Rights Act prohibits an employer from treating a particular person less favorably than others on the basis of national origin.[14] To prove disparate treatment, a plaintiff must show that the defendant acted with a discriminatory intent or motive.[15] The parties' burdens of proof are subject to the tripartite *McDonnell Douglas* framework.[16] First, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination.[17] To make a prima facie case of retaliation, the plaintiff must prove the following: (1) that he engaged in protected opposition to unlawful discrimination, (2) that the plaintiff suffered materially adverse employment consequences, and (3) that a causal connection existed between the protected activity and the materially adverse action.[18]

14 42 U.S.C. § 2000e–2(a).

15 *See Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 986 (1988).

16 *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1972).

17 *Adamson v. Multi Community Diversified Servs., Inc.,* 541 F .3d 1136, 1145 (10th Cir.2008).

18 *Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 998 (10th Cir.2011).

If the plaintiff meets the initial burden of proof, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions.[19] If the defendant presents such a reason, the burden returns to the plaintiff who must show that the defendant's stated reason is a pretext for discriminatory intent.[20] To show pretext, the plaintiff "must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of

credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons."[21]

19 *McDonnell Douglas,* 411 U.S. at 802–03.

20 *See Elmore,* 58 F.3d at 530.

21 *Fye v. Okla. Corp. Com'n,* 516 F.3d 1217, 1228 (10th Cir.2008) (quotation omitted).

**C. 42 U.S.C. § 1981**

Section 1981 ensures to all persons the same right to make and enforce contracts "as is enjoyed by white citizens."[22] Employment contracts are among those protected under § 1981.[23] The standards for proving a violation of § 1981 are identical to those for proving a violation of Title VII.[24]

22 42 U.S.C. § 1981.

23 *See Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 (8th Cir.1975); *Backlund v. Hessen,* 904 F.Supp. 964, 967 (D.Minn.1995), *rev. on other grounds* 104 F.3d 1031 (8th Cir.1997).

24 *Crowe v. ADT Sec. Servs., Inc.,* 649 F.3d 1189, 1194 (10th Cir.2011).

**D. Fair Labor Standards Act**

The Fair Labor Standards Act was enacted to ensure safe, efficient, and fair working conditions for employees throughout the country.[25] The FLSA includes minimum wage and maximum hour requirements that apply to all employees who do not fall within the Act's exemptions.[26] For these nonexempt employees, the FLSA mandates that employees who work in excess of forty hours per week must be compensated for the overtime work at "a rate not less than one and one-half times the regular rate at which he is employed."[27] "The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends."[28] If, however, further calculation of compensable overtime is necessary, the employer must pay the excess overtime as soon as is practicable. "[I]n no event may payment be delayed beyond the next payday after such computation can be made."[29]

25 *See* 29 U.S.C. § 202.

26 *See* 29 U.S.C. § 213.

27 29 U.S.C. § 207(a)(1).

28 29 C.F.R. § 778.106.

29 *Id.*

## III. Analysis

Davis asserts three claims for relief: (1) against Vaughn for retaliation in violation of 42 U.S.C. § 1981; (2) against USD 500 for retaliation in violation of Title VII and § 1981; and (3) against USD 500 for delayed payment of overtime compensation in violation of the FLSA. The Court will address Defendants' motion for summary judgment on each claim in turn.

**A. Retaliation Claim Against Vaughn**

***5** Davis first asserts that Vaughn violated 42 U.S.C. § 1981 by engaging in retaliatory conduct. Specifically, Davis alleges that Vaughn retaliated against him by failing to ensure that Davis's applications for head custodian at Silver City Elementary School and Welborn Elementary School were "referred for consideration," and by failing to investigate whether the candidates selected for head custodian position were more qualified than Davis.

Turning first to Davis's prima facie case for retaliation, the parties agree that Davis's EEOC complaints constitute protected opposition to alleged discrimination. The parties disagree, however, as to whether Vaughn took any employment actions that were materially adverse to Davis. The Tenth Circuit has said that an employment action is materially adverse if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different job responsibilities, or a decision causing a significant change in benefits."[30]

30 *McGowan v. City of Eufala,* 472 F.3d 736, 742 (10th Cir.2006) (citation and quotation marks omitted).

In this case, Vaughn's failure to investigate the qualifications of successful head custodian applicants as compared to Davis does not fall within the definition of an adverse employment action. Furthermore, Vaughn presented records showing that Davis's application *was* referred for consideration for the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

head custodian position at Welborn Elementary School. Finally, Vaughn explained in an affidavit that, although he could not find any records showing which applications were submitted to Silver City Elementary School, the "referred for consideration" designation was something the Human Resources Department added more recently. Therefore, Davis's application may have been passed along for that head custodian position. Given the lack of evidence that Vaughn excluded Davis's application for the vacant head custodian position at Silver City Elementary School—let alone that a retaliatory animus motivated such exclusion—no reasonable jury could find by a preponderance of the evidence that Vaughn took adverse employment action against Davis. Because Davis cannot prove a prima facie case of retaliation against Vaughn, the Court grants Vaughn's motion for summary judgment.

**B. Retaliation Claim Against USD 500**

Davis also claims that USD 500 engaged in retaliatory conduct in violation of Title VII and § 1981 when it failed to promote Davis. USD 500 claims that Davis has not made a prima facie case for retaliation, and that Davis cannot rebut USD 500's claim that building administrators, rather than the district, made the hiring decisions in question. Turning to the first factor in proving retaliation, it is uncontroverted that Davis engaged in protected opposition to alleged discrimination when he (1) filed EEOC claims on April 9, 2008, November 3, 2010, and September 29, 2011; and (2) sent a letter to Vaughn on January 22, 2010, alleging harassment and retaliation. Second, failure to promote is a recognized adverse employment consequence. But Davis has not presented evidence sufficient to establish a causal connection between his protected activities and USD 500's failure to promote him.

***6** Davis alleges that four pieces of circumstantial evidence show USD 500's retaliatory animus. First, Davis points to the temporal proximity between his filing of this lawsuit on January 6, 2012, and USD 500's failure to hire Davis to fill head custodian positions at Welborn Elementary School and Frank Rushton Elementary School in February 2012. Davis also relies on the proximity of discovery requests sent on September 11, 2012, and USD 500's failure to hire Davis to fill a head custodian position at Fairfax Bridges School on October 18, 2012. But Davis's argument is tautological—he filed this lawsuit alleging retaliation, but now relies on actions that had not occurred at the time of filing to sustain his claims. As USD 500 noted, Davis filed multiple charges with the EEOC, increasing the temporal proximity to Davis's applications. Even accounting for the greater likelihood of temporal proximity, periods of several months separate Davis's other protected actions and his rejection from head custodian positions. Therefore, Davis cannot rely on temporal proximity to show causality.

Second, Davis argues that USD 500's "use of subjective criteria"—such as reports that successful candidates had "good work ethic," the "best skills for the job," and gave the "best interview for the position"—is evidence of a causal connection between Davis's protected activity and his failure to secure a promotion. But the Tenth Circuit recognizes the use of subjective criteria as circumstantial evidence of pretext rather than evidence that establishes a causal connection between protected activity and adverse employment actions.[31] Furthermore, USD 500 has rebutted any presumption of a retaliatory animus that may arise from the use of subjective criteria by explaining that the building administrators were at least involved (if not the sole decision-makers) in hiring decisions in the district. Consequently, even if USD 500 had objective hiring criteria, the individual building administrators would negate any uniformity the objective criteria sought to enforce. Therefore, USD 500's subjective hiring criteria are not indicative of a retaliatory animus.

31 *See Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1217 (10th Cir.2002) (stating that "evidence of pretext may include ... the use of subjective criteria").

The third piece of circumstantial evidence that supposedly shows a causal connection between Davis's protected activity and his lack of promotion are alleged inconsistencies and contradictions in the evidence regarding Herbin's role in selecting applicants. Assuming these inconsistencies and contradictions in fact exist, they serve only to cast doubt on Herbin's credibility. Davis has not explained how such errors show a causal connection in this case.

Similarly, Davis alleges that USD 500 provided false explanations for its actions, providing a fourth piece of circumstantial evidence of retaliatory animus. But the statements that Davis categorizes as "false explanations" are simply contested facts and opinions of witnesses, not false explanations for USD 500's failure to promote Davis. Absent evidence of an actual lie regarding the reason Davis was not promoted, Davis's alleged "false explanations" offer no evidence of a retaliatory animus.

***7** Because Davis failed to show a causal connection between his protected activity and USD 500's decision not to promote him, Davis has failed to show a prima facie case of retaliation. As a result, USD 500 is entitled to judgment as a matter of law.

**C. FLSA Claim Against USD 500**

Davis contends that USD 500 delayed payment of overtime compensation in violation of the FLSA. The FLSA itself does not address when overtime compensation must be paid.[32] The Department of Labor has published an interpretive bulletin on the issue, which reads in part:

32 *Brooks v. Village of Ridgefield Park,* 185 F.3d 130, 135 (3d Cir.1999).

> There is no requirement in the Act that overtime compensation be paid weekly.... Payment [however] may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next pay day after such computation can be made....[33]

33 29 C.F.R. § 778.106.

Section 778.106 "is not a regulation and does not have the effect of law."[34] Courts have held that section 778.106 is a reasonable construction of the FLSA such that "when the amount of the FLSA overtime payment cannot be made at the time of the regularly scheduled payday, payments are to be made as soon as is practicable thereafter."[35]

34 *Nolan v. City of Chicago,* 162 F.Supp.2d 999, 1004 (N.D.Ill.2001).

35 *Id.; see also Brooks,* 185 F.3d at 135–36.

Davis contends—allegedly for the first time[36]—that his overtime compensation was delayed twice in 2012. Specifically, Davis alleges that he submitted a timesheet requesting overtime compensation on January 9, 2012, and was not compensated until February 15, 2012, and that payment for a timesheet submitted on October 12, 2012, was not made until November 30, 2012. As support, Davis submitted copies of his timesheets and corresponding paychecks .[37] But the October timesheet shows overtime worked on October 16 and 17, as well as October 12. Davis's contention that the timesheet was faxed to USD 500 on October 12 must therefore be false. Davis offers no other evidence to show that the November 30, 2012, paycheck was not issued as soon as practicable. Additionally, the January timesheet has a handwritten note alleging that the timesheet was faxed to USD 500 on January 9, but includes no coversheet or date stamp as corroboration. And even if the January 9 timesheet was faxed on that date, payment on February 15 falls reasonably close to the 30–day estimate that Vaughn provided as necessary to compute and compensate overtime within the district. Consequently, the Court finds that no reasonable jury would conclude from the evidence presented that USD 500 violated the FLSA by unreasonably delaying the payment of overtime compensation for longer than necessary to compute Davis's due compensation. USD 500 is therefore entitled to summary judgment on Davis's FLSA claim.

36 Defendants note that Davis's Complaint appears to allege a violation of the FLSA sometime earlier than 2012. According to Defendants, discovery focused on Davis's overtime compensation from January 2010. Because the Court is resolving Defendants' motion for summary judgment on the merits, it need not address this procedural irregularity.

37 Custodial Overtime Report Form (Ex. WW), Doc. 34–24.

**IT IS ACCORDINGLY ORDERED** this 15th day of August, 2013, that Defendants' Motion for Summary Judgment (Doc. 22) is hereby **GRANTED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4401855

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**User Name:** Tyler Hartney
**Date and Time:** Tuesday, March 3, 2026 10:11 PM EST
**Job Number:** 277373741

## Document (1)

1. *Gutierrez v. Ericsson Inc.*

**Client/Matter:** 106277.000003

**Search Terms:**

**Search Type:** Natural Language

**Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| | -None- |

# Gutierrez v. Ericsson Inc.

United States District Court for the Central District of California

November 29, 2023, Decided; November 29, 2023, Filed

EDCV 23-1665-GW-SHKx

**Reporter**
2023 U.S. Dist. LEXIS 212803 *

Josue Gutierrez v. Ericsson Inc., et al.

**Subsequent History:** Dismissed by, in part, Motion denied by, in part, Request denied by *Gutierrez v. Ericsson Inc., 2024 U.S. Dist. LEXIS 32829 (C.D. Cal., Feb. 21, 2024)*

Settled by, Judgment entered by *Gutierrez v. Ericsson Inc., 2025 U.S. Dist. LEXIS 49504 (C.D. Cal., Mar. 18, 2025)*

**Counsel:** **[*1]** For Ericsson Inc., Delaware Corporation, Defendant: Nathan Norimoto, Duane Morris LLP, San Francisco, CA; Tatyana Shmygol, Victoria Rose Carradero, Duane Morris LLP, Palo Alto, CA.

For Josue Gutierrez, individually and on behalf of all others similarly situated, Plaintiff: Aubry Wand, LEAD ATTORNEY, Wand Law Firm PC, Long Beach, CA.

**Judges:** GEORGE H. WU, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE H. WU

## Opinion

**CIVIL MINUTES - GENERAL**

**PROCEEDINGS: IN CHAMBERS - FINAL RULING ON DEFENDANT ERICSSON INC.'S MOTION TO DISMISS AND STRIKE PLAINTIFF JOSUE GUTIERREZ'S FIRST AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT [20]**

Attached hereto is the Court's Final Ruling on Defendant's Motion [20]. Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The Court grants Plaintiff leave to amend by December 22, 2023 to cure the deficiencies noted.

**I. Background**

On June 22, 2023, Plaintiff Josue Gutierrez filed suit against Defendant Ericsson Inc. in the Superior Court of California, Riverside County, asserting individual, class, and representative action claims premised on various Labor Code violations. *See* Complaint, ECF No. 1-1. Defendant removed the action

to this Court on August 16, **[*2]** 2023. *See* Notice of Removal, ECF No. 1. Plaintiff amended his complaint on September 7, 2023, asserting nine causes of action for: (1) failure to provide meal periods; (2) failure to provide rest breaks; (3) failure to provide recovery periods; (4) failure to pay overtime wages; (5) failure to pay all wages due to discharged and quitting employees; (6) failure to furnish accurate itemized statements; (7) failure to indemnify employees for necessary expenditures incurred in discharge of duties; (8) unfair and unlawful business practices under *California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.*; and (9) penalties under the *Private Attorneys General Act ("PAGA"), Cal. Labor Code § 2698, et seq. See generally* First Amended Complaint ("FAC"), ECF No. 16.

According to the FAC, Plaintiff was employed by Defendant as a Tower Technician (a non-exempt position) from May 2019 to November 2022. *Id.* ¶ 6. On that basis, he seeks to represent a class of "[a]ll non-exempt employees of Ericsson who performed work for Ericsson in California during the statute of limitations period," as well as a subclass whose employment ended during the same period. *Id.* ¶¶ 11, 13. Plaintiff alleges that Defendant "has implemented common policies and practices that have resulted in systematic violations of California's Labor Code and the **[*3]** applicable Industrial Welfare Commission ('IWC') Wage Order(s) predicated on the failure to provide meal, rest, and recovery periods, and failure to provide compensation for missed and otherwise unlawful meal, rest, and recovery periods (i.e., premium pay), unpaid overtime wages, failure to pay all wages owed and due to discharged or quitting non-exempt employees, failure to furnish accurate itemized wage statements, and failure to reimburse employees for employment-related expenses." *Id.* ¶ 2.

Now before the Court is Defendant's motion to dismiss and strike Plaintiff's FAC, or in the alternative, motion for a more definite statement ("Mot."), ECF No. 2. Plaintiff filed an opposition ("Opp."), ECF No. 21, and Defendant filed a reply ("Reply"), ECF No. 22.

## II. Legal Standard

Under *Rule 12(b)(6)*, a court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.), amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001)*; *Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998)*. The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003)*.

Dismissal pursuant to *Rule 12(b)(6)* is proper only where there **[*4]** is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)*; *Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121-22 (9th Cir. 2008)*; *see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561-63, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). However, a plaintiff must also "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Johnson, 534 F.3d at 1122* (quoting *Twombly, 550 U.S. at 570*); *see also William O. Gilley Enters., Inc. v. Atlantic Richfield Co., 588 F.3d 659, 667 (9th Cir. 2009)* (confirming that *Twombly* pleading requirements "apply in all civil cases"). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ascroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed.*

2d 868 (2009) (quoting Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In its consideration of the motion, the court is generally limited to the allegations on the face of a complaint (including any documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." **[*5]** *See* *Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001)*; *Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994)*, *overruling on other grounds recognized in* *Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002)*.

"A court can only strike a statement in a pleading under Rule 12(f) if the statement is '(1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous.'" *In re Mortgages Ltd., 771 F.3d 623, 630 (9th Cir. 2014)* (quoting *Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 973-74 (9th Cir. 2010)*). In *Whittlestone*, the Ninth Circuit read the terms "immaterial" matter as "that which has no essential or important relationship to the claim for relief or the defenses being plead" and "impertinent" matter as "consist[ing] of statements that do not pertain, and are not necessary, to the issues in question." *618 F.3d at 974* (quoting *Fantasy, Inc., 984 F.2d at 1527*). Under *Whittlestone*, where material "relates directly to the plaintiff's underlying claim for relief" it cannot be considered "immaterial." *Id.* Because of its similar application, the Court believes that the same general rule should apply to a determination of whether matter is "impertinent." Where there is "any doubt as to whether the allegations might be an issue in the action, courts will deny" a *Rule 12(f)* motion. *In re 2TheMart.com, Inc. Secs. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000)*.

## III. Discussion

### A. Rounding Practice Allegations

The Court begins by addressing the sufficiency of Plaintiff's allegations that Defendant implemented an unlawful time rounding policy, as that theory is relevant to several of Plaintiff's causes of action. **[*6]** The Court would agree with Defendant that those allegations suffer from a lack of detail, particularly in light of the pleading standard set forth in *Landers v. Quality Communications, Inc., 771 F.3d 638 (9th Cir. 2014)*. In *Landers*, the Ninth Circuit "addressed the degree of specificity required to state a claim for failure to pay minimum wages or overtime wages" following *Twombly* and *Iqbal*. *Id. at 640*. The court noted that while "detailed factual allegations regarding the number of overtime hours worked are not required to state a plausible claim, . . . conclusory allegations that merely recite the statutory language are [in]adequate." *Id. at 644* (citation omitted). Thus, the court held that "to survive a motion to dismiss, a plaintiff asserting a claim to overtime payments must allege that she worked more than forty hours in a given workweek without being compensated for the overtime hours worked during that workweek." *Id. 644-45* (citations omitted). While *Landers* involved a federal overtime claim under the Fair Labor Standards Act ("FLSA") - a statute not at issue here — the issue in question here is what is needed to satisfy federal pleading standards, which apply to both an FLSA claim and the state law wage claims in this action. *See, e.g.*, *Tan v. GrubHub, Inc., 171 F. Supp. 3d 998, 1006 (N.D. Cal. 2016)* ("Although *Landers* discussed FLSA claims, its reasoning applies to California Labor Code claims **[*7]** as well."); *Shann v. Durham Sch. Servs., L.P., 182 F. Supp. 3d 1044, 1048 (C.D. Cal. 2016)* ("The pleading

standards set forth in *Landers* apply equally to Plaintiffs' state overtime, minimum wage, meal period, and rest break allegations.").

Under this standard, Plaintiff's rounding theory is insufficient as currently pled. "Even before *Landers*, courts generally held that a plaintiff alleging wage violations based on improper rounding 'must, at a minimum, allege what the rounding policy is. . . .'" *Archuleta v. Avcorp Composite Fabrication, Inc., No. CV 18-8106 PSG (FFMx), 2019 U.S. Dist. LEXIS 71443, 2019 WL 1751830, at *2 (C.D. Cal. Feb. 5, 2019)* (quoting *Mendez v. H.J. Heinz Co., No. CV 12-5652 GHK (DTBx), 2012 U.S. Dist. LEXIS 170785, 2012 WL 12888526, at *2 (C.D. Cal. Nov. 13, 2012)*). Here, Plaintiff has failed to do so. Instead of identifying what Defendant's alleged rounding policy is or providing any details in support of that contention, Plaintiff offers only conclusory allegations, such as that Defendant "implemented a[] uniform practice of unlawfully rounding the time worked by Plaintiff and Class members down and in Ericsson's favor." FAC ¶ 60. Those conclusory allegations do not clear the pleading threshold articulated in *Landers*. *See* *Archuleta, 2019 U.S. Dist. LEXIS 71443, 2019 WL 1751830, at *2-3* (finding similar "barebones allegations of 'uneven' or 'improper' rounding [to be] plainly insufficient").

Plaintiff attempts to shore up these deficiencies in his opposition brief by drawing tenuous connections between allegations contained in entirely different portions of the FAC, and referencing facts about Defendant's **[*8]** timekeeping and payroll software that are not contained anywhere in the FAC. To survive a motion to dismiss, Plaintiff must do more than that. Accordingly, the Court would find that Plaintiff's rounding theory as currently pled cannot serve as a "factual predicate" for his claims.

**B. Overtime Claim**

Turning to the particular causes of action at issue, Defendant moves to dismiss Plaintiff's fourth causes of action for failure to pay overtime. To state this claim, "Plaintiff must sufficiently allege that he and other class members worked in excess of eight hours in a particular work day, or in excess of forty hours in a particular work week, without receiving overtime wage compensation at the rate of one and one-half times their regular rate of pay." *Johnson v. Winco Foods, LLC, No. EDCV172288DOCSHKX, 2018 U.S. Dist. LEXIS 228735, 2018 WL 6017012, at *12 (C.D. Cal. Apr. 2, 2018)* (citing *Cal. Lab. Code §§ 510(a)*, *1198*).

In addition to his rounding theory, Plaintiff offers two theories in support of this claim: that Defendant failed to compensate him for off-the-clock time, and that Defendant failed to properly calculate his regular rates of pay. As to the off-the-clock theory, Defendant again invokes *Landers* and argues that Plaintiff has failed to allege at least one workweek during which he worked off-the-clock and was not paid overtime. Plaintiff responds **[*9]** by pointing to a paragraph in the FAC alleging that he "missed, took a late meal period, or otherwise performed work during a meal period (i.e., had an interrupted meal period) during the pay period of 6/1/2020-6/14/2020." FAC ¶ 27. While this allegation might meet *Landers*'s workweek requirement as to Plaintiff's meal period claim (putting aside the distinction between a workweek and pay period), it does not do the same for Plaintiff's overtime claim; alleging a missed or late meal period is not the same as alleging a denial of overtime pay. *See* *Landers, 771 F.3d at 646* ("Although these allegations 'raise the possibility' of undercompensation . . . , a possibility is not the same as plausibility."). Indeed, the screenshot of the wage statement contained in paragraph 27 of FAC indicates that Plaintiff *was* paid overtime during that pay period.

As to the regular rate of pay theory, the parties' dispute boils down to whether Plaintiff has sufficiently alleged that non-discretionary bonuses were improperly excluded from the overtime calculation. *See* *Ferra v. Loews Hollywood Hotel, LLC, 11 Cal. 5th 858, 869, 280 Cal. Rptr. 3d 783, 489 P.3d 1166 (2021)* ("[T]he term 'regular rate' in *section 7(a) of the FLSA* [and *section 510 of the California Labor Code*] accounts for not only hourly wages but also nondiscretionary payments."). Plaintiff identifies three pay periods in which he received **[*10]** a bonus and yet his overtime equaled exactly 1.5x his hourly rate. *See* FAC ¶ 65. Plaintiff further alleges that Defendant "implemented a performance plan under which employees are entitled to bonuses if they meet certain business objectives," and states that "[t]hese bonuses are non-discretionary." *Id.* ¶¶ 62-63. Although a closer call, the Court would find that these allegations fall short. Plaintiff is correct that the Court cannot at this stage resolve whether the bonuses were *in fact* discretionary; nevertheless, Plaintiff must adequately *allege* that to be the case. Conclusory allegations that the "bonuses are non-discretionary" coupled with references to an unspecific "performance plan" involving unspecified "business objectives" do not suffice. Similarly, Plaintiff does not explain what the "TC Bonus" he received was, nor whether/how it was part of Defendant's performance plan. As a consequence, the Court cannot reasonably conclude that it was a non-discretionary bonus. Plaintiff's reference to the "Star Achievers" program — which he alleges "is designed to incentivize worker productivity[] by offering remuneration such as gift cards and even up to televisions," FAC ¶ 64 - does **[*11]** not fare much better, as he fails to allege that these were not gifts and were non-discretionary. Although Plaintiff asserts new factual allegations regarding the Star Achievers program in his opposition brief, those allegations cannot be considered in evaluating the sufficiency of the FAC.

Accordingly, the Court would dismiss Plaintiff's fourth cause of action, with leave to amend to cure the above-noted deficiencies.

### C. Meal Period, Rest Period, and Recovery Period Claims

Defendant moves to dismiss Plaintiff's first, second, and third causes of action for failure to provide meal periods, rest breaks, and recovery periods, respectively. Plaintiff alleges that Defendant's "skeletal staffing policies caused Plaintiff and Class members to be overworked," resulting in missed meal periods. FAC ¶ 22. Plaintiff alleges that while working at the warehouse, "he was so busy performing his job duties (e.g., scheduling, operating forklifts and moving equipment, assisting tower crews with equipment, taking inventory, etc.), that he regularly could not take compliant meal periods." *Id.* Further, with respect to off-site cell tower work, Defendant "would often send crews of only three technicians. For **[*12]** safety reasons, this work would require technicians to work non-stop until the job was completed (e.g., one worker would need to stand below the tower while two others worked on the tower itself)." *Id.* These allegations, if more fully fleshed out, could plausibly allege that Defendant "undermine[d] [its] formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." *Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040, 139 Cal. Rptr. 3d 315, 273 P.3d 513 (2012)*; *see also* *Varsam v. Lab'y Corp. of Am., 120 F. Supp. 3d 1173, 1178-79 (S.D. Cal. 2015)*. But as they currently stand, Plaintiff's allegations do not provide sufficient detail to state a claim. For example, the FAC does not state which positions were understaffed,[1] the time period(s) during which the understaffing occurred, or what specifically Defendant did to discourage Plaintiff and class members from

---

[1] The FAC states only (as part of the class allegations) that 450 of the 556 class members are employed in "field and tower jobs." FAC ¶ 18. Which of those jobs were the subject of the complained-of staffing policies, and in what way, is unexplained.

taking breaks. Accordingly, the Court would dismiss Plaintiff's meal, rest, and recovery period claims, with leave to amend to cure these deficiencies.[2]

### D. Wage Statement Claim

Plaintiff's sixth cause of action asserts a violation of *§ 226(a) of the California Labor Code*, which requires that every employer furnish, at the time of each payment of wages, "an accurate itemized statement in writing showing," among other things, wages earned. *See* *Cal. Labor Code § 226(a)*. Defendant contends that this claim **[*13]** should be dismissed because it is entirely derivative of Plaintiff's other claims. But that argument appears to be foreclosed by the California Supreme Court's decision in *Naranjo v. Spectrum Sec. Servs., Inc., 13 Cal. 5th 93, 293 Cal. Rptr. 3d 599, 509 P.3d 956 (2022)*. *See, e.g.*, *Almanzar v. Home Depot U.S.A., Inc., No. 2:20-cv-0699-KJN, 2022 U.S. Dist. LEXIS 127724, 2022 WL 2817435, at *12 (E.D. Cal. Jul. 19, 2022)* ("The California Supreme Court's decision in *Naranjo* eliminates the anticipated defense that, as a matter of law, non-payment of meal and rest break premiums cannot form the basis of derivative claims under *§ 203* or *§ 226*."); *Sousa v. Walmart, Inc., No. 1:20-CV-00500-EPG, 2023 U.S. Dist. LEXIS 143346, 2023 WL 5278662, at *16 (E.D. Cal. Aug. 16, 2023)* ("The Court agrees with the reasoning in *Lingle* that 'the California Supreme Court's decision in *Naranjo* implies strongly that derivative meal and rest break claims are viable.'" (quoting *Lingle v. Centimark Corp., No. 222CV01471KJMJDP, 2023 U.S. Dist. LEXIS 66683, 2023 WL 2976376, at *4 (E.D. Cal. Apr. 17, 2023)*)). Indeed, Defendant has not cited any case decided after *Naranjo* that mentions it, let alone attempts to reconcile it with the theory Defendant puts forth here.

Defendant next argues that Plaintiff's claim fails for failure to plead a knowing and intentional violation of *§ 226(a)*. "To establish that Defendant's violation of *§ 226(a)* was 'knowing and intentional,' Plaintiff must demonstrate that Defendant was 'aware of the factual predicate underlying the violation[s].'" *Dawson v. Hitco Carbon Composites, Inc., No. CV16-7337 PSG (FFMx), 2017 U.S. Dist. LEXIS 221094, 2017 WL 7806358, at *6 (C.D. Cal. May 5, 2017)* (quoting *Novoa v. Charter Commc'ns, LLC, 100 F. Supp. 3d 1013, 1028 (E.D. Cal. 2015)*). Plaintiff contends that he has done so here, relying solely on his allegations that Defendant knowingly implemented a time rounding policy. However, as discussed above, **[*14]** the allegations to that effect are deficient. The Court would therefore agree with Defendant that Plaintiff has failed to adequately allege a violation of *§ 226(a)*, and accordingly would dismiss Plaintiff's sixth cause of action, with leave to amend.

### E. Reimbursement Claim

Defendant moves to dismiss Plaintiff's seventh cause of action for failure to reimburse business expenses. The elements for this claim are that Plaintiff: (1) made expenditures or incurred losses, (2) those expenditures/losses were incurred in direct consequence of Plaintiff's discharge of his duties, and (3) the expenditures or losses were necessary. *See* *USS-POSCO Indus. v. Case, 244 Cal. App. 4th 197, 205, 197 Cal. Rptr. 3d 791 (2016)* (quoting *Cassady v. Morgan, Lewis & Bockius LLP, 145 Cal. App. 4th 220, 230, 51 Cal. Rptr. 3d 527 (2006)*); *Nicholas Labs., LLC v. Chen, 199 Cal. App. 4th 1240, 1249, 132 Cal. Rptr.*

---

[2] To the extent Plaintiff relies on his rounding theory to save these claims, that argument fails for the reasons discussed above. To the extent Plaintiff relies on allegations that Defendant implemented a *de facto* on-duty break policy, Plaintiff has not pled enough facts in that regard.

3d 223 (2011); *see also* Arroyo v. Int'l Paper Co., No. 17-cv-06211-BLF, 611 F. Supp. 3d 824, 2020 WL 887771, *15 (N.D. Cal. Feb. 24, 2020); Tan, 171 F. Supp. 3d at 1005 ("Section 2802 claims are sufficiently pled where the complaint identifies the particular expenses that were not reimbursed and affirmatively alleges that the expenses were part of the plaintiff's job duties.").

The Court would find that Plaintiff has sufficiently alleged his reimbursement claim. Plaintiff alleges that he made expenditures or incurred losses in the form of (1) his cell phone bill and (2) gas/car mileage. *See* FAC ¶¶ 79-82. He also alleges that those expenditures were necessarily incurred as part of his job duties, because: (1) he was required **[*15]** to have and/or use his personal phone to be available to take calls and respond to requests, clock in and out, and take photos of serialized bar codes with a GPS coordinate of the photo; and (2) his supervisors instructed him to drop off equipment on his commute home using his personal vehicle. *See id.* Defendant's request for greater specificity than that (such as that Plaintiff plead specific instances when he needed to take such photos) goes above and beyond what is required at this stage.[3]

**F. Waiting Time Claim**

Plaintiff's fifth cause of action asserts a claim for waiting time penalties, which is derivative of his other claims. Because the Court has concluded that Plaintiff's reimbursement claim may go forward, Plaintiff's waiting time penalty claim may also go forward at least to the extent it is premised on that claim (as well as on any amended claims that survive a future motion to dismiss). Defendant also argues that Plaintiff has failed to allege that the failure to issue final paychecks was willful. The FAC, however, does allege willfulness, and the Court agrees with Plaintiff that the allegations to that effect (which are premised on the alleged failure to pay a single premium **[*16]** payment) are sufficient at this stage. *See* FAC ¶ 71.

**G. UCL Claim**

Defendant moves to dismiss Plaintiff's eighth cause of action for violation of the UCL, arguing that Plaintiff has failed to plead that he lacks an adequate remedy at law as is required under *Sonner v. Premier Nutrition Corp., 971 F.3d 834, 839 (9th Cir. 2020)*, and the cases applying it. Although the FAC seeks money damages for Defendant's alleged Labor Code violations, the FAC also alleges that "Plaintiff lacks an adequate legal remedy because equitable relief is more certain. In addition, the UCL has a statute of limitations period of four years, while Plaintiff's meal, rest, recovery and overtime claims, which form the predicate for his UCL claim, have a statute of limitations period of three years." FAC ¶ 90. The Court would find that Plaintiff's threadbare allegation that the UCL provides "more certain" relief is insufficient. Similarly, the Court does not believe that the one-year difference in the applicable statutes of limitations is sufficient to plead an inadequate legal remedy. *See* McFall v. Perrigo Co., No. 220CV07752FLAMRWX, 2021 U.S. Dist. LEXIS 109451, 2021 WL 2327936, at *15 (C.D. Cal. Apr. 15, 2021) ("Although Plaintiffs may prefer to maximize their ultimate recovery, the mere possibility that three years' worth of legal damages under the CLRA could be less than four years of equitable restitution **[*17]** under the UCL does not render three years' worth of legal damages inadequate, such that equitable restitution is warranted." (citing *Sonner, 971 F.3d at 844*)). *But see* Rivera v. Jeld-Wen, Inc., No. 21-CV-01816-AJB-AHG, 2022 U.S. Dist. LEXIS 142129, 2022 WL 3219411, at *6 (S.D. Cal. Aug. 9, 2022) ("[W]hen equitable relief is

[3] However, the Court would permit Plaintiff to amend his reimbursement claim to provide additional factual detail, should he choose to do so.

sought under the UCL in tandem with damages under a 'borrowed' statute, the Court finds that the shorter statutory limitations period of the 'borrowed' statute renders legal remedies available under that statute inadequate.").

Accordingly, the Court would dismiss Plaintiff's eighth cause of action, with leave to amend to provide additional allegations as to inadequacy of legal remedies.

### H. PAGA Claim

Defendant moves to dismiss Plaintiff's ninth cause of action for PAGA penalties on the basis that it derivative of Plaintiff's other, purportedly defective claims. However, because the Court has concluded that some of Plaintiff's other claims may go forward, the PAGA claims may also go forward to that extent.

### I. Striking Class Allegations

In the alternative, Defendant argues the Court should strike the class definition and class representative allegations from the FAC as defective. In this Court's view, that is not an appropriate application of *Rule 12(f)*. Under *Rule 12(f)*, the concerns Defendant identifies do not make Plaintiff's class-related **[*18]** allegations an "insufficient defense," "redundant," "immaterial," "impertinent" or "scandalous." To the extent other district courts have taken a different approach to this question, this Court does not join them. If Plaintiff's proposed class is too overbroad and/or dis-similar, he will struggle to achieve certification at the appropriate stage.

### IV. Conclusion

The Court would grant-in-part and deny-in-part Defendant's motion to dismiss as delineated above. The Court would grant Plaintiff leave to amend to cure the deficiencies noted herein.

---

End of Document